# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

Rachel Kaltenbach )
4843 Davidson Run Drive )   Case No. 2:23-cv-00187
Hilliard, OH 43026 )
individually and as )   Judge Michael H. Watson
parent and natural guardian of her children, )
 )   Magistrate Kimberly A. Jolson
 )
and, )
 )
Daniel Kamento )
2630 Westbreeze Drive )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of his children, )
 )
and, )
 )
Sarah Kamento )
2630 Westbreeze Drive )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of her children, )
 )
and, )
 )
Bethany Russell )
3154 Griggsview Court )
Columbus, OH 43221 )
individually and as )
parent and natural guardian of her children, )
 )
and, )
 )
Jennifer King )
4958 Hollow Oak Court )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of her children, )
 )
and, )

Tanya Ciomek )
5559 Fescue Drive )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of her children, )
)
    and, )
)
Leizl Zirkle )
1302 Lieuteant Drive )
Galloway, OH 43119 )
individually and as )
parent and natural guardian of her children, )
)
    and, )
)
Lisa B. Chaffee )
5981 Lakefront Avenue )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of her children, )
)
    and, )
)
Danae Gordin )
2232 Jarrow Drive )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of her children, )
)
    and, )
)
Donna Senchesak, )
c/o Law Office of Josh Brown LLC )
3979 Main Street )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of her children, )
)
       Plaintiffs, )
)
    v. )

Hilliard City Schools Board of Education    )
c/o Scott Scriven LLP.    )
250 East Broad Street, Suite 900    )
Columbus, OH 43215,    )
    )
Beth Murdoch, in her official capacity    )
as Board President for the Hilliard City    )
Schools Board of Education    )
c/o Scott Scriven LLP.    )
250 East Broad Street, Suite 900    )
Columbus, OH 43215,    )
    )
Kara Crowley, in her official capacity    )
as Vice President for the Hilliard City    )
Schools Board of Education    )
c/o Scott Scriven LLP.    )
250 East Broad Street, Suite 900    )
Columbus, OH 43215,    )
    )
Nadia Long, in her official capacity    )
as a Member of the Hilliard City Schools    )
Board of Education    )
c/o Scott Scriven LLP.    )
250 East Broad Street, Suite 900    )
Columbus, OH 43215,    )
    )
Zach Vorst, in his official capacity    )
as a Member of the Hilliard City Schools    )
Board of Education    )
c/o Scott Scriven LLP.    )
250 East Broad Street, Suite 900    )
Columbus, OH 43215,    )
    )
Brian Perry, in his official capacity    )
as a Member the Hilliard City Schools    )
Board of Education    )
c/o Scott Scriven LLP.    )
250 East Broad Street, Suite 900    )
Columbus, OH 43215,    )
    )
            Defendants.    )

## PLAINTIFF'S FIRST AMENDED COMPLAINT

For their First Amended Complaint against Defendant Hilliard City Schools Board of Education, the Plaintiffs state as follows:

### I. PARTIES

1. Each Plaintiff except one is a parent of one or more children currently enrolled in the Hilliard City School District. One Plaintiff is a parent whose child is a former student in the Defendant School District, and who suffered actual harm as a result of the Defendant's activities, as described below. (Collectively hereinafter "Parents").

2. Hilliard City School District is a local school district in Hilliard, Ohio ("District"). The District is a "local education agency" pursuant to 20 U.S.C. § 1232h(c)(6).

### II. INTRODUCTION

3. This case is about drawing a line where a public school's administrative authority ends and where a parent's constitutional fundamental right to direct the upbringing of their children begins. The Defendants crossed that line. This matter encompasses a question of whether we accommodate differences among ourselves as a pluralistic society, or we allow administrative authorities at public institutions to choose sides and impose one side's views on the other.

4. Plaintiffs are aware of multiple parents at the District whose children experienced severe trauma at school, while the parents were completely unaware that the child was diagnosed and treated for gender dysphoria at the school.

5.      In fact, school officials deliberately hid this information from these parents.

6.      One of these parents had the courage to become a Plaintiff in this matter. Another agreed to be a witness.

<u>Summary</u>

7.      The Superintendent of Defendant Hilliard School District met with a group of parents including some of the Plaintiffs. The Superintendent stated that under Title IX, although the law is unclear, a teacher would be putting himself/herself at great personal risk if a teacher were to "out a kid" to their parents without the child's permission, when the teacher is not a counselor.

8.      Obviously, the parents in that room were extremely upset that the school may deceive parents about information about their children.

9.      The Plaintiffs then asked the District in writing whether the Superintendent's statement was true. (See Ex. F).

10. The District, through its attorneys, responded:

> The default expectation is to include parents with regard to gender identity matters because the District's position is that is generally in the student's best interest, but that will not always be the case. For example, there may be a health or safety concern at issue. There also may be confidentiality issues involved because a student's conversations with a school counselor are almost always privileged under Ohio law.

(See Ex. G).

11.      Next, the Plaintiffs responded with another written communication, noting specific incidents that occurred at the school that seemed to contradict the District's

"default expectation." The incidents included:

    i.    The District asked students what pronouns they prefer when a teacher speaks to them as a student, and separately, what pronouns the student prefers when the teacher is speaking to the student's parents.

    ii.    District teachers are actively soliciting conversations about intimate affairs with children. Here, the Plaintiffs knew District teachers displayed "I'm Here" badges distributed by an activist group, the National Education Association's LGBTQ+ Caucus, through the local teacher's union (Hilliard Education Association). Thus, activist teachers are soliciting conversations from children about sexuality and gender dysphoria. (Discussed in more detail below).

    iii.    Further, the badges contained a QR code linking to "adult" material (as admitted by both the Superintendent and the local teacher's union) which a person of normal sensibilities would label as obscene and pornographic.

    iv.    Plaintiffs knew the District schools are displaying educational content about sexuality and gender which are not part of the District's standards/curriculum.

(See Ex. H).

12.    The Plaintiffs were also particularly concerned that the "health and safety" exception to the District's so-called "default expectation" may apply simply because the parent disagrees with a school official's viewpoint regarding treatment of gender dysphoria. This concern is reasonably based on materials published by the District's teacher's union. (Discussed in detail below).

13.    The District, through its attorneys, in writing, refused to answer these concerns. (See Ex. I).

14.    The Plaintiffs are left with no choice but to seek relief from this Court.

### III.    JURISDICTION AND VENUE

15.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1342, and to the extent applicable 1367 because this case involves the interpretation of a federal law (namely Title IX, Public Law No. 92-318, 86 Stat. 235 (June 23, 1972), codified at 20 U.S.C. §§ 1681–1688) (hereinafter "Title IX"), the effect of U.S. federal agencies' interpretation of that law, and the Plaintiff's rights pursuant to that federal law.

16.    Federal law affords this Court authority to grant Plaintiff's requested declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201. Also, see Fed. R. Civ. P. 57.

17.    Plaintiff is unaware of any pending state litigation on these matters.

18.    This Court should accept discretionary jurisdiction because this case involves harms caused by a disputed interpretation of a federal statute (i.e., Title IX) and various federal government agency interpretations related to it. This area of law should be decided by a federal court, rather than politically-minded bureaucrats and special-interest parties, for reasons of finality, fairness, and efficiency. A federal declaration will likely: 1) resolve the uncertainty of the District's obligations and the Parents' rights; 2) provide a convenient and authoritative forum for resolution of this dispute; 3) help resolve confusion and disagreements about Title IX; and 4) prevent future duplicative litigation (Plaintiffs are not asking for money damages currently, despite actual damages incurred, but state that this suit could prevent a lawsuit for damages in the future). Also, Plaintiffs have no available alternative remedies.

19.     The case is ripe for review because, as this First Amended Complaint will show, the harms discussed below are currently occurring and causing damages.

20.     This case involves an actual case or controversy and Plaintiffs have standing pursuant to 42 U.S.C. §1983, due to the District's unconstitutional interference with Plaintiff's right to familial integrity, right to direct the upbringing of their children (*Gruenke v. Seip*, 225 F.3d 290, 303-307 (3d Cir. 2000)), and the District's violations of law causing harm to Plaintiffs.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (d), because: 1) all Plaintiffs except one reside in this District; 2) the Plaintiff who does not live in this District consents to jurisdiction in this District; 3) the Defendant's primary place of business is in this District; and 4) "a substantial part of the events or omissions giving rise to all Plaintiff's claim occurred" in this District.

**IV.     STATEMENT OF FACTS**

<u>Origination of the Problem</u>

22.     The problem of confusion about Title IX began when federal bureaucracies began attempting to rewrite Title IX in defiance of Congress.

23.     In 2010, under the leadership of President Barrack H. Obama (who is affiliated with the Democratic Party) the U.S. Department of Education and Department of Justice issued a joint "Dear Colleague" Letter (Ex. A) interpreting Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a) ("Title IX") as saying that prohibition of discrimination "on the basis of sex" encompasses discrimination based on

"sexual orientation" or "gender identity."

24.     However, Title IX expressly permits sex separation on the basis of biological sex. Id., at § 1681(a). The two agencies relied on the U.S. Supreme Court's opinion in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) for their "interpretations" but they both went far beyond the calling of *Bostock*. *Bostock* is limited to termination of an employee, merely for identifying as homosexual or transgender. *Id.*, at 1737-38 (quoting 42 U.S.C. § 2000e-2(a)(1)). Also, *Bostock* expressly disclaimed any intent to interpret other federal or state laws that prohibit sex discrimination. *Id.*, at 1753.

25.     The "Dear Colleague Letter" set off a firestorm across the nation.

26.     Ohio Attorney General R. Michael DeWine (who is affiliated with the Republican Party) responded with his own letter, which promised a vigorous defense against the agencies' interpretation, which he believed violated Ohio law. (Ex. B). DeWine is the current Governor of the State of Ohio.

27.     The 2016 Republican platform devoted an entire section to Title IX, charging that the "distortion of Title IX to micromanage the way colleges and universities deal with allegations of abuse contravenes our country's legal traditions and must be halted." See: Republican National Committee, *Republican Platform 2016*, (2016) https://prod-cdn-static.gop.com/media/documents/DRAFT_12_FINAL%5b1%5d-ben_1468872234.pdf (last accessed January 15, 2023).

28.     Later, U.S. President Donald J. Trump (affiliated with the Republican Party) revoked President Obama's Executive Orders and guidance regarding Title IX. (Ex. C).

29. Once elected, current U.S. President Joseph R. Biden (affiliated with the Democratic Party) directed federal agencies to implement the Administration's policy of "prevent[ing] and combat[ing] discrimination on the basis of gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. 7023-25 (Jan. 20, 2021). This essentially reenacted the policies of federal agencies under the leadership of President Obama, only to a new extreme.

30. In addition to alternating interpretations of Title IX, recently, federal agencies under President Biden's leadership, have taken the matter to a whole new level.

    i. The U.S. Department of Education and the U.S. Equal Employment Opportunity Commission ("EEOC") issued interpretations of federal antidiscrimination law which contrasted with the language of Title IX itself.

    ii. The U.S. Department of Agriculture threatened to take away money from school districts based on the Department's perceived compliance with President Biden's Title IX Order. USDA, CRD 01-2022, Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing – Policy Update (May 5, 2022), https://bit.ly/3NuXnSx ("Memorandum").

    iii. The agencies issued further guidance in a "Fact Sheet" that similarly disregards Title IX's plain text. Among other things, the guidance warns that the Department can launch an investigation if a school prevents a student from joining an athletic team or using the restroom that corresponds to the student's gender identity, or if a student's peers decline

- 10 -

to use the student's "preferred pronouns." (Ex. D).

iv.    The EEOC Chair unilaterally issued a "technical assistance document" declaring, among other things, that requiring "transgender" employees to use the shower, locker room, or restroom that corresponds to their biological sex, or to adhere to the dress code that corresponds to their biological sex, constitutes discrimination under Title VII (which the EEOC administers and enforces in part), notwithstanding that the U.S. Supreme Court expressly decline to "prejudge" those issues in *Bostock.* Available at: https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender

31.    In response, twenty-two (22) states, including Ohio, sued the United States. The case is: *The State of Tennessee, et al. v. United States Department of Education, et al., E.D.Tenn.* No. 3:21-cv-00308, 2022 U.S. Dist. LEXIS 125684 (July 15, 2022). The Plaintiffs alleged that the agencies failed to follow proper procedures in promulgating these interpretations; that although the agencies labelled their work "interpretation" they were actually attempting to legislate something the U.S. Congress would likely never approve; and that the agencies' interpretations are inconsistent with the statutory text, regulatory requirements, judicial precedents, and likely violate the U.S. Constitution. *Id.,* docket #1, Complaint.

32.    The Court issued a preliminary injunction against enforcement of the agencies' interpretations on July 15, 2022. See: *id.* docket #86, Memorandum Opinion and

Order granting Plaintiff's Motion for Preliminary Injunction.

33.    Next, the Ohio State Board of Education passed a Resolution in December of 2022, rejecting and condemning the above-referenced federal agencies' interpretation of Title IX. See: CBS News Network, *Ohio Board of Education Approves Resolution Rejecting Federal Protections for LGBTQ Students*, (December 13, 2022). https://www.10tv.com/article/news/education/ohio-board-of-education-rejects-title-ix-lgbtq-protections/530-c2c3b3f0-f73d-468a-98bc-80414674a509 (last accessed January 15, 2023).

34.    This sequence of events highlights the profound difference in opinion held by government officials and the public as it relates to Title IX. Unfortunately, the law of Title IX is more a function of the U.S. President's political party affiliation than the words in the law itself.

35.    The agencies' interpretations put local school districts across the United States into a precarious position. The "interpretations" are highly controversial, to say the least. They are confusing. They are not based in any known historical practice or legitimate research. They are deeply offensive to a large segment of the American population—while they are adamantly demanded by another.

36.    This Court should not tolerate a situation where a federal statute is politically charged and depends entirely on the political party of the U.S. President. This is not a political question, this is a matter of interpretation of a federal statute.

