# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Rachel Kaltenbach, et al., | : | Case No. 2:23-cv-00187 |
| Plaintiffs, | : | Judge: Michael H. Watson |
| v. | : | Magistrate Judge Kimberly A. Jolson |
| Hilliard City Schools Board of Education, et al., | : | |
| | : | |
| Defendants. | | |

## MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANTS HILLIARD CITY SCHOOLS BOARD OF EDUCATION, BETH MURDOCH, KARA CROWLEY, NADIA LONG, ZACH VORST, AND BRIAN PERRY

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Hilliard City Schools Board of Education, Beth Murdoch, Kara Crowley, Nadia Long, Zach Vorst, and Brian Perry (collectively "District") respectfully moves this Court for an Order dismissing all claims against them, with prejudice, as Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted. This Motion is further supported by the attached memorandum, which is incorporated herein by reference.

Respectfully submitted,

*/s/ Jessica K. Philemond*
Jessica K. Philemond, Trial Counsel (0076761)
jessica@scottscrivenlaw.com
Julie C. Martin (0056163)
julie@scottscrivenlaw.com
Mitchell L. Stith (0096759)
mitch@scottscrivenlaw.com
SCOTT SCRIVEN LLP
250 East Broad Street, Suite 900
Columbus, OH 43215
(614)222-8686; Fax (614) 222-8688

/s/ Brandon Abshier
Brandon Abshier (0083505)
Michael J. Valenine (0038806)
REMINGER CO., LPA
200 Civic Center Drive, Suite 800
Columbus, OH 43215
babshier@reminger.com
mvalentine@reminger.com
P: 614-232-2422

*Attorneys for Defendants*

ii

MEMORANDUM IN SUPPORT

I.  INTRODUCTION

"The Parents do not agree with the ideology behind the school's actions." (Amended Complaint at ¶153.)

Plaintiffs' Amended Complaint, which is still[1] riddled with inaccuracies and false statements, reveals that despite claiming this case is not political, it is in fact political. Plaintiffs have spent countless pages of their Amended Complaint citing to various national news articles, national political committee platforms, and "lesser known" news websites to make the point that they do not agree with a certain ideology. That much is clear. While Plaintiffs are entitled to their own beliefs and ideologies, what they are not entitled to is a fundamental constitutional right to direct the policies of a school district when they "do not agree with the ideology behind the school's actions."

Plaintiffs, ten (10) parents, nine (9) of whom claim to have children enrolled in the Hilliard City School District ("District"), bring this eighty-nine (89) page Amended Complaint to sound the alarm on what they describe as "confusion" concerning Title IX and ask for this Court to intervene by issuing a "federal declaration" to resolve these issues for a national audience. (Amended Complaint, ¶¶ 18, 22-29). There is no confusion that district courts have already rejected nearly identical arguments made in other cases. Plainly, Plaintiffs have not alleged an actual case or controversy that would invoke the jurisdiction of the federal courts nor a fundamental constitutional right.

---

[1] The Amended Complaint, appropriately, now no longer claims that the District engaged in "soliciting sexual conversations with children," as the initial Complaint had harmfully done while citing a website story that was actually about another school district. However, the Amended Complaint does still reference random unknown individuals, such as a "Superintendent Johnson" (perhaps from a cut and paste from some other case) and alleges "stories" that, should discovery commence in the case, ought to result in sanctions for their falsehoods.

1

The Hilliard City School District educates more than 16,000 students throughout its three (3) high schools, three (3) middle schools, two (2) sixth-grade schools, and fourteen (14) elementary schools. The Board maintains a policy prohibiting discrimination on the basis of sex, including sexual orientation and gender identity, and respects the privacy and dignity of each and every one of its students. See, Board Policy AC – Nondiscrimination. Likewise, the Board maintains a policy declaring its belief that parent and family involvement is an important part of the educational program and encourages strong home-school partnerships. See, Board Policy IGBL – Parent and Family Involvement in Education.

