# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Rachel Kaltenbach, *et al.*, | : | |
| | : | Case No. 2:23-cv-00187 |
| Plaintiffs, | : | |
| | : | Judge Michael H. Watson |
| v. | : | |
| | : | Magistrate Kimberly A. Jolson |
| Hilliard City Schools Board of | : | |
| Education, *et. al.*, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DOC. ENTRY #10) AND IN THE ALTERNATIVE, MOTION FOR LEAVE TO AMEND COMPLAINT**

Plaintiff asks the Court to deny Defendant's Motion to Dismiss for failure to state a claim (docket #10) for the reasons that follow. In the alternative, Plaintiff asks for leave to amend the complaint to remedy any defects.

March 20, 2023                                        Respectfully Submitted,

/s/ Joshua J. Brown
Joshua J. Brown  (0089836)
Attorney at Law
3979 Main Street
Hilliard, OH 43026
P: (614) 383-8886
josh@joshbrownesq.com
Attorney for Plaintiffs

TABLE OF CONTENTS

MEMORANDUM CONTRA ...................................................................................1

I.     INTRODUCTION ....................................................................................1

II.    LAW AND ANALYSIS ..........................................................................2

A.    Standard for Motion to Dismiss ...........................................................2

B.    Count One—Request for Declaratory Relief ......................................2

     1.    Plaintiff's Section 1983 Claims ..............................................2

         a.    Substantive Due Process ............................................3

         b.    Free of Conscience .....................................................14

         c.    Right to Familial Privacy............................................15

     2.    Level of Scrutiny .....................................................................16

     3.    Standing of Plaintiffs...............................................................18

         a.    General Standard .......................................................18

         b.    Declaratory Judgment is Procedural Only ...............19

         c.    Declaratory Judgment Appropriate When Litigant
             Needs Direction Before Damages Occur ...................19

         d.    District Exposes Plaintiffs to Liability......................24

C.    Count Two—Request for Injunctive Relief.........................................25

D.    In the Alternative, Motion to Amend ...................................................28

III.    CONCLUSION .......................................................................................28

## SUMMARY OF SECTIONS, PRIMARY ARGUMENT
### Loc.R. 7.2(a)(3)

Plaintiffs' legal arguments for declaratory judgment are divided into three primary sections: 1) Section 1983 claims (page 3); 2) standing (page 18); and 3) Count Two for injunctive relief (page 25).

Plaintiffs Section 1983 claims are based on the argument that the District is not precluded from informing parents about their child's health information by Title IX and to deceive parents about this information deprives parents of constitutional rights. Namely: 1) substantive due process (*Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) (on page 10)); 2) free exercise (*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982) (page 14)); and 3) familiar privacy (*Roberts v. United States Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *Gruenke*, 225 F.3d.) (page 15).

Plaintiffs claim standing, first, because one Plaintiff has a right to sue for damages, and a declaratory judgment is simply a different procedural route for a party that has a right to damages. *MedImmune, Inc. v. Genetech, Inc*., 549 U.S. 118, 119, 127 S, Ct, 764,166 L. Ed.604 (2007) (page 19). For the other Plaintiffs, they are being damages by being deprived of constitutional rights because the District usurping their role to make health decisions for their children (page 19).

In at least some circumstances, by sole virtue of being a taxpayer, a plaintiff does have standing to challenge constitutional violations of the Free Exercise Clause. *Flast v. Cohen,* 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968) (standing in a declaratory

iii

judgment requires only that the plaintiff show a violation of a particular constitutional right) (page 20). "Where threatened *government* action is concerned, a plaintiff is not required to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune*, 549 U.S., 119 (emphasis in the original) (page 21)).

As it pertains to the other Plaintiffs, equal protection is violated where government action coerces a party not to exercise their constitutional rights, thus the government policy effectively deprives that person of the exercise of a constitutional right. (See page 21). See, e.g., *Steffel*, 415 U.S., 480 (saying, "In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center). That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced."); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, syllabus 1, 47 S. Ct. 114, 71 L. Ed. 303, 4 Ohio Law Abs. 816 (1926) ("A suit to enjoin the enforcement of a zoning ordinance with respect to the plaintiff's land, need not be preceded by any application on his part for a building permit, or for relief under the ordinance from the board which administers it, where the gravamen of the bill is that the ordinance of its own force operates unconstitutionally to reduce the value of the land and destroy its marketability, and the attack is not against specific provisions but against the ordinance in its entirety.") (page 21).

Next, the District's acts expose the Parents to liability. Parents are liable for neglect

iv

for refusal to provide care necessary for the child's health, morals, or well-being or if "because of the omission of the child's parents, guardian, or custodian, [the child] suffers physical or mental injury harming or threatening to harm the child's health or welfare." See R.C. 2151.03. (Page 24).

Lastly, the badges identified in the Complaint explicitly invite and solicit intimate conversations about analysis, or evaluation of items, such as sex behaviors or attitudes, mental or psychological problems of the student or student's family, and religious practices. This, all while the District fails to assure parents that information gathered in these private conversations will not be actively hidden from parents. Thus, it must be enjoined, at least while it is not certain parents will have access to information gathered. (See page 25).