- 12 -

<u>The Question</u>

37.     One of the tragic consequences of the perversion of Title IX is the notion

that schools *must* hide from parents their own children's symptoms of gender dysphoria

manifested at school.

38.     The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5-TR")

defines "gender dysphoria as follows:

> A marked incongruence between one's experienced/expressed gender and
> assigned gender, of at least six months' duration, as manifested by at least
> two or more of the following:
>
> - A marked incongruence between one's
>   experienced/expressed gender and primary and/or secondary
>   sex characteristics (or in young adolescents, the anticipated
>   secondary sex characteristics)
>
> - A strong desire to be rid of one's primary and/or secondary
>   sex characteristics because of a marked incongruence with
>   one's experienced/expressed gender (or in young adolescents,
>   a desire to prevent the development of the anticipated
>   secondary sex characteristics)
>
> - A strong desire for the primary and/or secondary sex
>   characteristics of the other gender
>
> - A strong desire to be of the other gender (or some alternative
>   gender different from one's assigned gender)
>
> - A strong desire to be treated as the other gender (or some
>   alternative gender different from one's assigned gender)
>
> - A strong conviction that one has the typical feelings and
>   reactions of the other gender (or some alternative gender
>   different from one's assigned gender)
>
> - The condition is associated with clinically significant distress

- 13 -

or impairment in social, occupational, or other important areas of functioning.

39.     Proponents of the Title IX interpretation in effect when a Democratic Party president is elected argue, *inter alia*, that the federal agencies' interpretation forbids the "outing" of students. "Outing" is the public revelation of another's "gender identity" or sexual preferences identity. Their argument (presumably held by the District in this case) apparently goes as follows: "Under FERPA [the Family Educational Rights and Privacy Act] you can request a change in your name and gender marker on school records. A school that refuses to change your name and gender marker is outing you to those who examine the records, and consequently violating your privacy." See: Justia, *Transgender Rights at School*, (October 2022).

https://www.justia.com/lgbtq/youth/transgender-rights-school/ (last accessed January 15, 2023).

40.     Proponents of the interpretation in effect when a Republican Party president is elected argue, *inter alia*, that the law provides parents with constitutional rights to know what treatment their child is undergoing at school and to have access to mental health information gathered by the school about their child. Also, they argue that Title IX provides no right, and the law plainly prohibits school employees from probing children in private, secretive conversations about sex, religious beliefs, or to perform analysis, or evaluation of items, such as sex behaviors or attitudes, mental or psychological problems of the student or student's family, and religious practices,

- 14 -

without explicit parental consent and knowledge.

<u>Treatment of "Outing" at Hilliard Schools</u>

41.     Several Hilliard District parents, including some of the Plaintiffs, held a meeting with the District Superintendent David Johnson on or about July 19, 2022.

42.     In that conversation the Superintendent was asked whether a teacher is at liberty to disclose to parents, that their child seeks to identify as a different name than the one they are registered with or identify as a different gender than their biological gender.

43.     The Superintendent answered that the "law is unclear" but that, pursuant to Title IX, a teacher would be putting "his/herself at great personal risk" if teacher were to "out a kid" to their parents without the child's permission, when the teacher is not a counselor.

44.     Since the law is apparently "unclear," on August 15, 2022, the Parents, through legal counsel, wrote a letter to District legal counsel asking the following:

> The Parents are naturally concerned [with the Superintendent's comments on Title IX] given that this is a prominent national issue. The practice of hiding symptoms of gender dysphoria from parents led to currently ongoing lawsuits in Massachusetts, Florida, Wisconsin, Kansas, Virginia, and Maryland. Several states adopted policies that would seem to allow school officials to hide gender dysphoria symptoms from parents. For example, in Maryland, a lawsuit is currently pending over the Maryland State Department of Education guidelines which specifically advise school officials to hide symptoms of gender dysphoria from parents. In California, a person named Jessica Konen sued a school for allegedly manipulating and encouraging her daughter to "transition." At Charles F. Patton Middle School in Pennsylvania, emails were made public of staff members specifically stating that they will use different pronouns when talking to parents about their child. There are rumors these types of activities are currently

- 15 -

occurring at Hilliard City Schools—and no doubt they could occur.

Thus, the Parents feel they have a right to a clear, unambiguous answer, as to whether the school will require school officials to notify parents when their child manifests symptoms of gender dysphoria (or symptoms of anything else) at school, and what specific exceptions may apply.

(See Ex. F).

45.     The District responded on September 14, 2022. (See Ex. G). Essentially, the District said that its "default expectation" is to inform the parents, but there may be exceptions for matters of health and safety and confidentiality of counseling. Id.

46.     The Parents responded with a follow-up letter on September 16, 2022. (See Ex. H). First, the Parent's second letter pointed out that there is no such thing as a "default expectation." There is either an enforceable policy or there is not. This is clearly an effort by the District to deflect the question. Id.

47.     Second, the Parent's second letter identified three real-life occurrences—*not hypothetical scenarios*—that contradicted the District's stated "default expectation." The Parent's second letter asked for a response to questions which logically flow from these three occurrences. Id.

48. The Parent's second letter said:

In addition to the Superintendent's statement and a host of other items, there are a few other items that are causing serious concerns among parents that I want to point your attention toward. The Parents' concern is that there are activists within the schools in the District who are actively undermining the District's standards and the rights of parents to direct the upbringing of their children. The Parents have a right to know if the following acts are part of the District's standards, whether it violates the District's policies,

- 16 -

and whether these items violate the Parents' rights to control the upbringing of their children.

49.     The Parent's second letter first brought this occurrence to the District's

attention:

> **Occurrence 1:     Survey Questions**
> I possess direct evidence that teachers asked children—in a written survey (that I have a copy of) what pronouns a child prefers at school . . . *and in a different, subsequent question,* the survey asked what pronouns the student prefers the teacher use when speaking to parents. Since this was class-wide, it was not limited to situations involving health and safety, abuse, or confidentiality.

50.     The Parent's second letter brought this second occurrence to the District's

attention:

> **Occurrence 2:     "I'm Here" Badges**
> I am also aware that some Hilliard District teachers—not counselors— are wearing so-called "I'm Here" badges that identify particular teachers as a "safe person." The badge is accompanied by a holder that says "If you are not a safe person or do not support LGBTQ+ youth or issues, please do not wear or display the 'I'm Here' badge."
>
> That badge and the accompanying badge holder is distributed by the local teacher's union and emanates from the NEA-LGBT+ Caucus. This badge, and the holder that the badge came in, has a QR code linking to material giving instruction on sexual positions and suggested books that are not part of the District's standards. The Superintendent acknowledged in writing the material is "adult" material. The QR code can be scanned by students from far away and a student testified at a recent Hilliard School Board meeting that she was given one of these badges (she held one of the badges up at the Board meeting).
>
> The union admits the intention of the badge is to attract discussion from children about personal, intimate sexual matters—which will allow teachers (not counselors) to know who the most vulnerable children in Hilliard School District are. I have an email from the President of the Hilliard teacher's union, Linna Jordan, basically doubling down and

defending her dissemination of this badge. It also came to my attention that President Jordan was personally passing out sexual literature and/or badges last week at Davidson, and the President was asking people if they were "friend or foe" before giving the materials out.

51. The Parent's second letter brought this third occurrence to the District's

attention:

**Occurrence 3:    Displays of Sexual Content to Children, at School**
I am also aware of materials posted by a teacher, at a school, that contain educational materials about sexual materials that are not part of the district standards. I have a copy of the bulletin board. It has definitions of sexual items which, I am guessing, are not part of the District's standards.

52. Finally, the Parent's second letter asked the following question, based on

the three issues brought to the District's attention:

**Follow Up Questions**
So hopefully, you can understand why the parents are concerned about ideological and political activism at this District that would undermine parental rights. It seems the teacher's union and President Linna Jordan in particular, are actively organizing an effort to educate students in materials that are not part of—and perhaps contrary to—the District's standards. Meanwhile, these materials label certain people including parents, teachers, and school officials as "unsafe." They are doing so in partnership with an organization with tremendous resources: the NEA and its LGBTQ+ Caucus.

Thus, the Parents respectfully request unambiguous answers to the following questions:

1. Was the Superintendent's statement about "outing a kid" consistent with the policies of the Hilliard School District? We would like a direct answer.

2. What is the definition of a "default expectation" as referred to in your letter? And are there consequences for teachers who ignore the "default expectation" and use different pronouns with children than when talking to the childrens' parents (excluding situations of abuse,

confidential counseling, or similar situations)?

3. What are the definitions of "health and safety concerns" as it relates to persons who "are not a safe person?"

   a. Teachers are disseminating materials that say a person who does not support LGBTQ+ youth or issues is an "unsafe person." As a lawyer, you know that Americans have a right to know what conduct will result in legal consequences (i.e., the void for vagueness doctrine). Thus, is the District's policy that a person (such as a parent, teacher, etc.) who is "not a safe person" by virtue of their perceived lack of "support for LGBTQ+ issues" qualify as "health and safety concern?"

   b. In particular, will the district take a parent's opinions, thoughts, utterances, religious precepts, etc. into consideration as a "health and safety concern?" Should parents know that certain expressions could shut them out from information about their children learned at the District? Specifically, will the District take parent's expression related to so-called "gender-affirming treatment" into consideration?

4. Do the two questions presented to students last month—in writing—violate school policy (i.e., asking for a student's preferred pronouns and then asking the student what pronouns they want teachers to use when speaking to parents)?

53. The District's response refused to answer the Parent's questions asked in the Parent's second letter, complaining: 1) the request had "quadrupled in size"; 2) that the District was aware that the Parent's Legal Counselor had spoken to the Parents about potential litigation at a public meeting; and 3) that the question of whether Parent's "various hypothetical would conform or violate" Board Policy could be answered by reviewing the Board's policies online (the Parent's second letter contained no hypotheticals, but the three above-referenced real occurrences at the District). (See Ex. I).

54. Thus, the District explicitly refused, in writing, to state—directly to a large group of the District's parents—whether three actual occurrences at the District violated their policy or not.

55. District School Board Member Beth Murdoch proposed an addition to the District Services Policy in September of 2022 that would include the following language:

> all health-related information about a student must be shared with the student's parent(s) or guardian(s). It is not Hilliard City School District policy to hide or keep information from a student's parent(s) or guardian(s).

See: Ohio Press Network, Jack Windsor, *I Would Urge you Do That Hilliard Superintendent Says to Policy Change*, October 10, 2022.

https://www.theohiopressnetwork.com/news/ohio/i-would-urge-you-not-to-do-that-hilliard-superintendent-says-to-policy-change-requiring/article_d68591c6-48dc-11ed-8c4e-cfd4ef186cf3.html (last accessed January 16, 2023).

56. In response to this proposal, District Superintendent Dave Stewart refused to put the proposed policy addition on the Policy Review Committee agenda, saying to do so would "ignite an already volatile powder-keg." Id.

57. The next day, Superintendent Stewart said publicly, "My fear is that the debate that will undoubtedly ensue will be focused on one set of issues and will further divide our community and once again put the spotlight on a very vulnerable population of students." Id.

58. The Parents further reason to believe that the District's teacher's union is actively assisting teachers in deceiving parents about gender dysphoria at school and the

District is cooperating, for the reasons that follow.

59.     The Hilliard Education Association ("HEA") is the Defendant District's local teachers union, which is a local component of the national teachers union called the National Education Association ("NEA").

60.     The NEA jointly produced a document titled "Schools in Transition: A Guide for Supporting Transgender Students in K–12 Schools." This document offers "guidelines" to teachers as follows:

i.      One chapter of the guidelines includes: "approaches for working with unsupportive parents or parents who disagree about the appropriate response to their child's expressed gender identity." The premise of this section is stated as such: "Privacy and confidentiality are critically important for transgender students who do not have supportive families. In those situations, even inadvertent disclosures could put the student in a potentially dangerous situation at home, so it is important to have a plan in place to help avoid any mistakes or slip-ups." Of course, no definition of "supportive families" is provided, and presumably, this simply means they do not share the NEA's views. Also, there is no consideration of the damages caused by failing to inform parents about how their children are being treated for gender dysphoria.

ii.     These guidelines include an eight-page worksheet instructing teachers on how to facilitate a gender "transition" in school, while training teachers on

how to keep information about this "transition" from parents. The guidelines specifically give advice on how to use a student's preferred name and pronouns in class, but the legal name and normal sex-specific pronouns in communications with parents, to hide their child's symptoms of gender dysphoria.

61.     The District's teacher's union, the HEA, is one of just a few national "Sponsors" of the NEA LGBTQ+ Caucus.

62.     The NEA LGBTQ+ Caucus offers training on its views of gender identity and sexual orientation along with other resources.

63.     One of the resources the HEA and the NEA LGBTQ+ Caucus offers for voluntary development is a video titled "Sex acts that don't get enough play" and features the words and phrases "blow job, fingering, vaginal intercourse, outercourse, fisting, rimming, watching porn, BD (bondage and discipline), masturbating, muffing, sexting, and anal sex." Ohio Press Network, Jack Windsor, September 21, 2022. https://www.theohiopressnetwork.com/news/ohio/special-report-hilliard-parents-threaten-district-with-federal-lawsuit-after-school-says-it-may-hide/article_b82ef404-3993-11ed-9fd3-f719c77cdf17.html (last accessed January 15, 2023).

The Problem of the Badges

64.     In the fall of 2022, the Parents became aware that some teachers were displaying "I'm Here" badges. (See Ex. E).

65.     The badge was distributed through the HEA—which came from the NEA

LGBTQ+ Caucus.

66.     Teachers intend for the badges to solicit private, intimate conversations with children about their sexuality and gender identity.

67.     The badge asks teachers whether they self-identify as a "safe person." The badge is accompanied by a holder that says "If you are not a safe person or do not support LGBTQ+ youth or issues, please do not wear or display the 'I'm Here' badge." (See Ex. E).

68.     The badge has a QR code linking to the obscene material described in paragraph 64 above.

69.     District teachers exposed this badge, and its QR code, even in elementary schools to children as young as 6 years old.