With regard to handling student issues of gender identity, the Hilliard City School District follows the controlling law in our jurisdiction that provides that Title IX and the United States Constitution prohibits discrimination on the basis of sexual orientation and gender identity. *See, e.g., Bd. of Edn. of the Highland Local Sch. Dist. v. United States Dept. of Edn.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Dodds v. United States Dept. of Edn.*, 845 F.3d 217 (6th Cir. 2016). When the parent of a transgender student or a transgender student themselves requests accommodations, the relevant school officials will meet with the parent, student, and any other individuals with relevant information. The team will discuss the requested accommodations; the consistency and uniformity of the asserted gender identity; any legal or medical evidence that the gender identity is sincerely held as a part of the student's core identity; and any supports needed to ensure equal access to and equal opportunity to participate in the District's education programs. Accommodations are granted on a case-by-case basis, after considering the circumstances, and parents may or may not be initially involved, depending on student safety and protection of student privacy. There is simply not a "one size fits all" process as Plaintiffs insist.

Plaintiffs note multiple times that they are not asking for damages as a part of their lawsuit. Instead, Plaintiffs claim fear of future action, alleging that the District's teachers are "activists"

encouraged to have "sexual conversations" with children, making their children "vulnerable to abuse." (Amended Complaint, ¶¶ 48, 131, 172).

Plaintiffs' Amended Complaint alleges two Counts against the District. Count One seeks a declaratory judgment that essentially the District must, no matter the circumstances, inform a parent of a child's "gender dysphoria." Count Two seeks injunctive relief for alleged deprivations of the Plaintiffs' constitutional right to direct the upbringing and care for their children.

Plaintiffs' Amended Complaint fails for the following reasons. First, Plaintiffs lack standing to bring claims in this lawsuit because they have not been harmed and/or no longer live in the District and therefore would not be subject to the declaratory and/or injunctive relief.

Second, even if Plaintiffs had standing, their legal claims would fail as a matter of law. Both counts seek relief outside of what is provided by the constitutional right to direct the upbringing and care of children. The Court in *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Education*, 2022 WL 3544256 (D. Md. August 18, 2022), addressed similar claims to those brought here and found parents did not have a fundamental right under the due process clause to be promptly informed of their child's gender identity. Finally, in support of their request for an injunction, Plaintiffs cite authorities that are purely remedial in nature such that, when no underlying violation occurs, no remedy is warranted. For all of these reasons, the Amended Complaint must be dismissed, with prejudice.

## II.     LAW AND ARGUMENT

### A.     **Plaintiffs Lack Standing.**

In the original complaint, Plaintiffs did not allege injury to any of their children. When such issue was pointed out in Defendants' Motion to Dismiss the Complaint, Plaintiffs attempted to fix this issue in their Amended Complaint by naming a Plaintiff who does not live in the District

3

and whose daughter allegedly suffered injuries. (Amended Complaint, A Hilliard Family's Story 1, ¶¶ 74-94).

First, the Amended Complaint does not properly identify the Plaintiff's child whom allegedly suffered these injuries and simply lists the child as a Jane Doe. (Amended Complaint, ¶¶ 74-94). While the District can understand the sensitive nature of such an issue and would certainly consent to the student's proceeding with pseudonyms for privacy, Plaintiffs have not filed any motions to proceed anonymously. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a short and plain statement of the claim showing that the *pleader* is entitled to relief *Ashcroft v. Iqbal*, 556 U.S. 662, 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(emphasis added). Therefore, the First Amended Complaint should be dismissed.

Even if the Court believes this particular Plaintiff's child that is discussed in paragraphs 74-94 of the Amended Complaint and Exhibit A thereto is sufficiently identified, such Plaintiff should still be dismissed. This particular Plaintiff parent and family moved away from the District and the child is no longer enrolled in the District. (*Id.* at ¶¶ 90, 92). Plaintiffs do not establish how a Plaintiff who no longer lives in the District and who has a child that no longer attends school in the District, has standing to seek an injunction and declaratory judgment related to the District's policies and/or actions.