MEMORANDUM CONTRA

## I.    INTRODUCTION

Plaintiff's Complaint documents serious mental health injuries to two pubescent girls, culminating in one girl's threat of suicide and another girl's actual attempt at suicide. Plaintiff Senchesak's daughter experienced severe emotional trauma while at school, culminating in attempts at suicide. (First Am. Compl, ¶ 83, 87).

Senchesak, doing all she could to help her daughter through this trying time, discovered inadvertently that school officials diagnosed her daughter with gender dysphoria and treated her daughter with gender affirming care. (First Am. Compl, ¶ 88). Once Senchesak made this discovery, she was able to provide necessary care to her daughter and remedy the problem. (First Am. Compl., ¶ 89). The Complaint puts forth another similar story from a parent who will be a witness in this matter. (First Am. Compl, ¶ 95-130).

The school is the Defendant in this matter ("District"). The other Plaintiffs are all parents with children in this District ("Parents"). Senchesak is certainly within her rights to demand money damages. But instead, these parents joined with other district-parents with similar concerns.

First, they met with the Superintendent and asked about the District's policy on informing parents when a child is being treated for gender dysphoria at school. He said, because of Title IX, a teacher would be putting his/herself in legal jeopardy if he/she "outed" a student to the student's parents. (First Am. Compl, ¶ 7, 43). Then, the parents

had legal counsel ask the District if the Superintendent's words were true, in writing. First the District's lawyer gave a non-answer. In a second letter, she flat-out refused to answer. (First Am. Compl, ¶ 44-53).

The District rightfully points out that parents do not have a right to control the administration of the school under the doctrines of *parens patriae*. However, the District crosses the line when it lies to a child's parents about matters that threaten their child's very life. The District's administrative and educational authority is limited by the parent's constitutional rights, which include to care for and protect their children.

The parents ask that this Court make clear that Title IX does not allow this deceit and enjoin the school from soliciting information about this subject until it is clear District officials are legally required to be honest with parents.

## II.     LAW AND ANALYSIS

### A.     Standard for Motion to Dismiss

A claim survives a motion to dismiss pursuant to Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotations omitted). A court must also "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir. 2002); see also, *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007).

### B.     Count One—Request for Declaratory Relief

### 1.     Plaintiff's Section 1983 Claims

- 2 -

Plaintiff's First Amended Complaint asks for the Court to make a number of declarations that would preclude the District from continuing to violate the Parent's constitutional rights. The basis for Plaintiff's request is 42 U.S.C. §1983 and 1988.

Government institutions are liable for deprivation of constitutional rights under color of law. 42 U.S.C. §1983 and 1988. To prevail on a § 1983 claim, a plaintiff must plead: (1) a deprivation of a right, privilege or immunity secured by the Constitution or laws of the United States; and (2) the conduct complained of was committed by a person acting under the color of state law. 42 U.S.C. § 1983.

There are three constitutional provisions at issue in this case: Substantive Due Process provision (protection of fundamental rights to care for and direct the upbringing of one's children), the right to freedom of conscience, and the right to familial privacy.

### a.      Plaintiff's Fourteenth Amendment Claim, Substantive Due Process

Pursuant to the Fourteenth Amendment of the United States Constitution, no State may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Additionally, the Due Process Clause also "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). This doctrine is known as "substantive due process" and includes "heightened protection against government interference with certain fundamental rights and liberty interests," including the right to privacy. *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

The Supreme Court identified two types of interests "protected by the right to

privacy that [are] rooted in the substantive due process protections of the Fourteenth Amendment." *Lambert v. Hartman,* 517 F.3d 433, 440 (6th Cir. 2008). The first is an interest in "independence in making certain kinds of important decisions.'" *Id.* (quoting *Whalen v. Roe,* 429 U.S. 589, 599-600 & n.26, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977)). The second is an "'interest in avoiding disclosure of personal matters.'" *Id.* (quoting *Whalen,* 429 U.S. at 599, 603-04).

The latter interest is referred to as one's informational right to privacy and was the right challenged by Plaintiffs in this Court in *Ray v. Dir., Ohio Dep't of Health*, Civil Action 2:18-cv-272 (S.D. Ohio Oct. 10, 2018). In *Ray,* this Court decided that an adult is constitutionally entitled to alter his/her birth certificate pursuant to that individual's privacy rights, because failure to allow the person to alter his/her birth certificate would "out" the person, revealing private information (i.e., that the person identifies as transgender).

However, for every principle, there is a limiting principle. Children differ from adults. Generally speaking, the constitution does not entitle children to many rights reserved for adults, including privacy rights. Rather, parents own their minor child's privacy rights.

The law leaves no ambiguity about the rights of parents to honest reporting of their children's private information. "[A]ny substantive due process rights related to directing the medical care of children devolve upon the parents or legal guardians of the children." *Kanuszewski v. Mich. HHS,* 927 F.3d 396, 415 (6th Cir. 2019). "[Parents] retain a

substantial, if not the dominant, role in the decision [to provide medical care a child]."
*Parham v. J. R.*, 442 U.S. 584, 603-04 (1979).