70.     District teachers exposed the badge to students, even at the District's elementary schools. In fact, teachers often wear the badge on their hip, such that the display is eye-level for young children and easier to scan.

71.     One student had possession of the badge, and displayed the badge herself while speaking at a District School Board meeting.

72.     The Superintendent of the District sent an email describing the material linked from the badge's QR code as "adult" and wrote that it was not intended for display to students.

73.     The HEA itself said, "The QR code on the back of the badge links to a long list of resources for educators –not students—to ensure trusted adults are equipped to

support their students and provide assistance as needed." See: https://hilliardea.org/2022/09/22/hea-statement-on-safe-space-badges/. (Last accessed February 6, 2023).

A Hilliard Family's Story 1

74. One Plaintiff has a daughter who was a student in the Hilliard City School District ("Jane Doe").

75. Jane experienced emotional trauma beginning during the 2019-2020 school year and into the 2020-2021 school year, when Jane was in eighth and nineth grade respectively.

76. During eighth grade, some kids at school encouraged Jane to attend meetings of the "Gay-Straight Alliance Club" at school. The Club met once a week.

77. Jane went to two meetings of the Club. Jane observed that the children at the meeting would discuss issues of sexuality and gender identification. The conversations were directed or supervised by a teacher whose views on these subjects were well known.

78. Jane was made to feel uncomfortable because she did not identify as homosexual or transgender (although it is not clear whether the teacher-supervisor of the Club was to fault for this, the child cannot remember due to the trauma she experienced). Jane chose not to attend another meeting.

79. Jane considered herself to be a "tomboy" meaning she enjoys many things stereotypical of boys.

80.     Sometime after attending the meeting, Jane got a short haircut. At this time, certain teachers approached Jane and began questioning Jane about whether she was a male or transgender. Then they began calling Jane by a male name and male pronouns. This caused serious mental confusion for Jane. Because of the trauma, Jane has difficulty remembering how the situation transitioned from questions from the teachers, to the teachers assuming Jane had a new identity. However, Jane felt pressure to assume the new identity.

81.     Eventually, Jane succumbed to the persuasion. Jane adopted a male name and answered to male pronouns—but only at school.

82.     Jane's mother and father were never made aware of this treatment, even after several meetings with teachers, counselors, and staff members, who all used Jane's feminine name and pronouns.

83.     About this time, Jane began to harm herself in eighth grade by cutting the veins on her arms with razors.

84.     Jane's parents were extremely concerned about this cutting. In their investigation with school officials, it was never made known to Jane's parents that Jane was answering to a male name and pronouns at school.

85.     During the summer, in between eighth and nineth grade, Jane exhibited no signs of distress.

86.     Once Jane's nineth grade year began, she attended classes remotely, because of the COVID-19 quarantines. However, Jane attended a few classes at the school

in-person.

87.     During this time, Jane's signs of distress returned and she began cutting herself again.

88.     Near Christmas break of Jane's nineth grade year, a District office Secretary sent a post-card to Jane through U.S. Mail, which Jane's Mother personally saw. Besides the fact that receiving a post card from a school secretary is unusual for a nineth-grader, the post card referred to Jane with a male name and with male pronouns. This is how Jane's Mother discovered what the District employees were doing.

89.     At this time, Jane's Mother was able to begin speaking with Jane and learning what was causing her distress. The Mother was able to support the treatment Jane needed.

90.     After Jane's nineth grade year, Jane's family moved away from the Hilliard City School District because they did not trust the District anymore.

91.     At this time, Jane's family also brought Jane to counseling. In counseling, Jane affirmed that her distress was caused by the confusion brought on by teachers at the District confusing Jane about her development through puberty.

92.     Since the family took Jane away from the District, Jane has exhibited no symptoms of distress and is outraged about the District's handling of her situation.

93.     If the District had informed Jane's parents in the beginning about how they were identifying her as a male at school, Jane's family could have taken steps to provide necessary care for their daughter sooner. The District does not know Jane the way her

parents do and cannot provide treatment for Jane as well as her parents can.

94.     Jane continues with treatment for trauma associated with these events.

A Hilliard Family's Story 2

95.     A witness for Plaintiffs will testify to the following.

96.     Two parents with a child in the District suffered actual damages as a result of the District's failure to notify Parents of symptoms of gender dysphoria at school.

97.     The parents have a teenage daughter who was a student at the Hilliard City School District ("School").

98.     The daughter does not have a history of mental illness that the parents are aware of.

99.     The child's parents live with their daughter and they see and interact with their daughter every day; their daughter is naturally introverted and shy, typical of many pubescent teenage girls.

100.    On the 7th of October 2022 the parents received a call from a social worker ("Social Worker") at the District.

101.    The Social Worker informed the child's mother that their daughter was making suicidal remarks at the school, related to self-harm.

102.    The mother of the daughter then went to the school.

103.    When the mother went to the school, the mother met with the District's Social Worker.

104.    When the mother met with the Social Worker, the Social Worker informed

the mother that: 1) her daughter was observed, by one of her daughter's friends, making suicidal, self-harm remarks; 2) the friend informed the Social Worker of the remarks; 3) the Social Worker then asked the daughter to leave class, with the friend, and meet with the Social Worker privately; 4) the Social Worker, the daughter, and the daughter's friend all sat together in a room at the school and discussed the remarks the daughter made; and 5) after this first discussion, the Social Worker called the mother and asked the mother to come into the school.

105.    When the mother arrived at school, the mother spoke with the Social Worker and the school Principal.

106.    At this meeting with the Social Worker and the Principal, the Social Worker informed the mother that several teachers at the school were treating the daughter as a boy while their daughter was at school.

107.    Having seen their daughter every day the daughter's whole life, the parents have never seen their daughter manifest any symptom of gender dysphoria, heard her ask to be treated as a boy, and they are not aware of any of this type of manifestations anywhere.

108.    Outside of this incident, the daughter has not manifested any signs of abnormal mental health (which is to say, that she manifests some pubescent behaviors, but nothing abnormal); thus, they were not surprised that their daughter may have a behavioral issue at school, but they were shocked to learn that she may be suffering some mental health issues at school and that teachers withheld that information from the

- 28 -

daughter's parents.

109. The Social Worker and the Principal adamantly demanded that the mother's daughter be taken to Nationwide Children's Hospital.

110. The parents took their daughter to Nationwide Children's Hospital.

111. The Hospital conducted a review over a period of about four hours.

112. The Hospital concluded that it was safe to take the daughter home.

113. On Saturday, the following day, the parents contacted the school Principal through email, and asked him for a meeting to discuss the incident described above (the "Incident").

114. On Monday, the parents sent a follow-up email, asking the same.

115. The Principal responded on Monday that he (the Principal) could meet with the parents, but the Social Workers was out sick that day.

116. The parents responded that they wanted to meet with both the Principal and the Social Worker.

117. The Principal responded that the parents could meet with both the Social Worker and the Principal on Tuesday, the following day.

118. On Tuesday, the parents met with Social Worker and the Principal.

119. By the time the parents met with the Social Worker and the Principal, they had spoken with their daughter about the Incident.

120. Their daughter told the parents that she (the daughter) had been experiencing emotional trauma for several weeks, and that it was manifested at school;

the daughter said she was excused from class multiple times due to her emotional distress.

121. The parents were never informed of this activity.

122. Over the weekend, immediately following the Incident, another one of the daughter's friends sent the mother a text message asking the mother "is [your daughter] dead?"

123. At the Tuesday meeting with the Social Worker and the Principal, the parents asked the Social Worker and the Principal why the school did not notify them (the parents) that their daughter manifested unusual behavior at school.

124. The Social Worker and the Principal said they did not know why the parents were not notified, but they would "look into it."

125. The parents informed the Social Worker and the Principal that they (the parents) planned to keep their daughter out of school until they (the parents) received clarity as to this question and were assured that something of this nature would not occur again.

126. After not hearing from the school, the parents emailed the Principal the following Saturday, asking for an update.

127. The Principal responded that he spoke to the teachers involved, he let them know the situation, and the Principal provided nothing else—the Principal said, "if you need anything else, let me know."

128. To date, the parents have not heard anything further from the School.

129.    The parents kept their daughter out of the School as much as legally allowed, and her mental condition subsequently improved significantly; thus, the parents concluded that the school is part of the problem that caused their daughter's emotional trauma.

130.    The Parents believe the trauma their daughter experienced is due to people at the District who confused the child about her gender while she was going through puberty. Had the parents been informed of how the District personnel had treated their daughter, they could have worked to avoid the incredible trauma she experienced. Instead, the parents were informed only after the trauma escalated to the extent that the child threatened to commit suicide at the school.

<u>Broader Reasons for Concern</u>

131.    The Parents have very good reasons to seek a declaration of their rights from this Court that would clarify that teachers may not have unbridled, private, intimate discussions with children about sex, without parental notice. Children across this nation are vulnerable to abuse.

132.    Recently, Chicago Board of Education Inspector General Will Fletcher reported that the Chicago District received over 470 sexual complaints against Chicago Public School employees from students in 2022. The report details students being abused, groped, groomed, assaulted and threatened by school officials. The Report is available here: Chicago Board of Education, *Fiscal Year 2022 Annual Report*, (January 1, 2023). https://cpsoig.org/uploads/3/5/5/6/35562484/cps_oig_fy_2022_annual_report.pdf    (last

accessed January 15, 2023).

133.    A Hilliard District teacher was recently charged with sexual battery for having inappropriate sexual relationship with a student.

https://www.nbc4i.com/news/local-news/columbus/ex-hillard-darby-high-school-teacher-charged-with-sexual-battery/ (Last accessed February 6, 2023).

**COUNT ONE:**
**REQUEST FOR DECLARATORY JUDGMENTS**

134.    Plaintiffs incorporate the preceding as if fully restated herein.

135.    In *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) a high school swim coach suspected that a team member was pregnant, and, rather than notifying her parents, discussed the matter with other coaches, guidance counselors, and teammates, and eventually pressured her into taking a pregnancy test. *Id*. at 295–97. The mother sued the coach for a violation of parental rights, explaining that, had she been notified, she would have "quietly withdrawn [her daughter] from school" and sent her to live with her sister until the baby was born. *Id*. at 306. "[M]anagement of this teenage pregnancy was a family crisis," she argued, and the coach's "failure to notify her" "obstructed the parental right to choose the proper method of resolution." *Id*. at 306.

136.    The *Gruenke* court found that the mother had "sufficiently alleged a constitutional violation" against the coach and condemned his "arrogation of the parental role." "It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these

rights." *Id*. at 307. The court also suggested that the guidance counselors may have violated the mother's parental rights, even though she had not sued them: "We need not consider the potential liability of school counselors here, although we have considerable doubt about their right to withhold information of this nature from the parents." *Id*.

137.    Recently, in a case somewhat analogous to this one, the United States District Court for the Western District of Pennsylvania presided over a case where a school district was sued for reasons described by Senior United States District Judge Joy Flowers Conti as follows:

> The Parents assert they do not seek to impose their religious or moral beliefs about transgender topics on other students. Instead, the parents seek to protect their own young children from a public school teacher's showing videos and reading books about transgender topics and her attempts to promote or inculcate in the young children in her class the teacher's ideas or beliefs about a child's gender identity and to initiate and engage in discussions with the first-graders in her class about the children's own gender identity without the permission of their parents. No party in this case raised any issue about the existence in the school district of bullying or intolerance toward transgender children.

*Tatel v. Lebanon School District*, W.D.Pa. No. 2:22-cv-837, 2022 U.S. Dist. LEXIS 196081 (Oct. 27, 2022).

> Judge Conti denied the school district's motion to dismiss, saying:

> The Third Circuit Court of Appeals has recognized that the fundamental right of parents to raise and nurture their children may sometimes conflict with a public school's policies, but explained: "when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000).

> *Id.* docket #38, Opinion.

138.    The U.S. Supreme Court said:

[I]n *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, *in Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*, at 535. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 166.

*Troxel v. Granville,* 530 U.S. 57, 65 (2000).

139.    The Ohio Supreme Court found the above *Troxel* doctrine, applies in Ohio pursuant to the Ohio Constitution. See e.g., *State v. Whisner*, 47 Ohio St. 2d 181, 215-128, 351 N.E.2d 750 (1976).

140.    Parents are the primary decision-makers with respect to their minor children—not their school, or even the children themselves. *Parham v. J. R.*, 442 U.S. 584, 587 (1979). "Our jurisprudence historically has reflected . . . broad parental authority over minor children." *Id.* "This primary role of the parents . . . is now established beyond debate." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

141.    Parental decision-making authority rests on two core presumptions: 1) "that parents possess what a child lacks in maturity, experience, and capacity for

judgment required for making life's difficult decisions . . . Most children, even in adolescence, simply are not able to make sound judgments concerning . . . their need for medical care or treatment. Parents can and must make those judgments." *Parham*, 442 U.S. at 602-603; and 2) the "natural bonds of affection lead parents to act in the best interests of their children." *Id.*; "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Yoder*, at 232.

142.    At "the heart of parental decision-making authority" are those decisions "rais[ing] profound moral and religious concerns." *Bellotti v. Baird*, 443 U.S. 622, 640 (1979).

143.    Parental rights reach their peak, and thus receive the greatest constitutional protection, on "matters of the greatest importance." See *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005).

144.    "Choices about marriage, family life, and the upbringing of children are among the associational rights this court has ranked as of basic importance in our society." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).

145.    A parent's direction of their child's health care ranks as one of the most important, most traditional, and most fundamental of rights. "[A]ny substantive due process rights related to directing the medical care of children devolve upon the parents or legal guardians of the children." *Kanuszewski v. Mich. HHS*, 927 F.3d 396, 415 (6th Cir. 2019). "[Parents] retain a substantial, if not the dominant, role in the decision [to

- 35 -

hospitalize a child]." *Parham,* 603-604.