The threshold question in every federal case is whether the court has the judicial power to entertain the suit. *National Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Article III of the United States Constitution prescribes that federal courts may exercise jurisdiction only where an actual "case or controversy" exists. See U.S. Const. art. III, § 2. Courts have explained the "case or controversy" requirement through a series of "justiciability doctrines," including, "perhaps the most important," that a litigant must have "standing" to invoke the jurisdiction of the federal courts. *Magaw*, 132 F.3d at 279. The

4

plaintiff bears the burden of establishing standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). To satisfy the "irreducible constitutional minimum of standing," a plaintiff must establish that: (1) they have suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; (2) that there is a causal connection between the injury and the defendant's alleged wrongdoing; and (3) that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotations omitted).

Here, the alleged and unidentified Plaintiff parent in paragraphs 74-94 of the Amended Complaint does not allege how the District's policies and/or future actions (the only things relevant based on Plaintiffs' claims) will have any impact on such unidentified Plaintiff. Standing requires plaintiffs to demonstrate "actual present harm or a significant possibility of future harm." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citation omitted).  Further, a person no longer involved with an organization or entity has no standing to bring claims based on challenging an organization's policy. *Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) (finding plaintiff who was no longer employed by the university nor eligible for re-hire cannot demonstrate harm by claiming imminent enforcement of a university policy); *Piggee v. Carl Sandburg Coll.*, 464 F.3d 667, 673 (7th Cir. 2006) (holding that an instructor lacked standing to seek injunction against college's restriction on her speech because she was no longer employed and could not show "real and immediate" danger of injury from allegedly wrongful restriction).

Plaintiffs are clear that they are not making a claim for damages. Therefore, the unidentified Plaintiff parent in paragraphs 74-94, who no longer lives in the District and whose child no longer attends school in the District, has no imminent threat related to any District policy. Nor does such Plaintiff have any relationship to the District to be further affected by any declaration by this Court

5

regarding the District's policies. This unidentified Plaintiff in paragraphs 74-94 of the Amended Complaint lacks standing to bring any claims.

As to the remaining Plaintiffs, the injury prong of the standing doctrine requires that the harm be actual or imminent. In other words, the harm must have already occurred or it must be likely to occur "imminently." *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. "Imminent" in this context is defined as "certainly impending," in contradistinction to "allegations of possible future injury." *Clapper,* 133 S.Ct. at 1147. Moreover, the injury must be to a legally cognizable right. *McConnell v. FEC,* 540 U.S. 93 (2003) (overruled on other grounds); *Citizens United v. FEC,* 558 U.S. 310 (2010); *Diamond v. Charles,* 476 U.S. 54, 64 (1986).

The initial dispute here is whether Plaintiffs (other than the unidentified Plaintiff in paragraphs 74-94) suffered an injury in fact. The existence of an abstract injury is insufficient for a plaintiff to carry the burden on this element. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). Plaintiffs here are claiming exactly this – an abstract injury based upon concerns of possible future injury. They have made no allegation about how their children have been affected by the District's alleged conduct.

Because Plaintiffs do not claim actual injury, they instead cite three scenarios by which they apparently claim they may suffer future injury. First, Plaintiffs claim that at least one classroom teacher in the District provided a getting to know you survey to students that included questions asking what pronouns the student preferred in class and outside of class with the school and parents. (Amended Complaint, ¶ 49). As described below, even if true, this is not a legal violation. Further, Plaintiffs do not allege that any of their children were in this classroom in which the survey was provided. Second, Plaintiffs claim that some teachers wear badges with colored Pride stripes on them that say, "I'm Here," in order to show support for individuals in the LGBTQ+ community, and that there is a QR code on the back that links to inappropriate content. (Amended