The right of parents to their children's private information arises from the underlying principles regarding the fundamental rights of parents to direct the upbringing of their children. See, e.g., *Troxel v. Granville,* 530 US 57, 65, 120 S Ct 2054, 147 L Ed 2d 49 (2000); quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923) (the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own."); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925), ("liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control . . . [t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

The Ohio Supreme Court found the above *Troxel* doctrine, applies under Ohio law. See e.g., *State v. Whisner*, 47 Ohio St. 2d 181, 212-215, 351 N.E.2d 750 (1976) ("it has long been recognized that the right of a parent to guide the education, including the religious education, of his or her children is indeed a "fundamental right" guaranteed by the due process clause of the Fourteenth Amendment").

"Choices about marriage, family life, and the upbringing of children are among the associational rights this court has ranked as of basic importance in our society . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).

Thus, it is clear that the administrative authority of a school has limits. While schools and teachers serve an *in loco parentis* function while a child is at school, "[p]ublic schools must not forget that '*in loco parentis'* does not mean 'displace parents.'" *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

As it pertains to making medical and mental health decisions on behalf of children, the school's administrative authority recedes, because parents are the primary decision-makers—not their school, or even the children themselves. "Our jurisprudence historically has reflected . . . broad parental authority over minor children." *Parham*, 442 U.S at 587. "This primary role of the parents . . . is now established beyond debate." *Wisconsin v. Yoder*, 406 U.S. 205, 232, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972).

Parental decision-making authority rests on two core presumptions. First, "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions . . . Most children, even in adolescence, simply are not able to make sound judgments concerning . . . their need for medical care or treatment. Parents can and must make those judgments." *Parham*, 442 U.S. at 602-603; "Children, by definition, are not assumed to have the capacity to take care of themselves.

- 6 -

They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*." *Schall v. Martin*, 467 U.S. 253, 265, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984).

Second, natural bonds of affection lead parents to act in the best interests of their children." *Id.; "*The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Yoder,* 406 U.S., at 232.

The "notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children" is "statist" and "repugnant to American tradition." *Parham,* 442 U.S. at 603. The unfortunate reality that some parents "act against the interests of their children" does not justify "discard[ing] wholesale those pages of human experience that teach that parents generally do act in the child's best interests." *Id.*

Further, the fact that "the decision of a parent is not agreeable to a child or . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id*. "The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority." *Parham*, 442 U.S. at 603–04. A child's disagreement with a parent's decision "does not diminish the parents' authority to decide what is best for the child." *Id.*

As long as a parent is fit, "there will normally be no reason for the State to inject

itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68–69. To terminate parental rights, a state must present clear and convincing evidence of unfitness. *Santosky v. Kramer*, 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982).

The constitutional commitment to parental authority in personal decisions of their minor children is reflected in many state and federal laws. Just to name a few examples:

    i.    20 U.S.C. § 1232h prohibits a school from requiring a student to undergo analysis or evaluation of items such as sex behaviors or attitudes, mental or psychological problems of the student or student's family, and religious practices.

    ii.    20 U.S.C. § 1232h requires notification to parents of any "survey" seeking information that includes: political affiliations or beliefs of the student or the student's parent; mental or psychological problems of the student or the student's family; sex behavior or attitudes; critical appraisals of other individuals with whom respondents have close family relationships; religious practices, affiliations, or beliefs of the student or the student's parent.

    iii.    Both Ohio state and U.S. federal law require schools to provide parents with access to all records about their children. R.C. § 3319.321; 20 U.S.C. § 1232g(a)(1)(A).

    iv.    Under the federal Family Education Rights and Privacy Act (FERPA), only parents can request to amend education records. 34 CFR §§ 99.3; 99.4; 99.20(a).

    v.    Parental notification is required for almost all medical procedures in Ohio. For example, parental notification is required for minor abortion. Ohio Rev. Code Ann. § 2151.85. (Upheld in *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 111 L. Ed. 2d 405, 110 S. Ct. 2972 (1990)).

    vi.    Parental notification is required whenever a child is taken into federal custody. 18 U.S.C. §5033.

vii.   Generally, the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) Pub.L. No. 104-191, 110 Stat. 1936, requires healthcare providers to release a minor patient's medical records to the child's parent or guardian upon request. Protected health information includes any information that relates to the child's past, present, or future mental health or condition. Generally, anyone under eighteen is considered a minor and cannot legally exercise their rights under HIPAA. Instead, HIPAA considers the minor's parent or guardian to be their "personal representative."

viii.  In Ohio, mental health professionals cannot provide treatment without parental consent, for minors under the age of fourteen, and then only for six sessions or thirty days for minors fourteen and over. R.C. 5122.04.

Recently, in a case somewhat analogous to this one, the United States District Court for the Western District of Pennsylvania presided over a case where a school district was sued for reasons described by Senior United States District Judge Joy Flowers Conti as follows:

The Parents assert they do not seek to impose their religious or moral beliefs about transgender topics on other students. Instead, the parents seek to protect their own young children from a public school teacher's showing videos and reading books about transgender topics and her attempts to promote or inculcate in the young children in her class the teacher's ideas or beliefs about a child's gender identity and to initiate and engage in discussions with the first-graders in her class about the children's own gender identity without the permission of their parents. No party in this case raised any issue about the existence in the school district of bullying or intolerance toward transgender children.