146.     The District cannot justify diagnosing and treating children, then hiding those acts from parents. The "notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children" is "statist" and "repugnant to American tradition." *Parham,* at 603. While schools and teachers serve an in loco parentis function while a child is at school, "[p]ublic schools must not forget that 'in loco parentis' does not mean 'displace parents.'" *Gruenke*, at 307. The fact that "the decision of a parent is not agreeable to a child or . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id*. The unfortunate reality that some parents "act against the interests of their children" does not justify "discard[ing] wholesale those pages of human experience that teach that parents generally do act in the child's best interests." *Id*. As long as a parent is fit, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68–69. "Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as parens patriae." *Schall v. Martin*, 467 U.S. 253, 265, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984).

147.     Additionally, "[t]he fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents'

authority." *Parham*, at 603–04. A child's disagreement with a parent's decision "does not diminish the parents' authority to decide what is best for the child." *Id.*

148.    This constitutional commitment to parental authority is reflected in many state and federal laws. Just to name a few, for example:

i.    20 U.S.C. § 1232h prohibits requiring a student to be required to undergo analysis or evaluation of items such as sex behaviors or attitudes, mental or psychological problems of the student or student's family, and religious practices.

ii.    20 U.S.C. § 1232h requires notification to parents of any "survey" seeking information that includes: political affiliations or beliefs of the student or the student's parent; mental or psychological problems of the student or the student's family; sex behavior or attitudes; critical appraisals of other individuals with whom respondents have close family relationships; religious practices, affiliations, or beliefs of the student or the student's parent.

iii.    Ohio state and federal law require schools to provide parents with access to all records about their children. R.C. § 3319.321; 20 U.S.C. § 1232g(a)(1)(A).

iv.    Under the federal Family Education Rights and Privacy Act (FERPA), only parents can request to amend education records. 34 CFR §§ 99.3; 99.4; 99.20(a).

v.    Parental notification is required for almost all medical procedures in Ohio. For example, parental notification is required for minor abortion. Ohio Rev. Code Ann. § 2151.85. (Upheld in *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 111 L. Ed. 2d 405, 110 S. Ct. 2972 (1990)).

vi.    Parental notification is required whenever a child is taken into federal custody. 18 U.S.C. §5033.

vii.    Generally, the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) Pub.L. No. 104-191, 110 Stat. 1936, requires healthcare providers to release a minor patient's medical records to the child's parent or guardian upon request. Protected health information includes any

information that relates to the child's past, present, or future mental health or condition. Generally, anyone under eighteen is considered a minor and cannot legally exercise their rights under HIPAA. Instead, HIPAA considers the minor's parent or guardian to be their "personal representative."

viii. In Ohio, mental health professionals cannot provide treatment without parental consent, for minors under the age of fourteen, and then only for six sessions or thirty days for minors fourteen and over. R.C. 5122.04.

149. In addition, the District's acts expose the Parents to liability. Parents are liable for neglect for refusal to provide care necessary for the child's health, morals, or well-being or if "because of the omission of the child's parents, guardian, or custodian, [the child] suffers physical or mental injury harming or threatening to harm the child's health or welfare." See R.C. 2151.03. Additionally, in a petition for dissolution of marriage, a shared plan must be submitted and include "provision for the children's medical and dental care." R.C. 3109.04(G).

150. If a government action implicates a fundamental constitutional right, the action is subject to strict scrutiny and must be narrowly tailored in furtherance of a compelling government interest to pass constitutional muster. See *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005).

151. Government institutions are liable for deprivation of constitutional rights under color of law. 42 U.S.C. §1983 and 1988.

152. Here, the District's acts implicate the Parents' fundamental, constitutional right to direct the upbringing of their children because, as laid out in the Statement of Facts, the District's acts involve: 1) soliciting children for private, intimate conversations

that require parental notification; 2) exposing children to inappropriate "adult" materials; 3) diagnosing and treatment of children's mental health without parental notification or consent; and 4) actively deceiving parents about these acts.

153.    The District's acts violate the Parents' freedom of conscience. The appropriate treatment for gender dysphoria is the subject of legitimate debate among professionals and laymen alike. The Parents do not agree with the ideology behind the school's actions. As discussed above, Title IX changes based on which political party occupies the Presidency of the federal government. The District and its employees have no right to settle that debate internally and impose their views on families within their jurisdiction.

154.    Thus, the District's activities: 1) implicate the fundamental constitutional right of parents to direct the upbringing of their children, particular the parent's right to make medical and mental health decisions for their children; 2) implicates the Parents' right to freedom of conscience; 3) the District violates laws regarding exposing children to obscene material; and 4) the District exposes parents to liability related to their statutory and common law duties to provide care for their children.

155.    The District's approach is deliberately broadly tailored as possible. The District has no policy on Title IX policy on "outing" (a "default expectation" is nothing). No policy, in fact, is the District's effective policy. In fact the Superintendent specifically avoided adopting a policy, saying it would ""ignite an already volatile powder-keg." Thus, the District's policy is not narrowly tailored in furtherance of a compelling

government interest.

156. The District's action, even if well-intentioned, ignore the compelling government interest in protecting the rights of conscience of parents, and the fundamental rights of parents to decide what treatment is appropriate for their children.

157. Thus, the Parents request that the Court declare the following:

i. Informing a child's parents that their child is manifesting symptoms of gender dysphoria (or anything else) at school does not violate Title IX— parents are generally entitled to any information the school has about their children;

ii. A school employee's perception that a child's parent does not agree with gender affirming treatment is not appropriate "health and/or safety" concern for forming a basis to affirmatively withhold information, hide information, or otherwise actively deceive a parent about their child's manifestation of symptoms of gender dysphoria at school;

iii. Affirmatively withholding information, hiding information, or otherwise actively deceiving parents about information that their child is exhibiting symptoms of gender dysphoria at school violates Ohio and federal law, including HIPAA and the fundamental rights to parents to direct the upbringing of their child and exposes parents to liability for neglect because it makes it impossible for parents to support, and may undermine treatment;

iv. If a teacher or school official treats gender dysphoria at school, without parental consent, that act violates the parent's fundamental right to direct the upbringing of their child and make medical decisions for their child, and exposes parents to liability for neglect because it makes it impossible for parents to support, and may undermine, treatment;

v. Any other declaration the Court deems appropriate.

**COUNT TWO:**
**PERMANENT INJUNCTION**

158. Plaintiff incorporates the preceding as if fully restated herein.

159. This Court may issue a permanent injunction against the District pursuant to 28 U.S.C. 2201 and 2202, 28 U.S.C. § 1343, and Fed R. Civ. P. 65.

160. The injunctive relief requested by Plaintiffs is proper pursuant to 28 U.S.C. § 2202 because it constitutes "[f]urther necessary or proper relief based upon a declaratory judgment . . . against [an] adverse party whose rights have been determined by such judgment." Such relief may include damages or injunctive remedies, which are considered ancillary to the enforcement of the declaratory judgment. *United Teacher Associates Insurance Company v. Union Labor Life Insurance Company*, 414 F.3d 558, 570 (5th Cir. 2005); *Ashmus v. Calderon*, 123 F.3d 1199, 1206 (9th Cir. 1997), rev'd on other grounds, 523 U.S. 740 (1998).

161. In Ohio, "mental injury" is "any behavioral, cognitive, emotional, or mental disorder in a child caused by an act or omission that is described in section 2919.22 of the Ohio Revised Code and is committed by the parent or *other person responsible for the child's care*." (Emphasis added). R.C. 2151.031.

162. "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2019.22(A).

163. "No person shall do any of the following to a child under eighteen years of age . . . (5) permit . . . encourage . . . allow the child to . . . participate in . . . any material

- 41 -

or performance that the offender knows or reasonably should know is obscene, is sexually oriented matter, or is nudity-oriented matter." R.C. 2019.22(B).

164.    Here, the "I'm Here" badges, referred to in the Statement of Facts, have a QR code on them that link to obscene and pornographic content.

165.    QR codes are scanned, by cell phones, and automatically take the scanning device to an internet website. The District Superintendent admitted publicly that the QR take scanning devices to websites with adult-only content. The QR code can be scanned from as far as thirty (30) feet away. Children at the District carry cell phones that scan QR codes at school. Thus, the District is exposing children to highly inappropriate material.

166.    Further, the District's activities, as described in the Statement of Facts above, deprive the Parents—under color of law—of their constitutional right to direct the upbringing of, and provide care for, their children. The Badges explicitly invite and solicit intimate conversations about analysis, or evaluation of items, such as sex behaviors or attitudes, mental or psychological problems of the student or student's family, and religious practices. This, all while the District fails to assure parents that information gathered in these private conversations will not be actively hidden from parents.

167.    Meanwhile, although perhaps well-intentioned by most users, some teachers are not so well-intentioned. The badges provide a tool for identifying and engaging in private conversations with vulnerable children.

168.    The badges affect the fundamental rights of parents because they solicit intimate, private conversations about health matters that are not shared with parents.

- 42 -

169.    Exposing the badges to children violates Ohio obscenity laws.

170.    The badges lack any justifiable educational or governmental purpose that cannot be achieved with a more narrowly tailored and more legally sound approach. Thus, the District is acting unconstitutionally and beyond the scope of any authority of state or local law.

171.    The Parents seek a permanent injunction on:

   i.   display of materials linked to pornographic or obscene materials, specifically the "I'm Here" badged referred to above;

  ii.   invitations, solicitations, and other communications—from District employees—seeking private conversations, analysis, or evaluation of items, such as sex behaviors or attitudes, mental or psychological questions of the student or student's family, and religious practices, without explicit parental consent and knowledge; including, specifically, the display and use of the "I'm Here" badges referred to in the Statement of Facts above;

 iii.   District-oriented displays and communications which propound off-curriculum/standards education about sex and gender dysphoria, or District-endorsed promotion of ideologies regarding the same; (For clarity purposes, the Parents do not seek to enjoin teachers, students, student groups, third-parties, or others from expressing their personal views in the context of legally protected speech).

172.    Given the facts stated in the Statement of Facts above, the District is causing irreparable harm to the parents of the District, the Plaintiff Parents, and the children of the District. Specifically, allowing teachers to actively solicit private conversations with children about the children's intimate sexual matters and mental health, invites unaccountable abuse of children—especially when the conversations are affirmatively kept hidden from parents.

173. The District will not be harmed in any way by the issuance of the injunctive relief sought by the Parents. Even with such an injunction in place, the District can still address matters such as bullying and counseling in accordance with the law. For example, the District could inform students that trained counselors are available for private conversations about mental health and sexuality.

174. No third persons would be harmed in any way by the issuance of the injunctive relief sought by the Parents. Again, even with such an injunction in place, the District can still address matters such as bullying and counseling in accordance with the law. For example, the District could inform students that trained counselors are available for private conversations about mental health and sexuality.

175. The District's activity, as described in the Statement of Facts above, violates public policy because it violates the Parents' rights to direct the upbringing and provide care for their children. Thus, the injunctive relief that the Parents seek would not violate public policy or the public at large.

### V. REQUEST FOR RELIEF

Plaintiffs respectfully request the following relief:

1) A declaratory judgment, as described in detail above;

2) Injunctive relief as described in detail above;

3) Any other relief as this Court deems appropriate.

February 8, 2023                                    Respectfully Submitted,

                                                   /s/ Joshua J. Brown

Joshua J. Brown (0089836)
Attorney at Law
3979 Main Street
Hilliard, OH 43026
P: (614) 284-4394
F: (614) 388-3947
josh@joshbrownesq.com
Attorney for Plaintiff

CERTIFICATE OF SERVICE

I certify that on February 8, 2023, a copy of the preceding FIRST AMENDED

COMPLAINT was filed through the court's ECF system and served in accordance with

Fed.R.Civ.P. 5(b) to the following:

Jessica K Philemond (0076761)
Scott Scriven LLP
250 East Broad Street, Suite 900
Columbus, OH 43215
614-222-8686
jessica@scottscrivenlaw.com
Attorney for Defendant

Joshua J. Brown (0089836)
Joshua J. Brown

# Appendix

Affidavit ................................................................................................................ 0001

Exhibit A ............................................................................................................... 0004

Exhibit B ............................................................................................................... 0014

Exhibit C ............................................................................................................... 0017

Exhibit D ............................................................................................................... 0021

Exhibit E ............................................................................................................... 0026

Exhibit F ............................................................................................................... 0029

Exhibit G ............................................................................................................... 0033

Exhibit H ............................................................................................................... 0036

Exhibit I ................................................................................................................ 0041

0001

## UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

Kaltenbach, et. al.,                          :
                                              :    Case No. 2:23-cv-00187
                  Plaintiffs,                 :
                                              :    Judge Michael H. Watson
        v.                                    :
                                              :    Magistrate Kimberly A. Jolson
Hilliard City Schools Board of Education, :
                                              :
                  Defendant.                  :
                                              :

### AFFIDAVIT OF PLAINTIFF

State of Ohio          §
County of Franklin        §

I, Donna Senchesak, Plaintiff in the above-captioned case, after being duly cautioned and sworn, upon personal knowledge or information, hereby avers as follows:

1. I am an adult and competent to testify as to the matters set forth in this affidavit.

2. I offer the following testimony on personal knowledge.

3. I have a daughter who was a student in the Hilliard City School District ("Jane Doe").

4. Jane experienced emotional trauma beginning during the 2019-2020 school year and into the 2020-2021 school year, when Jane was in eighth and nineth grade respectively.

5. During eighth grade, some kids at school encouraged Jane to attend two meetings of the "Gay-Straight Alliance Club" at school. The Club met once a week.

6. Jane went to one meeting of the Club. Jane observed that the children at the meeting would discuss issues of sexuality and gender identification. The conversations were directed or supervised by a teacher.

7. Jane was made to feel uncomfortable because she did not

identify as homosexual or transgender (although it is not clear whether the teacher-supervisor of the Club was to fault for this). Jane chose not to attend another meeting.

8. Jane considers herself to be a "tomboy" meaning she enjoys many things stereotypical of boys.

9. Sometime after attending the meeting, Jane got a short haircut. At this time, certain teachers approached Jane began questioning Jane about whether she was a male or transgender. Then they began calling Jane by a male name and male pronouns. This caused serious mental confusion for Jane. Because of the trauma, Jane has difficulty remembering how the situation transitioned from questions from the teachers, to the teachers assuming Jane had a new identity. However, Jane felt pressure to assume the new identity.