6

Complaint, ¶¶ 51, 64-73). There is indeed a QR code on the back of the badges that is intended for teachers. It links to this website: nea-lgbtqc.org. As Plaintiffs concede in the Amended Complaint, the Superintendent acknowledged that the content linked from the QR code was not intended for students and sent an e-mail stating as much and the Hilliard Education Association also explained that the QR code on the back of the badges was for educators, not students. (Amended Complaint, ¶¶ 50, 72, 73). Third, Plaintiffs claim that a bulletin board in a school building, <u>that is no longer displayed</u>, had definitions of sexual items, providing a display of "sexual content" to children, at school. (Amended Complaint, ¶ 51).

Because Plaintiffs have not met their burden of pleading an injury in fact, the Amended Complaint must be dismissed.

**B.     Plaintiffs' Claims for Violation of Their Fundamental Rights to Direct the Upbringing of Their Children Fail as a Matter of Law Because the U.S. and Ohio Constitutions Do Not Provide A Fundamental Right for Parents to be Informed by the District of All Matters Related to Their Children.**

The allegations as pled do not invoke any Constitutional right or protection. Plaintiffs are essentially asking this Court to require the District to tell Plaintiffs what the District's policy is on informing parents of the mental health conditions teachers elicit from students." (Amended Complaint, ¶ 45-48). The Amended Complaint consists of thread-bare assertions, innuendo, rumor, and spurious legal conclusions. Plaintiffs do not articulate the District's policy or practices, and instead claim they have not received answers to questions from the District central to the nature of the District's policies and practices. In essence, Plaintiff's "factual" allegations can be distilled down to:

1. Some teachers at District schools wear a badge provided by the National Education Association indicating they were a "safe" person for LGBTQ+ students. This badge contains a QR code on the back that linked to certain objectionable material; however, this material was not intended for consumption by students. (Amended Complaint, ¶¶ 64-73).

7

2. Plaintiffs solicited information about District policy with respect to transgender students. Plaintiffs allege the District deflected this question. Plaintiffs' counsel exchanged correspondence with the District legal counsel about District policies. The District "refused to answer the Parent's questions" and "explicitly refused, in writing, to state – directly to a large group of the District's parents – whether three actual occurrences at the District violated their policy or not." (Amended Complaint, ¶¶ 41-54).

3. A Board member considered adding to a policy committee meeting agenda a policy regarding the sharing of health-related information about students with parents, but the policy was not considered by the full Board at a meeting. (Amended Complaint, ¶¶ 55-56).

4. Plaintiffs include a lengthy account ("A Hilliard Family's Story 1") of an alleged scenario involving a District student. It is not identified what Plaintiff is the parent of the student and the student and parent no longer reside in the District or go to school in the District. (Amended Complaint, ¶¶ 74-94).

5. Plaintiffs include a second lengthy account ("A Hilliard Family's Story 2") of an alleged scenario involving a District student whose parent(s) is not a Plaintiff in the Amended Complaint. (Amended Complaint, ¶¶ 95-120)

Plaintiffs seek to compel the District to answer their questions—in essence, to compel the District to respond to interrogatories. As a public body it has an obligation to respond to public records requests, but the appropriate forum to dispute responses is through the state legal procedure. Further, a public body should engage in regular communication with its constituents about relevant issues, but that does not mean the public body must respond to every hypothetical question posed or that its refusal to engage in a rhetorical back-and-forth rises to the level of a constitutional right actionable in federal court.

Assuming Plaintiffs have cobbled together a cognizable claim implicating more than just a hypothetical parental right, they have not asserted a right protected by the Constitution or that affords them with the remedy they seek. Plaintiffs' core legal theory is that the District's alleged "policy" violates their "their constitutional right to direct the upbringing of, and provide care for, their children." (Amended Complaint, ¶ 166). Plaintiffs ask this Court to declare their rights to be informed of any symptoms of gender dysphoria or other mental health condition the District attains

8

from a child; and that any effort to hide this information from parents violates the Parents' rights, including fundamental constitutional rights. (Amended Complaint, ¶ 157(iii)).