*Tatel v. Lebanon School District,* W.D.Pa. No. 2:22-cv-837, 2022 U.S. Dist. LEXIS 196081 (Oct. 27, 2022).

Judge Conti denied the defendant school district's motion to dismiss, saying:

The Third Circuit Court of Appeals has recognized that the fundamental right of parents to raise and nurture their children may sometimes conflict

with a public school's policies, but explained: "when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000).

*Id.* docket #38, Opinion.

In an analogous to this one, a high school swim coach suspected that a team member was pregnant, and, rather than notifying her parents, discussed the matter with other coaches, guidance counselors, and teammates, and eventually pressured her into taking a pregnancy test. *Gruenke*, 225 F.3d at 295-97.

When her mother discovered this, the mother sued the coach for a violation of parental rights, explaining that, had she been notified, she would have "quietly withdrawn [her daughter] from school" and sent her to live with her sister until the baby was born. *Id.* at 306. "[M]anagement of this teenage pregnancy was a family crisis," she argued, and the coach's "failure to notify her" "obstructed the parental right to choose the proper method of resolution." *Id.* at 306.

The *Gruenke* court found that the mother had "sufficiently alleged a constitutional violation" against the coach and condemned his "arrogation of the parental role." "It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Id.* at 307.

The court also suggested, "We need not consider the potential liability of school counselors here, although we have considerable doubt about their right to withhold information of this nature from the parents." *Id.*

Thus, American tradition and law clearly limit a school district's administrative and educational authority. A school district may not displace a parent's role in making health-related decisions for their child.

Here, the Complaint avers that the District is using Title IX as an excuse to hide critical health information from the Parents. (First Am. Compl., ¶¶ 7, 43). The Complaint alleges that District officials lied to parents, hiding the fact that District officials diagnosed their children and provided gender affirming treatment. (First Am. Compl. ¶¶ 5, 82, 106). The parents did not find out until after the children attempted or threatened suicide at school. (First Am. Compl. ¶ 82, 106).

Thus, the parents were deprived of the information needed to support care and/or treatment that could have prevented these calamities. Both parents were able to improve their children's condition after they found out what was going on. (First Am. Compl., ¶¶ 91-92, 129). If the parents knew, they could have provided appropriate care. (First Am. Compl. ¶ 93, 130). Thus, the District officials' act not only complicated the parents' ability to provide care, but completely deprived the parents of it, striking directly at the heart of the parent-child relationship.

In *Gruenke,* one important issue was the teacher making a health matter publicly known. Here, similarly, the provision of gender affirming care at school necessarily garners publicity within the school. Other people at the school necessarily observe the child being referenced with different names and pronouns.

This incident cannot be viewed in isolation—it is a logical function of an

underlying problem, i.e., the perversion of Title IX. (First Am. Compl. ¶ 37). The Superintendent stated that, pursuant to Title IX, a teacher would be putting his/herself in legal peril if he/she were to "out" a student to their parents. However, this position is not only putting children in imminent danger, but it is wholly unsupported by law and it violates parents' fundamental rights. As it applies to the privacy rights of minor children's health information, the right of privacy belongs to the parent, not the child.

The Superintendent's words are consistent with the District's many other acts, which culminated in the mental health breakdowns of the two girls discussed in Plaintiff's Complaint. The District took student surveys asking the children what pronouns they desire at school, and separately, what pronouns should be used with their parents. (First Am. Compl. ¶ 49). The District's teacher's union provides advice and instruction for hiding this information from parents. (First Am. Compl. ¶ 50, 59-63). Parents have discovered bulletin boards at a District school that educates students on sexual matters that are not part of the curriculum. (First Am. Compl. ¶ 51). The District is allowing its teacher's union to disseminate—and its teachers to wear—a badge that invites children to talk about these private matters without parental involvement. (First Am. Compl. ¶ 50). The District refused to state its policy when asked to address these concerns. (First Am. Compl. ¶ 53, Ex. I).

Thus, we must infer that the District tacitly adopts the Superintendent's stated position by having no policy governing—and passively tolerating—the acts of District officials in hiding health information from parents.

- 12 -

In it Motion to Dismiss, the District refers to a number of cases that establish the District's right to how a public school teaches a child, how to administrate the school, whether the kids will wear uniforms, etc. (Mot. Dismiss, 10) (citing, e.g., *Goss v. Lopez*, 419 U.S. 565, 578 (1975); *Blau v. Fort Thomas Public School Dist.*, 401 F.3d 381, 395-396 (6th Cir. 2005)). However, none of these cases give the District authority to make medical, health, or lifestyle choices in place of parents. Diagnosing and treating children, while hiding that information from parents, is simply not an administrative or education function.

Furthermore, Plaintiff's case is not about a duty to inform. Rather, it is a duty to be honest—i.e., not affirmatively hide information—when interacting with parents.