10. Eventually, Jane succumbed to the persuasion. Jane adopted a male name and answered to male pronouns—but only at school.

11. I was never made aware of this treatment, even after several meetings with teachers, counselors, and staff members.

12. Jane began to harm herself in eighth grade by cutting the veins on her arms with razors.

13. I was obviously, extremely concerned about this cutting. In my investigation with school officials, it was never made known to me that Jane was answering to a male name and pronouns at school. She was not doing so at home.

14. During the summer, in between eighth and ninth grade, Jane exhibited no signs of distress.

15. Once Jane's ninth grade year began, she attended remotely, because of the COVID-19 quarantines. However, Jane attended a few classes at the school in-person.

16. During this time, Jane showed further signs of distress, continuing to cut herself.

17. Near Christmas break of Jane's ninth grade year, a District Secretary sent a post-card to Jane through U.S. Mail, which I personally saw. Besides the fact that receiving a post

card from a school secretary is unusual for a nineth-grader, the post card referred to Jane with a male name and with male pronouns. This is how I discovered what the District employees were doing.

18. At this time, I was able to begin speaking with Jane and learning what was causing her distress. I was able to support the treatment she needed.

19. After Jane's nineth grade year, we moved away from the Hilliard City School District because we did not trust the District anymore.

20. At this time, we also brought Jane to counseling. In counseling, Jane affirmed that her distress was caused by the confusion brought on by teachers at the District confusing Jane about her development through puberty.

21. Since we took Jane away from the District, Jane has exhibited no symptoms of distress and is outraged about the District's handling of her situation.

22. If the District had informed me in the beginning about how they were identifying her as a male at school, I could have taken steps to provide necessary care for my daughter sooner. The District does not know her the way I do and cannot provide treatment for her as well as I can. Jane continues with treatment for trauma associated with these events.

By signing this affidavit, I acknowledge that all the statements contained herein are true, complete, and accurate to the best of my knowledge and that the Court may rely on the truth of each of these statements. I have consulted with legal counsel about this statement and I understand that I am signing under penalty of perjury.

FURTHER AFFIANT SAYETH NOT

Date: 2/6/2023

Donna Senchesak, Plaintiff

Subscribed and sworn to before me this ____ day of February, 2023

Date: 2/6/23

Tracy Yantzer

Notary

My Commission expires: 1/31/26



# Exhibit A

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

0005

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

### Dear Colleague Letter on Transgender Students
### **Notice of Language Assistance**

If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY:     1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon sa Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

May 13, 2016

Dear Colleague:

Schools across the country strive to create and sustain inclusive, supportive, safe, and nondiscriminatory communities for all students. In recent years, we have received an increasing number of questions from parents, teachers, principals, and school superintendents about civil rights protections for transgender students. Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulations prohibit sex discrimination in educational programs and activities operated by recipients of Federal financial assistance.[1] This prohibition encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status. This letter summarizes a school's Title IX obligations regarding transgender students and explains how the U.S. Department of Education (ED) and the U.S. Department of Justice (DOJ) evaluate a school's compliance with these obligations.

ED and DOJ (the Departments) have determined that this letter is *significant guidance*.[2] This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how the Departments evaluate whether covered entities are complying with their legal obligations. If you have questions or are interested in commenting on this guidance, please contact ED at ocr@ed.gov or 800-421-3481 (TDD 800-877-8339); or DOJ at education@usdoj.gov or 877-292-3804 (TTY: 800-514-0383).

Accompanying this letter is a separate document from ED's Office of Elementary and Secondary Education, *Examples of Policies and Emerging Practices for Supporting Transgender Students*. The examples in that document are taken from policies that school districts, state education agencies, and high school athletics associations around the country have adopted to help ensure that transgender students enjoy a supportive and nondiscriminatory school environment. Schools are encouraged to consult that document for practical ways to meet Title IX's requirements.[3]

**Terminology**

- *Gender identity* refers to an individual's internal sense of gender. A person's gender identity may be different from or the same as the person's sex assigned at birth.

- *Sex assigned at birth* refers to the sex designation recorded on an infant's birth certificate should such a record be provided at birth.

- *Transgender* describes those individuals whose gender identity is different from the sex they were assigned at birth. A *transgender male* is someone who identifies as male but was assigned the sex of female at birth; a *transgender female* is someone who identifies as female but was assigned the sex of male at birth.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

☐ *Gender transition* refers to the process in which transgender individuals begin asserting the sex that corresponds to their gender identity instead of the sex they were assigned at birth. During gender transition, individuals begin to live and identify as the sex consistent with their gender identity and may dress differently, adopt a new name, and use pronouns consistent with their gender identity. Transgender individuals may undergo gender transition at any stage of their lives, and gender transition can happen swiftly or over a long duration of time.

**Compliance with Title IX**

As a condition of receiving Federal funds, a school agrees that it will not exclude, separate, deny benefits to, or otherwise treat differently on the basis of sex any person in its educational programs or activities unless expressly authorized to do so under Title IX or its implementing regulations.[4] The Departments treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations. This means that a school must not treat a transgender student differently from the way it treats other students of the same gender identity. The Departments' interpretation is consistent with courts' and other agencies' interpretations of Federal laws prohibiting sex discrimination.[5]

The Departments interpret Title IX to require that when a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, the school will begin treating the student consistent with the student's gender identity. Under Title IX, there is no medical diagnosis or treatment requirement that students must meet as a prerequisite to being treated consistent with their gender identity.[6] Because transgender students often are unable to obtain identification documents that reflect their gender identity (*e.g.*, due to restrictions imposed by state or local law in their place of birth or residence),[7] requiring students to produce such identification documents in order to treat them consistent with their gender identity may violate Title IX when doing so has the practical effect of limiting or denying students equal access to an educational program or activity.

A school's Title IX obligation to ensure nondiscrimination on the basis of sex requires schools to provide transgender students equal access to educational programs and activities even in circumstances in which other students, parents, or community members raise objections or concerns. As is consistently recognized in civil rights cases, the desire to accommodate others' discomfort cannot justify a policy that singles out and disadvantages a particular class of students.[8]

*1. Safe and Nondiscriminatory Environment*

Schools have a responsibility to provide a safe and nondiscriminatory environment for all students, including transgender students. Harassment that targets a student based on gender identity, transgender status, or gender transition is harassment based on sex, and the Departments enforce Title IX accordingly.[9] If sex-based harassment creates a hostile environment, the school must take prompt and effective steps to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. A school's failure to treat students consistent with their gender identity may create or contribute to a hostile environment in violation of Title IX. For a more detailed discussion of Title IX

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

requirements related to sex-based harassment, see guidance documents from ED's Office for Civil Rights (OCR) that are specific to this topic.[10]

### 2. Identification Documents, Names, and Pronouns

Under Title IX, a school must treat students consistent with their gender identity even if their education records or identification documents indicate a different sex. The Departments have resolved Title IX investigations with agreements committing that school staff and contractors will use pronouns and names consistent with a transgender student's gender identity.[11]

### 3. Sex-Segregated Activities and Facilities

Title IX's implementing regulations permit a school to provide sex-segregated restrooms, locker rooms, shower facilities, housing, and athletic teams, as well as single-sex classes under certain circumstances.[12] When a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity.[13]

☐ **Restrooms and Locker Rooms**. A school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity.[14] A school may not require transgender students to use facilities inconsistent with their gender identity or to use individual-user facilities when other students are not required to do so. A school may, however, make individual-user options available to all students who voluntarily seek additional privacy.[15]

☐ **Athletics.** Title IX regulations permit a school to operate or sponsor sex-segregated athletics teams when selection for such teams is based upon competitive skill or when the activity involved is a contact sport.[16] A school may not, however, adopt or adhere to requirements that rely on overly broad generalizations or stereotypes about the differences between transgender students and other students of the same sex (*i.e.*, the same gender identity) or others' discomfort with transgender students.[17] Title IX does not prohibit age-appropriate, tailored requirements based on sound, current, and research-based medical knowledge about the impact of the students' participation on the competitive fairness or physical safety of the sport.[18]

☐ **Single-Sex Classes**. Although separating students by sex in classes and activities is generally prohibited, nonvocational elementary and secondary schools may offer nonvocational single-sex classes and extracurricular activities under certain circumstances.[19] When offering such classes and activities, a school must allow transgender students to participate consistent with their gender identity.

☐ **Single-Sex Schools**. Title IX does not apply to the admissions policies of certain educational institutions, including nonvocational elementary and secondary schools, and private undergraduate colleges.[20] Those schools are therefore permitted under Title IX to set their own

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sex-based admissions policies. Nothing in Title IX prohibits a private undergraduate women's college from admitting transgender women if it so chooses.

☐ **Social Fraternities and Sororities**. Title IX does not apply to the membership practices of social fraternities and sororities.[21] Those organizations are therefore permitted under Title IX to set their own policies regarding the sex, including gender identity, of their members. Nothing in Title IX prohibits a fraternity from admitting transgender men or a sorority from admitting transgender women if it so chooses.

☐ **Housing and Overnight Accommodations**. Title IX allows a school to provide separate housing on the basis of sex.[22] But a school must allow transgender students to access housing consistent with their gender identity and may not require transgender students to stay in single-occupancy accommodations or to disclose personal information when not required of other students. Nothing in Title IX prohibits a school from honoring a student's voluntary request for single-occupancy accommodations if it so chooses.[23]

☐ **Other Sex-Specific Activities and Rules**. Unless expressly authorized by Title IX or its implementing regulations, a school may not segregate or otherwise distinguish students on the basis of their sex, including gender identity, in any school activities or the application of any school rule. Likewise, a school may not discipline students or exclude them from participating in activities for appearing or behaving in a manner that is consistent with their gender identity or that does not conform to stereotypical notions of masculinity or femininity (*e.g.*, in yearbook photographs, at school dances, or at graduation ceremonies).[24]

### 4. Privacy and Education Records

Protecting transgender students' privacy is critical to ensuring they are treated consistent with their gender identity. The Departments may find a Title IX violation when a school limits students' educational rights or opportunities by failing to take reasonable steps to protect students' privacy related to their transgender status, including their birth name or sex assigned at birth.[25] Nonconsensual disclosure of personally identifiable information (PII), such as a student's birth name or sex assigned at birth, could be harmful to or invade the privacy of transgender students and may also violate the Family Educational Rights and Privacy Act (FERPA).[26] A school may maintain records with this information, but such records should be kept confidential.

☐ **Disclosure of Personally Identifiable Information from Education Records**. FERPA generally prevents the nonconsensual disclosure of PII from a student's education records; one exception is that records may be disclosed to individual school personnel who have been determined to have a legitimate educational interest in the information.[27] Even when a student has disclosed the student's transgender status to some members of the school community, schools may not rely on this FERPA exception to disclose PII from education records to other school personnel who do not have a legitimate educational interest in the information. Inappropriately disclosing (or requiring students or their parents to disclose) PII from education records to the school community may

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

violate FERPA and interfere with transgender students' right under Title IX to be treated consistent with their gender identity.

☐ **Disclosure of Directory Information**. Under FERPA's implementing regulations, a school may disclose appropriately designated directory information from a student's education record if disclosure would not generally be considered harmful or an invasion of privacy.[28] Directory information may include a student's name, address, telephone number, date and place of birth, honors and awards, and dates of attendance.[29] School officials may not designate students' sex, including transgender status, as directory information because doing so could be harmful or an invasion of privacy.[30] A school also must allow eligible students (*i.e.*, students who have reached 18 years of age or are attending a postsecondary institution) or parents, as appropriate, a reasonable amount of time to request that the school not disclose a student's directory information.[31]

☐ **Amendment or Correction of Education Records**. A school may receive requests to correct a student's education records to make them consistent with the student's gender identity. Updating a transgender student's education records to reflect the student's gender identity and new name will help protect privacy and ensure personnel consistently use appropriate names and pronouns.

○ Under FERPA, a school must consider the request of an eligible student or parent to amend information in the student's education records that is inaccurate, misleading, or in violation of the student's privacy rights.[32] If the school does not amend the record, it must inform the requestor of its decision and of the right to a hearing. If, after the hearing, the school does not amend the record, it must inform the requestor of the right to insert a statement in the record with the requestor's comments on the contested information, a statement that the requestor disagrees with the hearing decision, or both. That statement must be disclosed whenever the record to which the statement relates is disclosed.[33]

○ Under Title IX, a school must respond to a request to amend information related to a student's transgender status consistent with its general practices for amending other students' records.[34] If a student or parent complains about the school's handling of such a request, the school must promptly and equitably resolve the complaint under the school's Title IX grievance procedures.[35]

* * *

We appreciate the work that many schools, state agencies, and other organizations have undertaken to make educational programs and activities welcoming, safe, and inclusive for all students.

Sincerely,

/s/                                            /s/

Catherine E. Lhamon                            Vanita Gupta
Assistant Secretary for Civil Rights           Principal Deputy Assistant Attorney General for Civil Rights
U.S. Department of Education                    U.S. Department of Justice

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

[1] 20 U.S.C. §§ 1681–1688; 34 C.F.R. Pt. 106; 28 C.F.R. Pt. 54. In this letter, the term *schools* refers to recipients of Federal financial assistance at all educational levels, including school districts, colleges, and universities. An educational institution that is controlled by a religious organization is exempt from Title IX to the extent that compliance would not be consistent with the religious tenets of such organization. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a).

[2] Office of Management and Budget, Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf.

[3] ED, *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 13, 2016), www.ed.gov/oese/oshs/emergingpractices.pdf. OCR also posts many of its resolution agreements in cases involving transgender students online at www.ed.gov/ocr/lgbt.html. While these agreements address fact-specific cases, and therefore do not state general policy, they identify examples of ways OCR and recipients have resolved some issues addressed in this guidance.