Plaintiffs seek relief based on the alleged violation of their substantive rights under the Due Process Clause of the Fourteenth Amendment "to make decisions concerning the care, custody and control of their children," as recognized by the United States Supreme Court. *Troxel v. Granville,* 530 U.S. 57, 66 (2000). This right, among others, is one "not mentioned in the Constitution," but one that is "deeply rooted in this Nation's history and tradition," and "implicit in the concept or ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2242 (2022).

A claim asserting a violation of a substantive right under the Fourteenth Amendment largely hinges upon the proper characterization of the right in question. If the contested action infringes upon a fundamental constitutional right, the action is subject to strict scrutiny and must be narrowly tailored in furtherance of a compelling government interest to pass constitutional muster. Alternatively, government action that does not implicate a fundamental right need only bear a "rational" relationship to a "legitimate" government interest. *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005).

The District does not dispute the *existence* of parents' fundamental right to make decisions regarding the care, custody, and control of their children. However, Plaintiffs misconstrue the nature and applicability of this right. Courts have reiterated again and again this right is clearly not absolute or unlimited. Specifically, Courts have almost unanimously concluded there is no "fundamental right" for parents to dictate the nature, content, or manner of their children's education in public schools. *Id.* at 394.

By their nature, rights protected as a matter of substantive due process must be narrowly defined and consistent with the doctrine of judicial self-restraint. *Id.* Here, to find a cognizable

9

claim would require this Court to expand a substantive due process right far beyond recognized and accepted boundaries. Plaintiffs seek to impose upon the District a *constitutional* requirement to inform them of certain symptoms and/or conditions related to their children's mental health and/or gender expression. (Amended Complaint, ¶157(iii)). The *Constitution* does not provide Plaintiffs a fundamental right to either direct the policies of a school district, or to receive certain information, even about their own children, from a school district. Nor does the District violate any *Constitutional* right of Plaintiffs by withholding such information, in limited circumstances, from Plaintiffs about their children. *See, e.g., John & Jane Parents 1 v. Montgomery Cnty. Bd. of Education*, 2022 WL 3544256 (D. Md. August 18, 2022) (finding parents did not have fundamental right under due process clause to be promptly informed of their child's gender identity when it differed from that usually associated with their sex assigned at birth).

The Sixth Circuit Court of Appeals clearly articulated its standard for assessing the rights of parents with respect to their children's education:

> The critical point is this: While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities." *Goss v. Lopez,* 419 U.S. 565, 578 (1975).

*Blau v. Fort Thomas Public School Dist.*, 401 F.3d 381, 395-396 (6th Cir. 2005) (emphasis original).

The Sixth Circuit is not alone in limiting parents' rights once they have elected to enroll their children in public schools. Where parents have sought to expand the scope of their control of their children's schooling to include a right to dictate the operations of public schools, courts have time and again rejected their efforts. Among others, courts have rejected parental challenges to sex

education programs, *see Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005); mandatory health curriculums, *see Leebaert v. Harrington,* 332 F.3d 134, 142 (2d Cir. 2003); and mandatory community service programs, *see Herndon v. Chapel Hill–Carrboro City Bd. of Educ.,* 89 F.3d 174, 176 (4th Cir. 1996).