The District claims that, "To avoid violating Plaintiffs' rights, the District need merely refrain from coercing students to keep these issues secret from parents." (Mot. Dismiss, 13). This position allows the District to affirmatively hide and deceive parents. This is exactly the problem that kept parents in the dark about their children's needs, and almost killed the girls affected in this case. For the reasons stated above, this strikes at the parent-child relationship and deprives parents of their right to care for their children.

Furthermore, the District's position is coercive. Courts find coercion where an unconstitutional limitation prevents a plaintiff from exercising a constitutional right. See, e.g., *Steffel v. Thompson*, 415 U.S. 452, 480, 94 S. Ct. 1209 , 39 L. Ed. 2d 505 (1974) (finding that a law restricting free speech unconstitutionally coerced plaintiff to refrain from exercising his rights to pass out pamphlets). If the Parents seek information about their children's health, the District will not give the information to the parents, and will

diagnose and treat the child regardless of the parent's knowledge or wishes. The District give the parents no say in a matter squarely within their sole prerogative. This is a way of coercing parents into relinquishing their rights.

b.    **Freedom of Conscience**

"[N]o preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted." Ohio Constitution, Article I, Section 7. The First Amendment to the United States Constitution provides, in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I. The protections in the Bill of Rights (including the Free Exercise clause) are made applicable to state actors through the incorporation doctrine under the Fourteenth Amendment. See *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019). These rights are collectively known as "rights to freedom of conscience."

The Supreme Court recognized that local school boards must be permitted to establish a curriculum to reflect community values, but cautioned "that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982) (holding that a school district's right to remove books from a library is limited by the First Amendment).

Here, similarly, the District's authority to engage in diagnosis and treatment of children is limited by parent's freedom of conscience, which includes First Amendment rights. The appropriate treatment for gender dysphoria is the subject of legitimate debate

- 14 -

among professionals and laymen alike. (First Am. Compl. ¶ 153). The Parents do not agree with the ideology behind the school's actions, and the school's actions (lying to parents about health matters) are not within its administrative or educational authority. To the contrary, the District's action strikes squarely at the right of parents to decide what care is appropriate for their children.

The District's teachers are being instructed to withhold information specifically based on the views of parents. (First Am. Compl., ¶ 60). They are teaching if one does not agree with them, that person is not a "safe person." (First Am. Compl., ¶ 52). This is not a neutral approach parent's rights to conscience, and thus requires strict scrutiny. There is no compelling interest in distinguishing which parents are "safe" and withholding vital information from them, based on their personal views.

c. **Right to Familial Privacy**

The U.S. Supreme Court "has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Familial relationships are the quintessential "personal bonds" that "act as critical buffers between the individual and the power of the State." *Id.* at 619–20. See also: *Kolley v. Adult Protective Serv.*, 725 F.3d 581, 587 (6th Cir. 2013).

The Third Circuit construed this "to encompass only those instances where state official's actions were: (1) directly aimed at the parent-child relationship"; (2) implicated

the "right of the family to remain together"; or (3) "eroded the family's solidarity internally and impaired the family's ability to function." *Ridgewood,* 430 F.3d 159, at 184; see also, *Gruenke,* 225 F.3d, at 305.

Plaintiffs in this case evoke the same rights upheld in *Ridgewood, Gruenke,* and *Tatel.* In each case, school officials directly interfered with the parent-child relationship, acting outside the bounds of administrative and educational duties. The defendants each usurped parents' role, making independent judgments about private health matters related to students and acting with deceit toward parental knowledge and consent.

Here, lying to parents about critical information regarding a child's mental health qualifies as interference with the parent-child relationship. *Gruenke* in particular tells us that parents have a right to their child's health information.

### 2. Level of Scrutiny

When a government action infringes a fundamental right, it is subject to strict scrutiny, which means it must be narrowly tailored to further a compelling interest. *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *United States v. Brandon,* 158 F.3d 947, 959-60 (6th Cir. 1998). If the law is not neutral (i.e., if it discriminates against religiously motivated conduct) or is not generally applicable (i.e., if it proscribes particular conduct only or primarily when religiously motivated), strict scrutiny applies. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 542, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Whether a law is narrowly tailored "will turn on whether it is the least restrictive and least harmful means of satisfying the government's goal . . ." *Brandon,*

158 F.3d, at 960.

Here, undoubtedly, the case law shows that the rights of parents to their children's health information, as set forth above, are deeply rooted in this Nation's history and tradition and implicit in ordered liberty. Further, the District's acts clearly imposes a burden on any parents (whether religious motivations or otherwise) that disagrees with whatever treatment the District provides. The District takes sides in heated social debate that encompasses religion, morality, medicine, and the metaphysics of humankind. The District simply ignores the parents' beliefs altogether, then lies to the parents when they ask about what is going on with their children. Thus, strict scrutiny applies.

The District's approach is deliberately broadly tailored as possible. The District has no policy regarding "outing" (the District's so-called "default expectation" is nothing). (First Am. Compl., ¶ 10). But the Superintendent said Title IX put District officials in legal jeopardy if they "out" a child to the child's parents. No policy, in fact, is the District's effective policy. In fact the Superintendent specifically avoided adopting a policy, saying it would ""ignite an already volatile powder-keg." (First Am. Compl., ¶ 155). Thus, the District's policy is not narrowly tailored in furtherance of a compelling government interest.