[4] 34 C.F.R. §§ 106.4, 106.31(a). For simplicity, this letter cites only to ED's Title IX regulations. DOJ has also promulgated Title IX regulations. *See* 28 C.F.R. Pt. 54. For purposes of how the Title IX regulations at issue in this guidance apply to transgender individuals, DOJ interprets its regulations similarly to ED. State and local rules cannot limit or override the requirements of Federal laws. *See* 34 C.F.R. § 106.6(b).

[5] *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 79 (1998); *G.G. v. Gloucester Cnty. Sch. Bd.*, No. 15-2056*,* 2016 WL 1567467, at *8 (4th Cir. Apr. 19, 2016)*; Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 572-75 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000); *Schroer v. Billington*, 577 F. Supp. 2d 293, 306-08 (D.D.C. 2008); *Macy v. Dep't of Justice*, Appeal No. 012012082 (U.S. Equal Emp't Opportunity Comm'n Apr. 20, 2012). *See also* U.S. Dep't of Labor (USDOL), Training and Employment Guidance Letter No. 37-14, *Update on Complying with Nondiscrimination Requirements: Discrimination Based on Gender Identity, Gender Expression and Sex Stereotyping are Prohibited Forms of Sex Discrimination in the Workforce Development System* (2015), wdr.doleta.gov/directives/attach/TEGL/TEGL_37-14.pdf; USDOL, Job Corps, Directive: Job Corps Program Instruction Notice No. 14-31, *Ensuring Equal Access for Transgender Applicants and Students to the Job Corps Program* (May 1, 2015), https://supportservices.jobcorps.gov/Program%20Instruction%20Notices/pi_14_31.pdf; DOJ, Memorandum from the Attorney General, *Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* (2014), www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/18/title_vii_memo.pdf; USDOL, Office of Federal Contract Compliance Programs, Directive 2014-02, *Gender Identity and Sex Discrimination* (2014), www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html.

[6] *See Lusardi v. Dep't of the Army*, Appeal No. 0120133395 at 9 (U.S. Equal Emp't Opportunity Comm'n Apr. 1, 2015) ("An agency may not condition access to facilities—or to other terms, conditions, or privileges of employment—on the completion of certain medical steps that the agency itself has unilaterally determined will somehow prove the bona fides of the individual's gender identity.").

[7] *See G.G.*, 2016 WL 1567467, at *1 n.1 (noting that medical authorities "do not permit sex reassignment surgery for persons who are under the legal age of majority").

[8] 34 C.F.R. § 106.31(b)(4); *see G.G.*, 2016 WL 1567467, at *8 & n.10 (affirming that individuals have legitimate and important privacy interests and noting that these interests do not inherently conflict with nondiscrimination principles); *Cruzan v. Special Sch. Dist. No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (rejecting claim that allowing a transgender woman "merely [to be] present in the women's faculty restroom" created a hostile environment); *Glenn*, 663 F.3d at 1321 (defendant's proffered justification that "other women might object to [the plaintiff]'s restroom use" was "wholly irrelevant"). *See also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (recognizing that "mere negative attitudes, or fear . . . are not permissible bases for" government action).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[9] *See, e.g.,* Resolution Agreement, *In re Downey Unified Sch. Dist., CA*, OCR Case No. 09-12-1095, (Oct. 8, 2014), www.ed.gov/documents/press-releases/downey-school-district-agreement.pdf (agreement to address harassment of transgender student, including allegations that peers continued to call her by her former name, shared pictures of her prior to her transition, and frequently asked questions about her anatomy and sexuality); Consent Decree, *Doe v. Anoka-Hennepin Sch. Dist. No. 11, MN* (D. Minn. Mar. 1, 2012), www.ed.gov/ocr/docs/investigations/05115901-d.pdf (consent decree to address sex-based harassment, including based on nonconformity with gender stereotypes); Resolution Agreement, *In re Tehachapi Unified Sch. Dist., CA*, OCR Case No. 09-11-1031 (June 30, 2011), www.ed.gov/ocr/docs/investigations/09111031-b.pdf (agreement to address sexual and gender-based harassment, including harassment based on nonconformity with gender stereotypes). *See also Lusardi*, Appeal No. 0120133395, at *15 ("Persistent failure to use the employee's correct name and pronoun may constitute unlawful, sex-based harassment if such conduct is either severe or pervasive enough to create a hostile work environment").

[10] *See, e.g.,* OCR, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001), www.ed.gov/ocr/docs/shguide.pdf; OCR, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010), www.ed.gov/ocr/letters/colleague-201010.pdf; OCR, *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011), www.ed.gov/ocr/letters/colleague-201104.pdf; OCR, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf.

[11] *See, e.g.,* Resolution Agreement, *In re Cent. Piedmont Cmty. Coll., NC*, OCR Case No. 11-14-2265 (Aug. 13, 2015), www.ed.gov/ocr/docs/investigations/more/11142265-b.pdf (agreement to use a transgender student's preferred name and gender and change the student's official record to reflect a name change).

[12] 34 C.F.R. §§ 106.32, 106.33, 106.34, 106.41(b).

[13] *See* 34 C.F.R. § 106.31.

[14] 34 C.F.R. § 106.33.

[15] *See, e.g.,* Resolution Agreement, *In re Township High Sch. Dist. 211, IL*, OCR Case No. 05-14-1055 (Dec. 2, 2015), www.ed.gov/ocr/docs/investigations/more/05141055-b.pdf (agreement to provide any student who requests additional privacy "access to a reasonable alternative, such as assignment of a student locker in near proximity to the office of a teacher or coach; use of another private area (such as a restroom stall) within the public area; use of a nearby private area (such as a single-use facility); or a separate schedule of use.").

[16] 34 C.F.R. § 106.41(b). Nothing in Title IX prohibits schools from offering coeducational athletic opportunities.

[17] 34 C.F.R. § 106.6(b), (c). An interscholastic athletic association is subject to Title IX if (1) the association receives Federal financial assistance or (2) its members are recipients of Federal financial assistance and have ceded controlling authority over portions of their athletic program to the association. Where an athletic association is covered by Title IX, a school's obligations regarding transgender athletes apply with equal force to the association.

[18] The National Collegiate Athletic Association (NCAA), for example, reported that in developing its policy for participation by transgender students in college athletics, it consulted with medical experts, athletics officials, affected students, and a consensus report entitled *On the Team: Equal Opportunity for Transgender Student Athletes* (2010) by Dr. Pat Griffin & Helen J. Carroll (*On the Team*), https://www.ncaa.org/sites/default/files/NCLR_TransStudentAthlete%2B(2).pdf. *See* NCAA Office of Inclusion, *NCAA Inclusion of Transgender Student-Athletes* 2, 30-31 (2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf (citing *On the Team*). The *On the Team* report noted that policies that may be appropriate at the college level may "be unfair and too complicated for [the high school] level of competition." *On the Team* at 26. After engaging in similar processes, some state interscholastic athletics associations have adopted policies for participation by transgender students in high school athletics that they determined were age-appropriate.

[19] 34 C.F.R. § 106.34(a), (b). Schools may also separate students by sex in physical education classes during participation in contact sports. *Id.* § 106.34(a)(1).

[20] 20 U.S.C. § 1681(a)(1); 34 C.F.R. § 106.15(d); 34 C.F.R. § 106.34(c) (a recipient may offer a single-sex public nonvocational elementary and secondary school so long as it provides students of the excluded sex a "substantially

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case: 2:23-cv-00187-MHW-KAJ Doc #: 6 Filed: 02/08/23 Page: 60 of 89 PAGEID #: 158

---

equal single-sex school or coeducational school").

[21] 20 U.S.C. § 1681(a)(6)(A); 34 C.F.R. § 106.14(a).

[22] 20 U.S.C. § 1686; 34 C.F.R. § 106.32.

[23] *See, e.g.,* Resolution Agreement, *In re Arcadia Unified. Sch. Dist., CA*, OCR Case No. 09-12-1020, DOJ Case No. 169-12C-70, (July 24, 2013), www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadiaagree.pdf (agreement to provide access to single-sex overnight events consistent with students' gender identity, but allowing students to request access to private facilities).

[24] *See* 34 C.F.R. §§ 106.31(a), 106.31(b)(4). *See also, In re Downey Unified Sch. Dist., CA, supra* n. 9; *In re Cent. Piedmont Cmty. Coll., NC, supra* n. 11.

[25] 34 C.F.R. § 106.31(b)(7).

[26] 20 U.S.C. § 1232g; 34 C.F.R. Part 99. FERPA is administered by ED's Family Policy Compliance Office (FPCO). Additional information about FERPA and FPCO is available at www.ed.gov/fpco.

[27] 20 U.S.C. § 1232g(b)(1)(A); 34 C.F.R. § 99.31(a)(1).

[28] 34 C.F.R. §§ 99.3, 99.31(a)(11), 99.37.

[29] 20 U.S.C. § 1232g(a)(5)(A); 34 C.F.R. § 99.3.

[30] Letter from FPCO to Institutions of Postsecondary Education 3 (Sept. 2009), www.ed.gov/policy/gen/guid/fpco/doc/censuslettertohighered091609.pdf.

[31] 20 U.S.C. § 1232g(a)(5)(B); 34 C.F.R. §§ 99.3. 99.37(a)(3).

[32] 34 C.F.R. § 99.20.

[33] 34 C.F.R. §§ 99.20-99.22.

[34] *See* 34 C.F.R. § 106.31(b)(4).

[35] 34 C.F.R. § 106.8(b).

0014

# Exhibit B

0015

# MIKE DEWINE
## ★ OHIO ATTORNEY GENERAL ★

Administration
Office 614-466-4320
Fax 614-466-5087

30 E. Broad Street, 17th Floor
Columbus, OH  43215
www.OhioAttorneyGeneral.gov

May 27, 2016

The Honorable Loretta E. Lynch
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530-0001

The Honorable John B. King, Jr.
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C.  20202

Dear Attorney General Lynch and Secretary King,

Subordinates within your Departments on May 13, 2016 released what they styled a "Dear Colleague" letter decreeing certain  "legal obligations" of schools "at all educational levels, including school districts, colleges, and universities" that receive federal funding.

The letter purports to recite rules that schools must follow concerning access for transgender students to "restrooms, locker rooms, shower facilities, housing," and the like.  For example, with regard to "**Restrooms and Locker Rooms**" (the bolding and capitalization is from the "Dear Colleague" communication itself), the letter states that a school "must allow transgender students access to such facilities consistent with their gender identity" as determined by the "individual's internal sense of gender," and further specifies that "[a] school may not require transgender students … to use individual user facilities when other students are not required to do so."

This attempt to nationalize and politicize the way schools address gender identity issues down to the level of school locker rooms, showers, and bathrooms might be dismissed as simple bureaucratic arrogance were it not so potentially harmful to our civic discourse  and to the important rights and needs of all the school children involved.  Your assistants apparently have concluded that people of good faith across this country, informed by the basic decency and common sense of their communities, cannot be trusted to work through any particular locker room problems of this sort; instead, the premise of the letter is that local solutions undertaken in good faith must be displaced by edict from Washington, D.C.

As the Chief law officer of the State of Ohio, I write to advise you that this judgment of the "Dear Colleague" letter is wrong, both in its elitist disregard for our 21st Century communities and as a matter of law.  The letter says that a school's "desire to accommodate others' discomfort cannot justify a policy" other than that required by the letter's "guidance" – but in fact, our State and our communities are much better equipped on these matters than even the most well intentioned federal "Principal Deputy Assistant Attorney General" or "Assistant Secretary" to

advance the important dignity and privacy interests of every student-- of all students -- at a school in our State.

The "Dear Colleague" letter reports, with emphasis, that "ED and DOJ (the Departments) have determined that this letter is *significant guidance*." Significant it may be, but it is not law. To impose a national policy as "significant" as the writers would desire, proponents must obtain passage of legislation by both houses of Congress that then is submitted to the President for signature or veto. Further, the federal government cannot use its spending authority to impose administrative conditions on States, at least absent clear and explicit statutory text. Here, Congress has not enacted a federal decree along the lines the letter advocates, and I am not aware that the Administration has even proposed such legislation. Indeed, the directives have not even gone through the process of notice and comment rulemaking as would be required by the Administrative Procedure Act were the rules consistent with and authorized by legislation.

Rather than heavy-handed federal bureaucratic action guaranteeing prolonged controversy and litigation over locker room regulation, we need to let our communities sort out how best to advance the dignity and privacy interests of all students as appropriate to the differing contexts presented from one circumstance to the next. I urge you to take a step back and reconsider the unlawful and ill-advised federal decree that the Dear Colleague letter seeks to impose.

If your Departments act against our State contrary to law, I will defend vigorously the interests of the State of Ohio. Again, the federal government does not need and is not empowered to make every decision for every social institution in our country: There are many, many questions that, consistent with constitutional guarantees, are best left to the decent, commonsense judgment of individuals and communities at the state and local level. Under the laws of the United States, how schools work to handle locker room questions involving students' gender identities is one such matter.

Very respectfully yours,

Mike DeWine
Ohio Attorney General

0017

# Exhibit C



**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

**Dear Colleague Letter**
**Notice of Language Assistance**

If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY:      1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

0019

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

February 22, 2017

Dear Colleague:

The purpose of this guidance is to inform you that the Department of Justice and the Department of Education are withdrawing the statements of policy and guidance reflected in:

> Letter to Emily Prince from James A. Ferg-Cadima, Acting Deputy Assistant Secretary for Policy, Office for Civil Rights at the Department of Education dated January 7, 2015; and

> Dear Colleague Letter on Transgender Students jointly issued by the Civil Rights Division of the Department of Justice and the Department of Education dated May 13, 2016.

These guidance documents take the position that the prohibitions on discrimination "on the basis of sex" in Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 et seq., and its implementing regulations, see, e.g., 34 C.F.R. § 106.33, require access to sex-segregated facilities based on gender identity. These guidance documents do not, however, contain extensive legal analysis or explain how the position is consistent with the express language of Title IX, nor did they undergo any formal public process.