Plaintiffs here do not allege the District has in any way interfered with their right to direct the education of their children by infringing upon their ability to choose *where* their children are educated. Instead, Plaintiffs find the District's alleged policies and practices objectionable or offensive. They enjoy no constitutional right to be free of that which they find offensive. In a recent decision on an almost identical case in Maryland, District Judge Paul Grimm cited to the Ninth Circuit's opinion in *Fields*:

> [The Supreme Court's precedent does not provide] support for the view that parents have a right to prevent a school from providing any kind of information—sexual or otherwise—to its students....*Meyer* and *Pierce* do not encompass [the] broad-based right [the parent-plaintiffs seek] *to restrict the flow of information* in the public schools. Although the parents are legitimately concerned with the subject of sexuality, there is no constitutional reason to distinguish that concern from any of the countless moral, religious, or philosophical objections that parents might have to other decisions of the School District—whether those objections regard information concerning guns, violence, the military, gay marriage, racial equality, slavery, the dissection of animals, or the teaching of scientifically-validated theories of the origins of life. Schools cannot be expected to accommodate the personal, moral or religious concerns of every parent. Such an obligation would not only contravene the educational mission of the public schools, but also would be impossible to satisfy. *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Education*, 2022 WL 3544256, *12 (D. Md. August 18, 2022), citing *Fields,* 427 F.3d at 1206 (emphasis original).

Plaintiffs here seek to do exactly what those who came before them in *Fields* and *Montgomery Cnty.* sought—a unilateral line item veto on anything within a school district's walls they do not like. The Constitution affords no such right.

11

In *Montgomery Cnty.*, parents alleged that a public school's guidelines violated their state and federal constitutional rights as parents. The parents alleged the school's guidelines allow minor children, of any age, to transition socially to a different gender identity at school without parental notice of consent. Further the parents alleged the guidelines require school personnel to enable the transition by using pronouns other than those consistent with the child's sex assigned at birth. *Montgomery Cnty.*, at *4. The court in *Montgomery Cnty.* ultimately found the schools policies and guidelines did not violate or interfere with the parents' role in the upbringing of their children or the parental role in counseling a transgender child. *Montgomery Cnty.* at *14. However, it also noted the opinion should not be seen as a foreclosure of a possibility that under certain extreme circumstances a parent's constitutional rights could be violated by school actions. *Montgomery Cnty.*, at *12.

In such extreme cases, the courts in question have found two important elements dispositive: coercion to undertake a controversial or intimate act and coercion to conceal that act from the student's parents. *Id.* at *10-12. In one such case, *Arnold v. Board of Educ. of Escambia Cnty., Ala.*, 880 F.2d 305 (11th Cir. 1989), the Eleventh Circuit found a violation of the parents' rights where school officials (1) coerced a minor into having an abortion, and (2) compelled her to keep it a secret from her parents.

In *Arnold*, the Court emphasized that the decision to notify the student's parents was the *student's* alone. *Arnold*, 880 F.2d at 314. The Court emphatically declined to "constitutionally mandate[e]" a requirement that school counselors notify parents when their child receives counseling regarding something as intimate as pregnancy. *Id.*. Instead, the Court held:

> "[School] counselors must not coerce minors to refrain from communicating with their parents. The decision whether to seek parental guidance, absent law to the contrary, should rest within the discretion of the minor. As a matter of common sense, not constitutional duty, school counselors should encourage

12

> communication with parents regarding difficult decisions such as the one involved here." *Id.*

Further, the case cited by Plaintiffs, *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) (Amended Complaint at ¶ 135), involves another extreme example of school personnel becoming unduly involved in a student's pregnancy that *Montgomery Cnty.* distinguished. In *Gruenke*, a high school swim coach forced one of his seventeen-year-old team members to take a pregnancy test, and went on to spread rumors about her pregnancy in the school community, all without informing the teen's parents. *Gruenke*, 225 F.3d at 308-309. Importantly, in that case, the student did not seek out the coach for guidance or assistance. Instead, the coach forced his own will upon the student and was clearly "acting contrary to [the student's] express wishes that [the coach] mind his own business." *Id.*

The authorities cited herein clearly articulate there is no constitutional requirement for the District to notify parents of these types of situations. To avoid violating Plaintiffs' rights, the District need merely refrain from coercing students to keep these issues secret from parents. The facts as alleged make no claim that the District or its employees have actively coerced any children to engage in anything amounting to a "controversial or intimate act," or to withhold such information from their parents.