No case cited by the District allows it to lie to parents regarding health matters of their child. Plaintiffs agree that the District's administrative authority encompasses protecting privacy rights of families and students. But, here, the District has no compelling interest in lying to parents because the privacy rights of children belong to

their parents. Thus, the District's actions and effective policy fail to survive strict scrutiny requirements.

**3.      Standing of Plaintiffs**

**a.      General Standard**

Federal law affords this Court authority to grant Plaintiff's requested declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, which says:

> [i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment and shall be reviewable as such.

When reviewing standing in a declaratory judgment case, the question is whether the complaint states a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" relief, *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826. Generally, standing under the federal Declaratory Judgment Act is approached as a combination of Article III limitations and judicial prudential concerns. *Elk Grove Unified Sch. Dist. v. Newdown*, 542 U.S. 1, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004).

The purpose of a declaratory judgment is to afford litigants an early opportunity to resolve their disputes so as to avoid the threat of impending litigation. *Severe Records, LLC. v. Rich*, 658 F.3d 571, 580 (6th Cir. 2011) and to obtain both clarity in their legal relationships and the ability to make responsible decisions about their future. *Medtronic, Inc. v. Mirowski Family Venturs, LLC*, 571 U.S. 191, 200-01, 134 S.Ct. 843, 187 L.Ed. 2d 703

(2014). It allows controversies to be settled before they mature into full-fledged violations of law or duties. *Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agriculture Implement Workers of Am.*, 687 F.3d 1076, 1081-82 (8th Cir. 2012). It provides a prudent procedural vehicle for "clearing the air." *Microchip Technology Inc. v. Chamberlain Group, Inc.*, 441 F.3d 936, 943 (Fed. Cir. 2006).

### b.      Declaratory Judgment Act is Procedural Only

The U.S. Supreme Court held "the operation of the Declaratory Judgment Act is procedural only." *Aetna Life Ins.*, 300 U.S., at 240, 57 S. Ct. 461, 81 L. Ed. 617. Had the insured filed his traditional cause of action first, "there would have been no question that the controversy was of a justiciable nature." *Id.*, at 243. Accordingly, the Act merely provided a different procedural tool that allowed the insurance company to bring an otherwise justiciable controversy before a federal court. *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 119, 127 S, Ct, 764,166 L. Ed.604 (2007).

### c.      Declaratory Judgment Appropriate when Litigant Needs Direction Before Damages Occur

Plaintiffs agree with Defendants that a plaintiff's mere ideological opposition to a government action is not a sufficient basis for standing. (Def. Mot. Dismiss, 1). *Frothingham v. Mellon*, 262 U.S. 447, 480, 43 S. Ct. 597, 67 L. Ed. 1078 (1923); *Ex Parte Levitt*, 302 U.S. 633, 58 S. Ct. 1, 82 L. Ed. 493 (1937).

However, in at least some circumstances, by sole virtue of being a taxpayer, a plaintiff does have standing to challenge constitutional violations of the Free Exercise

Clause. *Flast v. Cohen,* 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968) (standing in a declaratory judgment requires only that the plaintiff show a violation of a particular constitutional right).

There is no question of standing when government controls a potential plaintiff by unlawfully threatening to deprive a plaintiff of constitutional rights. Public institutions are bound to principles of neutrality as it pertains to matter of conscience, thus, ideological differences can give rise to constitutional deprivations. *Employment Div., Dept. of Human Resources of Ore. v. Smith,* 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990); *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.,* 565 U.S. 171, 190, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012).

Specifically, declaratory relief is appropriate where a litigant needs direction from a court before taking potentially damaging future action, where such direction will afford the litigant relief from uncertainty or insecurity. See *Amer. Household Products, Inc. v. Evans Manufacturing, Inc.,* 139 F.Supp.2d 1235, 1239 (N.D. Al. 2001); *County Materials Corp. v. Allan Block Corp.,* 431 F.Supp.2d 937, 945 (W.D. Wisc. 2006) ("a declaratory judgment action is proper when a declaration of rights is a bona fide necessity for the natural defendant/declaratory judgment plaintiff to carry on with its business.").

"The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right." *Obergefell v. Hodges,* 576 U.S. 644, 677, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015). "An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees

and even if the legislature refuses to act." *Id.* State laws and policies are still subject to guarantees afforded by the Constitution. *Id.,* at 981.

"Where threatened *government* action is concerned, a plaintiff is not required to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune*, 549 U.S., 119 (emphasis in the original)). This principle is seen in two primary contexts.