This interpretation has given rise to significant litigation regarding school restrooms and locker rooms. The U.S. Court of Appeals for the Fourth Circuit concluded that the term "sex" in the regulations is ambiguous and deferred to what the court characterized as the "novel" interpretation advanced in the guidance. By contrast, a federal district court in Texas held that the term "sex" unambiguously refers to biological sex and that, in any event, the guidance was "legislative and substantive" and thus formal rulemaking should have occurred prior to the adoption of any such policy. In August of 2016, the Texas court preliminarily enjoined enforcement of the interpretation, and that nationwide injunction has not been overturned.

In addition, the Departments believe that, in this context, there must be due regard for the primary role of the States and local school districts in establishing educational policy.

In these circumstances, the Department of Education and the Department of Justice have decided to withdraw and rescind the above-referenced guidance documents in order to further and more completely consider the legal issues involved. The Departments thus will not rely on the views expressed within them.

0020

Please note that this withdrawal of these guidance documents does not leave students without protections from discrimination, bullying, or harassment. All schools must ensure that all students, including LGBT students, are able to learn and thrive in a safe environment. The Department of Education Office for Civil Rights will continue its duty under law to hear all claims of discrimination and will explore every appropriate opportunity to protect all students and to encourage civility in our classrooms. The Department of Education and the Department of Justice are committed to the application of Title IX and other federal laws to ensure such protection.

This guidance does not add requirements to applicable law. If you have questions or are interested in commenting on this letter, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339); or the Department of Justice at education@usdoj.gov or 877-292-3804 (TTY: 800-514-0383).

Sincerely,

/s/                                                            /s/
Sandra Battle                                                 T.E. Wheeler, II
Acting Assistant Secretary for Civil Rights                   Acting Assistant Attorney General for Civil Rights
U.S. Department of Education                                  U.S. Department of Justice

0021

# EXHIBIT D

**FACT SHEET: U.S. Department of Education's 2022 Proposed Amendments to its Title IX Regulations**

Over the last 50 years, since Title IX of the Education Amendments of 1972 (Title IX) was signed into law, it has paved the way for tremendous strides in access to education, scholarships, athletics, and more for millions of students across the country. In spite of this historic progress, women and girls still face fundamental barriers to equal education opportunity. Rates of sexual harassment and assault in our nation's schools and colleges remain unacceptable high. Far too many women see their education derailed because of pregnancy discrimination. The promise of Title IX, an education free from sex discrimination, remains as vital now as it was when it was first signed into law.

Today, in celebration of the 50th anniversary of Title IX, the U.S. Department of Education released for public comment proposed changes to the regulation that help schools and colleges implement this vital civil rights legislation. The proposed amendments aim to ensure full protection under Title IX for students, teachers, and employees from all forms of sex discrimination, including sex-based harassment and sexual violence, in federally funded elementary schools, secondary schools, and postsecondary institutions.

These proposed regulations will advance Title IX's goal of ensuring that no person experiences sex discrimination in education, that all students receive appropriate support as needed to access equal educational opportunities, and that school procedures for investigating and resolving complaints of sex discrimination, including sex-based harassment and sexual violence, are fair to all involved.

The Department's proposed amendments will restore vital protections for students in our nation's schools which were eroded by controversial regulations implemented during the previous Administration. Those regulations weakened protections for survivors of sexual assault and diminished the promise of an education free from discrimination. The new regulations proposed by the Department will also provide clear rules to help schools meet their Title IX obligation to eliminate sex discrimination in their programs and activities. Through the proposed regulations, the Department reaffirms its core commitment to fundamental fairness for all parties; protecting freedom of speech and academic freedom; and respect for the autonomy and protections that complainants need and deserve when they come forward with a claim of sex discrimination.

The Department's proposed regulations will also strengthen protections for LGBTQI+ students by clarifying that Title IX's protections against discrimination based on sex apply to discrimination based on sexual orientation and gender identity.

In developing these proposed regulations, the Department consulted extensively with stakeholders, and received input from students, parents, educators, state government representatives, advocates, lawyers, researchers, and representatives from elementary, secondary, and postsecondary schools. The Department also held its first-ever nationwide virtual public hearing on Title IX in June 2021 and conducted a careful review of federal case law to support its comprehensive review of current Title IX policy and development of the proposed regulations.

The proposed regulations would:

**Clearly protect students and employees from all forms of sex discrimination**

The Department's proposed regulations clarify that Title IX's prohibition of discrimination based on sex includes protections against discrimination based on sex stereotypes and pregnancy. The Department is

also clarifying that Title IX's protections against discrimination based on sex apply to sexual orientation and gender identity. This clarification is necessary to fulfill Title IX's nondiscrimination mandate.

**Provide full protection from sex-based harassment.**

The proposed regulations will restore vital protections for students against all forms of sex-based harassment. Under the previous Administration's regulations, some forms of sex-based harassment were not considered to be a violation of Title IX, denying equal educational opportunity. The proposed regulations would cover all forms of sex-based harassment, including unwelcome sex-based conduct that creates a hostile environment by denying or limiting a person's ability to participate in or benefit from a school's education program or activity.

**Protect the right of parents and guardians to support their elementary and secondary school children.**

The proposed regulations would strengthen clear protection for parents, guardians, and other authorized legal representatives of students to act on behalf of a student, including by seeking assistance under Title IX and participating in any grievance procedures.

**Protect students and employees who are pregnant or have pregnancy-related conditions.**

The proposed regulations would update existing protections for students, applicants, and employees against discrimination because of pregnancy or related conditions.  The proposed regulations would strengthen requirements that schools provide reasonable modifications for pregnant students, reasonable break time for pregnant employees, and lactation space.

**Require schools to take prompt and effective action to end any sex discrimination in their education programs or activities – and to prevent its recurrence and remedy its effects.**

The proposed regulations would promote accountability and fulfill Title IX's nondiscrimination mandate by requiring schools to act promptly and effectively in response to information and complaints about sex discrimination in their education programs or activities. And they would require that schools train employees to notify the Title IX coordinator and respond to allegations of sex-based harassment in their education programs or activities.

**Require schools to respond promptly to all complaints of sex discrimination with a fair and reliable process that includes trained, unbiased decisionmakers to evaluate all permissible evidence.**

The proposed regulations would establish clear requirements for schools to conduct a reliable and impartial investigation of all sex discrimination complaints, as Title IX requires. The current regulations' requirements cover *only* formal complaints of sexual harassment.

The proposed regulations would keep as much of the current regulations as possible to ensure consistency for schools *and* would update procedures to fill gaps and work more effectively in protecting against sex discrimination in the nation's K-12 schools and postsecondary institutions.

The Department's proposed regulations would include the following requirements:

- All schools must treat complainants and respondents equitably.
- Schools have the option to offer informal resolution for resolving sex discrimination complaints.

- Title IX Coordinators, investigators, decisionmakers, and facilitators of an informal resolution process must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent.
- A school's grievance procedures must give the parties an equal opportunity to present relevant evidence and respond to the relevant evidence of other parties.
- The school's decisionmakers must objectively evaluate each party's evidence.
- The proposed regulations would not require a live hearing for evaluating evidence, meaning that if a school determines that its fair and reliable process will be best accomplished with a single-investigator model, it can use that model.
- A school must have a process for a decisionmaker to assess the credibility of parties and witnesses through live questions by the decisionmaker. The proposed regulations would not require cross-examination by the parties for this purpose but would permit a postsecondary institution to use cross-examination if it so chooses or is required to by law.
- In evaluating the parties' evidence, a school must use the preponderance-of-the-evidence standard of proof unless the school uses the clear-and-convincing-evidence standard in all other comparable proceedings, including other discrimination complaints, in which case the school may use that standard in determining whether sex discrimination occurred.
- A school must not impose disciplinary sanctions under Title IX on any person unless it determines that sex discrimination has occurred.

**Protect LGBTQI+ students from discrimination based on sexual orientation, gender identity, and sex characteristics.**

The proposed regulations would clarify that Title IX's prohibition on discrimination based on sex applies to discrimination based on sexual orientation and gender identity. They would make clear that preventing someone from participating in school programs and activities consistent with their gender identity would cause harm in violation of Title IX, except in some limited areas set out in the statute or regulations. By providing this protection, the proposed provisions would carry out Title IX's nondiscrimination mandate and help to ensure access to education free from sex discrimination for LGBTQI+ students and others.

The Department plans to issue a separate notice of proposed rulemaking to address whether and how the Department should amend the Title IX regulations to address students' eligibility to participate on a particular male or female athletics team.

**Require schools to provide supportive measures to students and employees affected by conduct that may constitute sex discrimination, including students who have brought complaints or been accused of sex-based harassment.**

Under the proposed regulations, schools would be required to offer supportive measures, as appropriate, to restore or preserve a party's access to the school's education program or activity. The current regulations require this support only when sexual harassment, rather than any form of sex discrimination, might have occurred.

**Clarify and confirm protection from retaliation for students, employees, and others who exercise their Title IX rights.**

Retaliation against someone who provides information about alleged sex discrimination or who participates in a school's Title IX process can interfere with protections guaranteed by Title IX. If

0025

students or others do not have clear protection against such retaliation, they may be unwilling to come forward with information or a complaint of sex discrimination, leaving Title IX protections unfulfilled.

The proposed regulations would make clear that schools must not intimidate, threaten, coerce, or discriminate against someone because they provided information about or made a complaint of sex discrimination or because they participated in the school's Title IX process – and that schools must protect students from retaliation by other students.

**Improve the adaptability of the regulations' grievance procedure requirements so that all recipients can implement Title IX's promise of nondiscrimination fully and fairly in their educational environments.**

To be effective in implementing Title IX, a school's grievance procedures for sex discrimination complaints must adapt to the age, maturity, needs, and level of independence of students in various educational settings, and the particular contexts of employees and third parties.

Based on this reality, the Department's proposed regulations would include a framework that accounts for these differences, including requirements that apply in all settings and specialized requirements that are tailored to the unique situation of sex-based harassment complaints involving postsecondary students.

This framework would ensure that all federally funded schools and postsecondary institutions can provide for the prompt and equitable resolution of sex discrimination complaints in their respective settings.

**Ensure that schools share their nondiscrimination policies with all students, employees, and other participants in their education programs or activities**

The proposed regulations also would require all schools that receive federal funding to clearly and effectively communicate their nondiscrimination policies to all students, employees, and other participants in their education programs or activities.

The Department's proposed Title IX regulations will be open for public comment for 60 days from the date of publication in the *Federal Register*.

Additional information on the proposed rule is available here. The unofficial version of the proposed rule is available here.

0026

# EXHIBIT E

0027



The views expressed in this document are those of the Caucus.
The Caucus has no authority to speak for, or act on behalf of, the NEA.





0028

We are excited that you are willing to partner with the NEA-LGBTQ+ Caucus by wearing your "I'm HERE" badge. By wearing our badge, you tell everyone that you are a safe person to discuss LGBTQ+ issues. Affirming LGBTQ+ youth couldn't be easier than by identifying yourself as a safe and supportive person.

Use the QR code on the back of the badge to access the "I'm HERE" Toolkit with links to a variety of LGBTQ+ issues, organizations, and resources.

Get your Local, State Affiliate or School District onboard today! Order additional badges from the NEA LGBTQ+ Caucus. Larger quantities can be customized with your specific group's logo/information.

To order additional badges, or find out about sponsorship, co-branding, or customization please email:
imhere@nea-lgbtqc.org





**Disclaimer:**
Links/Resources/Referrals to other organizations does not constitute an endorsement by the NEA-LGBTQ+ Caucus. All copyrights belong to their respective organization. If you are not a safe person or do not support LGBTQ+ youth or issues, please do not wear or display the "I'm Here" badge.



# EXHIBIT F

0030

Joshua J. Brown (0089836)

Ohio Attorney at Law

5086 N. High Street

Columbus, OH 43214-1526

Office Phone: (614) 974-2022

Cell: (614) 284-4394

Fax: (614) 388-3947

josh@joshbrownesq.com

August 15, 2022

BY U.S. MAIL AND EMAIL DELIVERY

Dave Stewart, Superintendent

Hilliard City Schools

2140 Atlas Street

Columbus, OH 43228

david_stewart@hboe.org

RE:     Request for District Position on Parental Notification of Gender Dysphoria Symptoms Manifested at School

Dear Mr. Stewart:

I am writing on behalf of over thirty (30) parents (the "Parents") who have children in Hilliard City Schools (the "District"). Some of the parents met with you on or about July 19, 2022.

In that conversation you were asked whether a teacher is at liberty to disclose to parents, that their child seeks to identify as a different name than the one they are registered with or identify as a different gender than their biological gender. You said the law is unclear and that, pursuant to Title IX, a teacher would be putting his/herself at great personal risk if teacher were to "out a kid" to their parents without the child's permission, when the teacher is not a counselor.

This ambiguity gives rise to great concern, both from a standpoint of health and law. The DSM-5-TR still defines these items as symptoms of gender dysphoria. Appropriate treatment for gender dysphoria is currently a subject of sharp disagreement. ***Parents cannot support, and may inadvertently undermine treatment if they are unaware of the dysphoria and/or the treatment the school is providing.***

Erica Anderson, a clinical psychologist who is former President of the U.S. Professional Association for Transgender Health, said leaving parents in the dark is not the answer. "If there are issues between parents and children, they need to be addressed

Page 2 of 3

August 15, 2022

. . . It's like kicking a can down the road. It only postpones, in my opinion, and aggravates any conflict that may exist."

You said there were different perspectives and that this is not a clear area of law. The Parents sympathize, as the lack of clarity likely arises from the opinion of the U.S. Department of Education. In fact, that is why a Federal Judge issued an injunction against actions based on the Department's interpretation. See: *The State of Tennessee, et al. v. United States Department of Education, et al.,* Case No. 3:21-cv-00308, docket #86, Memorandum Opinion and Order granting Plaintiff's Motion for Preliminary Injunction.

The Department's opinion on Title IX is not law and will certainly undergo legal challenges. However, one area of law is crystal clear: parents have a right to direct their children's education. The U.S. Supreme Court said:

> [I]n *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, *in Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*, at 535. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 166.