"Coercion" is "the use of express or implied threats of violence or reprisal or other intimidating behavior that <u>puts a person in immediate fear of the consequences in order to compel that person to act against his or her will</u>" (emphasis added).[2] In this case, Plaintiffs do not allege any coercion and cite facts, which do not establish coercion, related only to one student - the unnamed Jane Doe. Again, Plaintiffs do not allege any District employee or official *coerced* Jane

---

[2] Definition of "coercion," https://www.merriam-webster.com/dictionary/coercion (accessed February 23, 2023).

13

Doe with respect to her gender identity or to withhold or conceal her gender identity from her parents. Plaintiffs instead allege:

1. Other students "**encouraged** Jane to attend two meetings of the 'Gay-Straight Alliance Club.'"
2. "The conversations [at the Gay-Straight Alliance Club meetings] were **directed or supervised** by a teacher."
3. "Jane was **made to feel uncomfortable** because she did not identify as homosexual or transgender **(although it is not clear whether the teacher-supervisor of the Club was to fault for this). Jane chose not to attend another meeting.**"
4. "After Jane got a short haircut, "certain teachers approached Jane began [sic] questioning Jane about whether she was a male or transgender. Then they began calling Jane by a male name and male pronouns***Jane has difficulty remembering how the situation transitioned from questions from teachers, to the teachers assuming Jane had a new identity. However, Jane **felt pressure** to assume the new identity."
5. "Eventually, Jane succumbed to the **persuasion**. Jane adopted a male name and answered to male pronouns—but only at school."

(Amended Complaint, ¶¶ 74-81) (emphasis added).

In sum, Plaintiffs allege Jane Doe attended two meetings of the Gay-Straight Alliance based on encouragement from other students. Jane Doe felt uncomfortable at these meetings but cannot attribute that to the supervising District employee. Jane stopped attending the meetings. Jane later changed the style of her hair, after which it is asserted that teachers started asking about her gender identity. Though these teachers allegedly began referring to Jane with a masculine name and pronouns, Jane does not recall how that transpired. It is alleged only that Jane felt "pressured" to assume a new identity and that she ultimately succumbed to this "persuasion," though it is not explained how or when this occurred. Because Jane Doe allegedly cannot recall these events with any degree of certainty, these allegations do not present the District's teachers as acting wholly "contrary to [Jane Doe's] express wishes that [they] mind [their] own business," as was the case with the coach in *Gruenke*. These allegations contain no alleged threats of violence or reprisal, or other behavior putting Jane Doe in immediate fear of consequences.

14

The Plaintiffs also do not plead Jane was coerced to keep any of this secret from her parents. Though the Amended Complaint alleges the parents were never informed, they do not claim the District ever persuaded, pressured, encouraged, and/or coerced Jane to conceal any of these events from her parents. In fact, in the broader sense, Plaintiffs quote one of the District's responses to their written inquiries as specifically saying the District's "default expectation" is to notify parents and have parent involvement when students exhibit symptoms of gender dysphoria absent exceptions for health and safety, and confidentiality of counseling. (Amended Complaint, ¶ 45). Plaintiffs therefore have failed to allege facts, which even if taken as true, demonstrate the District's actions rose to the requisite level of coercion to run afoul of the standards articulated in *Arnold* and *Gruenke*.

Finally, Plaintiffs appear to also invoke the Ohio Constitution, asserting "The Ohio Supreme Court adopted the above doctrine in *Troxel [v. Granville*, 530 U.S. 57, 65 (2000)] pursuant to the Ohio Constitution. See e.g., *State v. Whisner*, 47 Ohio St. 2d 181, 215-128 [sic], 351 N.E.2d 750 (1976)." Amended Complaint, ¶ 139. The claim must fail for the reasons set forth above regarding the same claimed right under the U.S. Constitution.