In the first context, a court violates principles of equal protection when it denies a plaintiff a judicial determination needed to prevent him/herself from violating a government policy, effectively coercing plaintiff to not exercise his/her rights. See, e.g., *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908) ("While there is no rule permitting a person to disobey a statute with impunity at least once for the purpose of testing its validity, where such validity can only be determined by judicial investigation and construction, a provision in the statute which imposes such severe penalties for disobedience of its provisions as to intimidate the parties affected thereby from resorting to the courts to test its validity practically prohibits those parties from seeking such judicial construction and denies them the equal protection of the law."). See also: *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967) ("The dilemma posed by that coercion--putting the challenger to the choice between abandoning his rights or risking prosecution--is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'"); *North Amer. Oil Co. v. Star Brite Distributing, Inc.*, 148 F.Supp.2d 1351, 1355 (N.D. Ga. 2001) ("A company concerned about

- 21 -

infringing another company's patent may file a declaratory judgment action seeking a declaration of non-infringement"); *Terrace v. Thompson*, 263 U.S. 197, 216, 44 S. Ct. 15, 68 L. Ed. 255 (1923) ("we did not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action.").

In the second context, we see equal protection is also at play where government action similarly coerces a party not to exercise their constitutional rights, thus the government policy effectively deprives that person of the exercise of a constitutional right. See, e.g., *Steffel*, 415 U.S., 480 (saying, "In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center). That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced."); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, syllabus 1, 47 S. Ct. 114, 71 L. Ed. 303, 4 Ohio Law Abs. 816 (1926) ("A suit to enjoin the enforcement of a zoning ordinance with respect to the plaintiff's land, need not be preceded by any application on his part for a building permit, or for relief under the ordinance from the board which administers it, where the gravamen of the bill is that the ordinance of its own force operates unconstitutionally to reduce the value of the land and destroy its marketability, and the attack is not against specific provisions but against the ordinance in its entirety.").

Here, for Plaintiff Senchesak, a declaratory judgment is a mere procedural matter.

Senchesak is certainly entitled to pursue a claim for damages. She represents her minor child, who suffered real damages due to the District's dishonesty and the District depriving Senchesak of her constitutional right to direct the upbringing and care of her child. (First Am. Compl., ¶93). District officials, on their own, internally diagnosed Senchesak's child with gender dysphoria. (First Am. Compl., ¶84). District officials affirmatively hid these facts from Senchesak, using a different name and pronouns with Senchesak then they used at school. The District internally provided Senchesak's child with gender affirming treatment. (First Am. Compl., ¶88-89).

Thus, Senchesak could not participate in the treatment. This culminated in suicide attempts by Senchesak's child. (First Am. Compl., ¶¶83, 87). If she had the information she needed, Senchesak could have taken steps to aid in treating this trauma. (First Am. Compl., ¶93). But the District deprived Senchesak of this opportunity. This is a violation of Senchesak's fundamental rights. Plaintiffs also offer another witness with virtually the same story.

As for the other Plaintiffs, they each send their children to the District's schools. The Parents will not be informed, even upon request, if their children are experiencing certain types of trauma at school. The District's so-called "default expectation" to inform parents is utterly meaningless.

To the extent the "default expectation" has any meaning at all, the District claims it makes exceptions for "health and safety." Meanwhile, the District teachers are distributed materials that instruct that a person (such as a parent, teacher, etc.) is "not a

safe person" by virtue of their perceived lack of "support for LGBTQ+ issues." The teacher's union trains teachers on how to hide gender dysphoria diagnosis and treatment from parents. (First Am. Compl., ¶60). The District refuses to assure parents that differences in opinion about gender affirming care will not become a health and safety justification to withhold vital information. (First Am. Compl., ¶53). Thus, these Plaintiffs are damaged and harmed by being deprived of their constitutional right to play the primary role in the health decisions of their children. A declaratory judgment that this action is illegal will solve this problem.

### d. District's Acts Expose Parents to Liability

In addition, the District's acts expose the Parents to liability. Parents are liable for neglect for refusal to provide care necessary for the child's health, morals, or well-being or if "because of the omission of the child's parents, guardian, or custodian, [the child] suffers physical or mental injury harming or threatening to harm the child's health or welfare." See R.C. 2151.03.

In Ohio, "mental injury" is "any behavioral, cognitive, emotional, or mental disorder in a child caused by an act or omission that is described in section 2919.22 of the Ohio Revised Code and is committed by the parent or *other person responsible for the child's care*." (Emphasis added). R.C. 2151.031. "No person, who is the parent, guardian, custodian, person having custody or control, or person *in loco parentis* of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating

a duty of care, protection, or support." R.C. 2019.22(A). Additionally, in a petition for dissolution of marriage, a shared plan must be submitted and include "provision for the children's medical and dental care." R.C. 3109.04(G).

Here, the District's dishonest withholding of important health information precludes parents from making fully informed decisions regarding the care of their children, which they are legally required to do. Whether it be in criminal, civil, or domestic proceedings, inevitably, Parents will find themselves prosecuted for failing to care for their children's mental health, only to find out that their school lied to them regarding critically needed information regarding that very responsibility. Given the harm to the two minor girls referred to in the First Amended Complaint, there is no doubt this is major a threat to the Parents, particularly in child-custody disputes.

## C.    Count Two—Request for Injunctive Relief

A court is to consider the following four factors in determining whether a plaintiff is entitled to a temporary restraining order or other preliminary injunctive relief: 1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; 2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued; 3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and 4) whether the public interest would be served by the issuance of a preliminary injunction. *Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995). The standard for preliminary injunction is not a rigid and comprehensive test, and the four factors are to

be balanced, not prerequisites that must be satisfied, but instead "these factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.* 963 F.2d 855, 859 (6th Cir. 1992).