*Troxel v. Granville,* 530 U.S. 57, 65 (2000). The Ohio Supreme Court adopted the same doctrine, pursuant to the Ohio Constitution. See e.g., *State v. Whisner*, 47 Ohio St. 2d 181, 215-128 (Ohio 1976).

The Parents are naturally concerned, given that this is a prominent national issue. The practice of hiding symptoms of gender dysphoria from parents led to currently ongoing lawsuits in Massachusetts, Florida, Wisconsin, Kansas, Virginia, and Maryland. Several states adopted policies that would seem to allow school officials to hide gender

0032
Page 3 of 3
August 15, 2022

dysphoria symptoms from parents. For example, in Maryland, a lawsuit is currently pending over the Maryland State Department of Education guidelines which specifically advise school officials to hide symptoms of gender dysphoria from parents. In California, a person named Jessica Konen sued a school for allegedly manipulating and encouraging her daughter to "transition." At Charles F. Patton Middle School in Pennsylvania, emails were made public of staff members specifically stating that they will use different pronouns when talking to parents about their child. There are rumors these types of activities are currently occurring at Hilliard City Schools—and no doubt they could occur.

Thus, the Parents feel they have a right to a clear, unambiguous answer, as to whether the school will require school officials to notify parents when their child manifests symptoms of gender dysphoria (or symptoms of anything else) at school, and what specific exceptions may apply.

You may reply to my contact information in the header. We will wait thirty (30) days for an answer, which will be until September 15, 2022. At that time, if we have no answer, then we will seek to require an answer from the District in federal court.

Thank you,

Joshua J. Brown (0089836)
Ohio Attorney at Law

jjb.

CC:

Julie C. Martin, Legal Counsel
Hilliard City Schools
Scott Scriven LLP
250 E. Broad St., Suite 900
Columbus, OH 43215
Phone: (614) 222-8686
Fax: (614) 222-8688
julie@scottscrivenlaw.com

0033

# Exhibit G



Writer's Extension: 1120
jessica@scottscrivenlaw.com

September 14, 2022

**Via Email: josh@joshbrownesq.com**
Joshua J. Brown, Esq.
5086 N. High Street
Columbus, Ohio 43214
josh@joshbrownesq.com

Re:     **Your Request to Hilliard City Schools**

Mr. Brown:

Our office serves as legal counsel to Hilliard City Schools.  Superintendent Stewart asked that I respond to your recent correspondence of August 15, 2022 wherein you indicate you represent parents with questions regarding student gender identity as it is addressed at the District.  Your letter asks the question of whether the school will "require school officials to notify parents when their child manifests symptoms of gender dysphoria (or symptoms of anything else) at school, and what specific exceptions may apply."

As an initial matter, the District's goal is to include parents in all aspects of a child's education.  Your question asks for something different, however.  Without going back and forth about who can assess "symptoms," and what that undefined term may mean to you or the parents you represent, it appears your question is really – if a student identifies at school as a gender different than their birth gender, will the school discuss this with the parents?  The answer is "probably."  Schools stand *in loco parentis*, meaning in place of parents, for students who attend school.  While parents generally have rights regarding the upbringing of their children, schools and educators have an obligation to act in the student's best interest when the student is at school.  School districts also must comply with state and federal anti-discrimination and privacy laws that protect students.  The default expectation is to include parents with regard to gender identity matters because the District's position is that is generally in the student's best interest, but that will not always be the case.  For example, there may be a health or safety concern at issue.  There also may be confidentiality issues involved because a student's conversations with a school counselor are almost always privileged under Ohio law.   With regard to school counseling and health care, when students are referred to mental or other health care professionals, the District complies with the notice and consent requirements as set forth in Ohio law.  Generally, consent for healthcare referrals or treatment must be clarified as part of a child's emergency medical authorization form.  See Board Policy JHC, Student Health Services and Requirements.

Your letter also suggested that a recent court decision issued by the United States District Court for the Eastern District of Tennessee (the "Tennessee Case") applies to transgender student rights in the education setting. We are familiar with that case, but I believe your interpretation is a bit misplaced because that case did not consider the substantive question regarding Title IX's application and did not change the controlling law under Title IX in our jurisdiction. The Tennessee Case involved a challenge, among other things, to the United States Department of Education ("DOE") guidance regarding school districts' obligations not to discriminate against, and to accommodate, transgender students. On July 15, 2022, the United States District Court for the Eastern District of Tennessee granted a preliminary injunction barring DOE from enforcing this guidance in certain states, including Ohio. As the court explained, the basis for the injunction was strictly procedural. The court held that DOE's guidance was not proper because DOE failed to comply with required administrative notice and comment procedures. Importantly, the court expressly refrained from determining whether DOE's guidance regarding transgender students was or was not "substantively lawful." In other words, the Tennessee Case did not reject DOE's substantive position that discrimination on the basis of sexual orientation or gender identity is a violation of Title IX and other federal laws.

While the Tennessee court barred DOE from enforcing the challenged guidance in certain states, it did not change the controlling body of law in our jurisdiction that holds that Title IX and the United States Constitution prohibits discrimination on the basis of sexual orientation and gender identity. Nor did it change the numerous court opinions, including those issued by courts with jurisdiction over Ohio, that require school districts to provide accommodations to transgender students and to treat them as the gender with which they identify. *See Bd. of Edn. of the Highland Local Sch. Dist. v. United States Dept. of Edn.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Bd. of Edn. of the Highland Local Sch. Dist. v. United States Dept. of Edn.*, 2016 WL 6125403 (S.D. Ohio 2016); *Dodds v. United States Dept. of Edn.*, 845 F.3d 217 (6th Cir. 2016). The District and its administration is fully aware of the above and will continue to apply the controlling law, including as it may evolve over time, throughout its educational program.

I hope this information has helped to resolve any concerns your clients may have regarding the District's academic program. If you have further questions or would like to discuss, you may reach out to me directly.

Sincerely,

Jessica K. Philemond

Cc:     David Stewart, Superintendent

# Exhibit H

Joshua J. Brown (0089836)
Ohio Attorney at Law
5086 N. High Street
Columbus, OH 43214-1526
Office Phone: (614) 974-2022
Cell: (614) 284-4394
Fax: (614) 388-3947
josh@joshbrownesq.com

September 16, 2022

BY U.S. MAIL AND EMAIL DELIVERY
Hilliard City Schools
c/o Jessica K. Philemond, Attorney
Scott Scriven Law
250 East Broad Street, Suite 900
Columbus, OH 43215
jessica@scottscrivenlaw.com

       RE:     Follow Up Request for District Position on Parental Notification of
                   Gender Dysphoria Symptoms Manifested at School

Dear Mrs. Philemond:

     Thank you for your letter dated September 14, 2022. I believe it took us closer to a resolution on this issue. The Parents have a few follow up questions.

     On behalf of over thirty parents (hereinafter the "Parents") with children in the Hilliard School District, on August 15, 2022, I sent you a letter wherein I asked you, in short, whether the school will require school officials to notify parents when their child manifests symptoms of gender dysphoria at school. You answered that this is the "default expectation" of the school, but the school will make exceptions when there may be a "health or safety concern at issue." Also, you offered a very generalized statement that the school follows applicable law.

     It is rather obvious that when a child is being abused by their parents that the school will not work with parents as normal. Also, it is obvious that a child who merely discusses sex and gender confusion issues solely within the confines of discussions with a counselor is likely to benefit from the confidentiality afforded counseling.

     However, those are not the situations the Parents are concerned about. Again, the school superintendent is receiving this question because he said the law is unclear and that, pursuant to Title IX, a teacher would be putting his/herself at great personal risk if

teacher were to "out a kid" to their parents without the child's permission, when the teacher is not a counselor.

In addition to the Superintendent's statement and a host of other items, there are a few other items that are causing serious concerns among parents that I want to point your attention toward. The Parents' concern is that there are activists within the schools in the District who are actively undermining the District's standards and the rights of parents to direct the upbringing of their children.

The Parents have a right to know if the following acts are part of the District's standards, whether it violates the District's policies, and whether these items violate the Parents' rights to control the upbringing of their children.

1.      **Survey Questions**

I possess direct evidence that teachers asked children—in a written survey (that I have a copy of) what pronouns a child prefers at school . . . *and in a different, subsequent question,* the survey asked what pronouns the student prefers the teacher use when speaking to parents. Since this was class-wide, it was not limited to situations involving health and safety, abuse, or confidentiality.

2.      **"I'm Here" Badges**

I am also aware that some Hilliard District teachers—not counselors—are wearing so-called "I'm Here" badges that identify particular teachers as a "safe person." The badge is accompanied by a holder that says "If you are not a safe person or do not support LGBTQ+ youth or issues, please do not wear or display the 'I'm Here' badge."

That badge and the accompanying badge holder is distributed by the local teacher's union and emanates from the NEA-LGBT+ Caucus. This badge, and the holder that the badge came in, has a QR code linking to material giving instruction on sexual positions and suggested books that are not part of the District's standards. The Superintendent acknowledged in writing the material is "adult" material. The QR code can be scanned by students from far away and a student testified at a recent Hilliard School Board meeting that she was given one of these badges (she held one of the badges up at the Board meeting).

The union admits the intention of the badge is to attract discussion from children about personal, intimate sexual matters—which will allow teachers (not counselors) to know who the most vulnerable children in Hilliard School District are. I have an email

0039
Page 3 of 4
September 16, 2022

from the President of the Hilliard teacher's union, Linna Jordan, basically doubling down and defending her dissemination of this badge. It also came to my attention that President Jordan was personally passing out sexual literature and/or badges last week at Davidson, and the President was asking people if they were "friend for foe" before giving the materials out.

### 3.  Displays of Sexual Content to Children, at School

I am also aware of materials posted by a teacher, at a school, that contain educational materials about sexual materials that are not part of the district standards. I have a copy of the bulletin board. It has definitions of sexual items which, I am guessing, are not part of the District's standards.

### Follow Up Questions

So hopefully, you can understand why the parents are concerned about ideological and political activism at this District that would undermine parental rights. It seems the teacher's union and President Linna Jordan in particular, are actively organizing an effort to educate students in materials that are not part of—and perhaps contrary to—the District's standards. Meanwhile, these materials label certain people including parents, teachers, and school officials as "unsafe." They are doing so in partnership with an organization with tremendous resources: the NEA and its LGBTQ+ Caucus.

Thus, the Parents respectfully request unambiguous answers to the following questions:

1. Was the Superintendent's statement about "outing a kid" consistent with the policies of the Hilliard School District? We would like a direct answer.

2. What is the definition of a "default expectation" as referred to in your letter? And are there consequences for teachers who ignore the "default expectation" and use different pronouns with children than when talking to the childrens' parents (excluding situations of abuse, confidential counseling, or similar situations)?

3. What are the definitions of "health and safety concerns" as it relates to persons who "are not a safe person?"
   a. Teachers are disseminating materials that say a person who does not support LGBTQ+ youth or issues is an "unsafe person." As a lawyer, you know that Americans have a right to know what conduct will

result in legal consequences (i.e., the void for vagueness doctrine). Thus, is the District's policy that a person (such as a parent, teacher, etc.) who is "not a safe person" by virtue of their perceived lack of "support for LGBTQ+ issues" qualify as "health and safety concern?"

b. In particular, will the district take a parent's opinions, thoughts, utterances, religious precepts, etc. into consideration as a "health and safety concern?" Should parents know that certain expressions could shut them out from information about their children learned at the District? Specifically, will the District take parent's expression related to so-called "gender-affirming treatment" into consideration?

4. Do the two questions presented to students last month—in writing—violate school policy (i.e., asking for a student's preferred pronouns and then asking the student what pronouns they want teachers to use when speaking to parents)?

We greatly appreciate the timeliness of your last response. Again, you may reply to my contact information in the header. We will wait thirty (30) days for an answer, which will be until October 17, 2022. At that time, if we have no answer, then we will seek to require an answer from the District in federal court.

Thank you,

Joshua J. Brown (0089836)
Ohio Attorney at Law

jjb.

CC:
Julie C. Martin, Legal Counsel
Hilliard City Schools
Scott Scriven LLP
250 E. Broad St., Suite 900
Columbus, OH 43215
Phone: (614) 222-8686
Fax: (614) 222-8688
julie@scottscrivenlaw.com

0041

# Exhibit I



Writer's Extension:  1120
jessica@scottscrivenlaw.com

October 14, 2022

<u>**Via Email: josh@joshbrownesq.com**</u>
Joshua J. Brown, Esq.
5086 N. High Street
Columbus, Ohio 43214

> **Re:**    <u>**Your Follow-Up Letter to Hilliard City Schools**</u>

Mr. Brown:

    We have received your follow-up letter in which you stated that the District's response "took us closer to resolution."  I can't help but notice, though, that your first request had one interrogatory and this follow-up request has more than quadrupled in size.  I called you at your office after receiving the letter and left a message requesting to discuss, but you did not return my call.  I understand that you then held a community meeting to discuss a lawsuit against the District on these very issues and sought to raise $30,000.00 from residents for what was described as possibly two years of litigation.  If that is the intent, our written exchange or discussion is pointless.

    With regard to your questions concerning Board Policy and whether various hypotheticals would conform with or violate them, the Board's policies are all available online at the <u>District webpage</u>. Regarding your questions concerning parents' rights to direct the upbringing of their children, you cited U.S. Supreme Court case law in your first letter (see, e.g., *Troxel v. Granville*, 530 U.S. 57 (2000)).  I assume you are aware of the Sixth Circuit Court of Appeals decision in *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) and a case that was recently decided outside our jurisdiction looking at similar issues (and discussing the case you cited).  See, *John and Jane Parents 1, et al. v. Montgomery County Board of Education, et al*., 2022 WL 3544256 (Aug. 18, 2022).

    The District is committed to working with parents on any specific concerns they may have about their child's education, and parents are encouraged to bring any specific concerns directly to the District's attention so they may be addressed.  I remain available if you would like to reach out to discuss.

        Sincerely,

        Jessica K. Philemond

Cc:    David Stewart, Superintendent