Moreover, in *Whisner*, the Ohio Supreme Court acknowledged only that "it has long been recognized that the right of a parent to guide the education, including the religious education, of his or her children is indeed a 'fundamental right' guaranteed by the due process clause of the Fourteenth Amendment." *Whisner*, 351 N.E.2d 750, at 769. The controversy in *Whisner* focused on the ability of the Ohio Department of Education to articulate certain minimum standards for nonpublic schools in order to obtain a charter. Because these standards fundamentally changed the nature of those nonpublic schools, the Court determined they so infringed upon the religious philosophy of the schools that they violated the parents' rights to direct the upbringing and education of their children. However, as with the relevant federal authorities on this issue, the

15

government action in question fundamentally interfered with the choice of parents *where* to send their children to school by altering the nature of private religious school curriculum. The Court did not determine, as Plaintiffs' assert here, that parents enjoy a fundamental right to control the operations and actions of *public* schools, once they have elected to enroll their children in them.

Plaintiffs accordingly fail to state any claim under either the U.S. or Ohio Constitutions for which relief can be granted.

**C.     Because Plaintiffs' Claims in Count I Fail as a Matter of Law, Count II Must also be Dismissed.**

In Count II, Plaintiffs seek injunctive relief pursuant to 28 U.S.C. 2201 and 2202, 28 U.S.C. 1343, and Fed. R. Civ. P. 65. As an initial matter, 28 U.S.C. 1343 is a jurisdictional statute. It does not, itself, provide a basis for relief, but instead grants the Court jurisdiction over certain controversies. Moreover, the remaining statutes, and Fed R. Civ. P. 65 are entirely remedial in nature. They provide no substantive protections or rights themselves, but instead are vehicles by which a party may seek vindication of other rights articulated elsewhere either in the Constitution or federal law.

Plaintiffs allege the District's "activities, as described in the Statement of Facts above, deprive the Parents—under color of law—of their constitutional right to direct the upbringing of, and provide care for, their children. Meanwhile, these activities lack any justifiable educational or governmental purpose. Thus, Plaintiffs allege the District is acting unconstitutionally and beyond the scope of any authority of state or local law." (Amended Complaint, ¶ 170). However, as set forth above, Plaintiffs' Complaint fails to allege any violations of any substantive right articulated in the Constitution or federal law. Because Plaintiffs fail to assert the violation of any protected right, the remedial powers of Section 2201, Section 2202, and Fed. R. Civ. P. 65 cannot be invoked to vindicate such violations. *See, e.g., Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002).

16

Accordingly, because Plaintiffs fail to assert the District has violated any right protected by the Constitution or federal law, Plaintiffs' requests for remedial action under the identified authorities fail as a matter of law.

## III. CONCLUSION

For the reasons set forth above, Plaintiffs' claims fail as a matter of law and the Amended Complaint should be dismissed, with prejudice.

Respectfully submitted,

*/s/ Jessica K. Philemond*
Jessica K. Philemond, Trial Counsel (0076761)
jessica@scottscrivenlaw.com
Julie C. Martin (0056163)
julie@scottscrivenlaw.com
Mitchell L. Stith (0096759)
mitch@scottscrivenlaw.com
SCOTT SCRIVEN LLP
250 East Broad Street, Suite 900
Columbus, OH 43215
(614)222-8686; Fax (614) 222-8688

/s/ Brandon Abshier
Brandon Abshier (0083505)
Michael J. Valenine (0038806)
REMINGER CO., LPA
200 Civic Center Drive, Suite 800
Columbus, OH 43215
babshier@reminger.com
mvalentine@reminger.com
P: 614-232-2422

*Attorneys for Defendants*

### CERTIFICATE OF SERVICE

A true and accurate copy of the foreign was served on this 27th day of February 2023, upon all counsel of record via the Court's electronic filing system.

*/s/ Jessica K. Philemond*
Jessica K. Philemond, Trial Counsel (0076761)

17