The injunctive relief requested by Plaintiffs is proper pursuant to 28 U.S.C. § 2202 because such relief would constitutes "[f]urther necessary or proper relief based upon a declaratory judgment . . . against [an] adverse party whose rights have been determined by such judgment." Such relief may include damages or injunctive remedies, which are considered ancillary to the enforcement of the declaratory judgment. *United Teacher Associates Insurance Company v. Union Labor Life Insurance Company*, 414 F.3d 558, 570 (5th Cir. 2005); *Ashmus v. Calderon*, 123 F.3d 1199, 1206 (9th Cir. 1997), rev'd on other grounds, 523 U.S. 740 (1998).

In Ohio, "No person shall do any of the following to a child under eighteen years of age . . . (5) permit . . . encourage . . . allow the child to . . . participate in . . . any material or performance that the offender knows or reasonably should know is obscene, is sexually oriented matter, or is nudity-oriented matter." R.C. 2019.22(B).

Here, the "I'm Here" badges, referred to in the Statement of Facts, have a QR code on them that link to obscene and pornographic content. QR codes are scanned, by cell phones, and automatically take the scanning device to an internet website. The District Superintendent admitted publicly that the QR take scanning devices to websites with adult-only content. (First Am. Compl., ¶72). The QR code can be scanned from as far as thirty (30) feet away. Children at the District carry cell phones that scan QR codes at

school. Thus, the District is exposing children to highly inappropriate material.

Further, these Badges explicitly invite and solicit intimate conversations about analysis, or evaluation of items, such as sex behaviors or attitudes, mental or psychological problems of the student or student's family, and religious practices. This, all while the District fails to assure parents that information gathered in these private conversations will not be actively hidden from parents.

Meanwhile, although perhaps well-intentioned by most users, some teachers are not so well-intentioned. The badges provide a tool for identifying and engaging in private conversations with vulnerable children.

The badges affect the fundamental rights of parents because they solicit intimate, private conversations about health matters that are not shared with parents. Exposing the badges to children violates Ohio obscenity laws and creates a tool for child-predators.

The badges lack any justifiable educational or governmental purpose that cannot be achieved with a more narrowly tailored and more legally sound approach. Thus, the District is acting unconstitutionally and beyond the scope of any authority of state or local law.

Given the facts stated in the First Amended Complaint's Statement of Facts, the District is causing irreparable harm to the parents of the District, the Plaintiff Parents, and the children of the District. Specifically, allowing teachers to actively solicit private conversations with children about the children's intimate sexual matters and mental health, invites unaccountable abuse of children—especially when the conversations are

affirmatively kept hidden from parents.

The District will not be harmed in any way by the issuance of the injunctive relief sought by the Parents. Even with such an injunction in place, the District can still address matters such as bullying and counseling in accordance with the law. For example, the District could inform students that trained counselors are available for private conversations about mental health and sexuality.

No third persons would be harmed in any way by the issuance of the injunctive relief sought by the Parents. Again, even with such an injunction in place, the District can still address matters such as bullying and counseling in accordance with the law. For example, the District could inform students that trained counselors are available for private conversations about mental health and sexuality.

The District's activity, as described in the Statement of Facts above, violates public policy because it violates the Parents' rights to direct the upbringing and provide care for their children. Thus, the injunctive relief that the Parents seek would not violate public policy or the public at large.

### D. In the Alternative, Motion to Amend

If the Court sees fit to deny Plaintiff's request to proceed to a declaratory judgment, the Plaintiffs ask the Court to grant them leave to amend their Complaint to remedy any deficiencies.

### III. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss must be denied.

March 20, 2023                                    Respectfully Submitted,

                                                  /s/ Joshua J. Brown
                                                  Joshua J. Brown  (0089836)
                                                  Attorney at Law
                                                  3979 Main Street
                                                  Hilliard, OH 43026
                                                  P: (614) 383-8886
                                                  josh@joshbrownesq.com
                                                  Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I certify that on March 20, 2023, a copy of the preceding PLAINTIFFS'

MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR

FAILURE TO STATE A CLAIM (DOC. ENTRY #10) AND IN THE ALTERNATIVE,

MOTION FOR LEAVE TO AMEND COMPLAINT was served by email in accordance

with Fed.R.Civ.P. 5(b)(2)(E) delivery to the following:

  Jessica K. Philemond (0076761)
  Scott Scriven LLP
  250 East Broad Street, Suite 900
  Columbus, OH 43215
  614-222-8686
  jessica@scottscrivenlaw.com
  Attorney for Defendants

  Brandon Abshier (0083505)
  Michael J. Valentine (0038806)
  REMINGER CO., LPA
  200 Civic Drive, Suite 800
  Columbus, OH 43215
  babshier@reminger.com
  mvalentine@reminger.com
  P: 614-232-2422

Attorney for Defendants

/s/ Joshua J. Brown

Joshua J. Brown (0089836)