## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

Rachel Kaltenbach )
4843 Davidson Run Drive ) Case No. 2:23-cv-00187
Hilliard, OH 43026 )
individually and as ) Judge Michael H. Watson
parent and natural guardian of her )
children, ) Magistrate Kimberly A. Jolson
)
   and, ) Jury demand endorsed hereon
)
Daniel Kamento )
2630 Westbreeze Drive )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of his )
children, )
)
   and, )
)
Sarah Kamento )
2630 Westbreeze Drive )
Hilliard, OH 43026 )
individually and as )
parent and natural guardian of her )
children, )
)
   and, )
)
Bethany Russell )
3154 Griggsview Court )
Columbus, OH 43221 )
individually and as )
parent and natural guardian of her )
children, )
)
   and, )
)
Jennifer King )
4958 Hollow Oak Court )

Hilliard, OH 43026                              )
individually and as                             )
parent and natural guardian of her              )
children,                                       )
                                                )
          and,                        )
                                                )
Tanya Ciomek                                    )
5559 Fescue Drive                               )
Hilliard, OH 43026                              )
individually and as                             )
parent and natural guardian of her              )
children,                                       )
                                                )
          and,                        )
                                                )
Leizl Zirkle                                    )
1302 Lieuteant Drive                            )
Galloway, OH 43119                              )
individually and as                             )
parent and natural guardian of her              )
children,                                       )
                                                )
          and,                        )
                                                )
Lisa B. Chaffee                                 )
5981 Lakefront Avenue                           )
Hilliard, OH 43026                              )
individually and as                             )
parent and natural guardian of her              )
children,                                       )
                                                )
          and,                        )
                                                )
Danae Gordin                                    )
2232 Jarrow Drive                               )
Hilliard, OH 43026                              )
individually and as                             )
parent and natural guardian of her              )
children,                                       )
                                                )

and,                                                )
                                                    )
D.S. (Per Court Order 3/28/2024),                   )
c/o Law Office of Josh Brown LLC                    )
3979 Main Street                                    )
Hilliard, OH 43026                                  )
individually and as                                 )
parent and natural guardian of her                  )
children,                                           )
                                                    )
            Plaintiffs,                             )
                                                    )
      v.                                            )
                                                    )
Hilliard City Schools Board of Education            )
c/o Scott Scriven LLP.                              )
250 East Broad Street, Suite 900                    )
Columbus, OH 43215,                                 )
                                                    )
Beth Murdoch, in her official capacity              )
as Board President for the Hilliard City            )
Schools Board of Education                          )
c/o Scott Scriven LLP.                              )
250 East Broad Street, Suite 900                    )
Columbus, OH 43215,                                 )
                                                    )
Kara Crowley, in her official capacity              )
as Vice President for the Hilliard City             )
Schools Board of Education                          )
c/o Scott Scriven LLP.                              )
250 East Broad Street, Suite 900                    )
Columbus, OH 43215,                                 )
                                                    )
Nadia Long, in her official capacity                )
as a Member of the Hilliard City Schools            )
Board of Education                                  )
c/o Scott Scriven LLP.                              )
250 East Broad Street, Suite 900                    )
Columbus, OH 43215,                                 )
                                                    )
Zach Vorst, in his official capacity                )

as a Member of the Hilliard City Schools )
Board of Education )
c/o Scott Scriven LLP. )
250 East Broad Street, Suite 900 )
Columbus, OH 43215, )
  )
Brian Perry, in his official capacity )
as a Member the Hilliard City Schools )
Board of Education )
c/o Scott Scriven LLP. )
250 East Broad Street, Suite 900 )
Columbus, OH 43215, )
  )
              Defendants. )

## PLAINTIFFS' SECOND AMENDED COMPLAINT

For their Second Amended Complaint against Defendant Hilliard City Schools

Board of Education, the Plaintiffs state as follows:

### I.     PARTIES

1.     Each Plaintiff except one is a parent of one or more children currently

enrolled in the Hilliard City School District.

2.     One Plaintiff, D.S., is a parent whose child is a former student in the

Defendant School District, and who suffered actual harm as a result of the Defendant's

acts. (Collectively hereinafter "Parents").

3.     Hilliard City School District is a local school district in Hilliard, Ohio

("District"). The District is a "local education agency" pursuant to 20 U.S.C. § 1232h(c)(6).

### II.    JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1342, and to the

extent applicable 1367 because this case involves the interpretation of a federal law (namely the Constitution of the United States and Plaintiff anticipates defenses based on Title IX, Public Law No. 92-318, 86 Stat. 235 (June 23, 1972), codified at 20 U.S.C. §§ 1681–1688) (hereinafter "Title IX"), the effect of U.S. federal agencies' interpretation of those laws, and the Plaintiff's rights pursuant to those federal laws.

5.      Federal law affords this Court authority to grant Plaintiff's requested declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201. Also, see Fed. R. Civ. P. 57.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (d), because: 1) all Plaintiffs except one reside in this District; 2) the Plaintiff who does not live in this District consents to jurisdiction in this District; 3) the Defendant's primary place of business is in this District; and 4) "a substantial part of the events or omissions giving rise to all Plaintiff's claim occurred" in this District.

**III.    STATEMENT OF FACTS**

7.      Plaintiff D.S.'s daughter ("T.S.") suffered severe emotional trauma at her school during her eighth and nineth grade years.

8.      Certain teachers at the District concluded that the child was experiencing "gender dysphoria" although they express it as "transgenderism."

9.      The teachers concluded that the appropriate treatment for T.S. was to for T.S. to adopt a male identity and for District officials to affirm T.S.'s identity as a male.

10.     These teachers diagnosed and treated T.S. based on their opinions as to the

child's healthcare needs, specifically as to T.S.'s mental health needs.

11.     The teachers convinced T.S. she was a boy in a girl's body, and pressured the child to adopt a new name and identity as the opposite sex.

12.     The teachers treated the child as the opposite sex and used an opposite-sex name in referring to the child.

13.     However, in the presence of the child's parents, the teachers treated the child as her biological sex and referred to the child with pronouns consistent with her biological sex.

14.     D.S. has never been accused or adjudicated as one who abuses or neglects her child.

15.     D.S. went to great lengths to care for her daughter, knowing that the child was suffering from mental health issues. For example, D.S. met with school officials to gain knowledge of T.S.'s in-school experience.

16.     Ultimately, the emotional trauma culminated with T.S.'s attempted suicide at school, resulting in physical injuries.

17.     Later, D.S. discovered inadvertently that Hilliard District officials diagnosed and treated her daughter for gender dysphoria at school, when a school secretary sent T.S. a postcard using a male name and male pronouns.

18.     Once D.S. made this discovery, she had the full information she needed to care for T.S.

19.     If D.S. had known about this element of T.S.'s struggles, D.S. would have

been equipped with the knowledge she needed to provide appropriate care for her daughter T.S. much sooner.

20.    In hindsight, through professional therapy and counseling, the child and her parents understand that her problems were not gender dysphoria. Thus, the child was misdiagnosed and mistreated by the District officials.

**Other Reasons The Parents Believe the District is Hiding
Their Children's Healthcare Information From Parents**

21.    Plaintiffs identified other Hilliard parents who will be witnesses in this matter, who have similar stories. They are afraid to come forward as parties to this case because of the backlash anticipated (and already received for the current Plaintiffs) from certain activists in the community.

22.    Due to several reasons, as described in detail below, other parents became concerned that the District was actively hiding their children's gender dysphoria from them.

23.    Diagnosis and treatment of gender dysphoria is a healthcare issue.

24.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5-TR") defines "gender dysphoria as follows:

A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two or more of the following:

-    A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)

- 4 -

-   A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)

-   A strong desire for the primary and/or secondary sex characteristics of the other gender

-   A strong desire to be of the other gender (or some alternative gender different from one's assigned gender)

-   A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender)

-   A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender)

-   The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

25.     There are different opinions about how gender dysphoria should be treated.

See, e.g., Kenneth J. Zucker, Gender Dysphoria in Children and Adolescents, in Principles and Practice of Sex Therapy 395, 406-09 (6th ed., 2020) (surveying competing treatment approaches); Stephen B. Levine, Reflections on the Clinician's Role with Individuals Who Self-identify as Transgender, Arch. Sex. Behav. (2021) Available at: https://doi.org/10.1007/s10508-021-02142-1; Gender Dysphoria is Rising, and So Is Professional Disagreement, Jennifer Block, February 23, 2023. Available at: https://www.bmj.com/company/newsroom/gender-dysphoria-in-young-people-is-rising-and-so-is-professional-disagreement/

26.     Given the severe damage caused to D.S.'s child and others known to the Parents, several of the Parents sought to understand the District's policies concerning

- 5 -

disclosing student health information to parents.

27.     The Parents met with the District Superintendent and asked about the District's policy on informing parents when a child is being treated for gender dysphoria at school.

28.     The Superintendent responded that, pursuant to federal law, Title IX, a teacher would be putting his/herself in legal jeopardy if the teacher "outed" a student to the student's parents.

29.     After the Superintendent meeting, the Parents retained legal counsel, who sent a letter to the District asking if the Superintendent's words were an accurate statement of the District's policy. (Ex. A).

30.     The District responded on September 14, 2022. (Ex. B). The District said its "default expectation" is to inform the parents, but there may be exceptions for matters of "health and safety and confidentiality of counseling." (Id.).

31.     The Parents responded with a second letter on September 16, 2022. (Ex. C).

32.     First, the Parent's second letter pointed out that there is no such thing as a "default expectation" in law and government. There is either an enforceable policy or there is not.

33.     Second, the Parent's second letter identified three real-life occurrences—*not hypothetical scenarios*—that contradicted the District's stated "default expectation." Then the Parent's second letter asked for a response to questions which logically flow from these three occurrences.

34. The Parent's second letter said:

In addition to the Superintendent's statement and a host of other items, there are a few other items that are causing serious concerns among parents that I want to point your attention toward. The Parents' concern is that there are activists within the schools in the District who are actively undermining the District's standards and the rights of parents to direct the upbringing of their children. The Parents have a right to know if the following acts are part of the District's standards, whether it violates the District's policies, and whether these items violate the Parents' rights to control the upbringing of their children.

35.     The Parent's second letter first brought this occurrence to the District's

attention:

**Occurrence 1:     Survey Questions**
I possess direct evidence that teachers asked children—in a written survey (that I have a copy of) what pronouns a child prefers at school . . . *and in a different, subsequent question,* the survey asked what pronouns the student prefers the teacher use when speaking to parents. Since this was class-wide, it was not limited to situations involving health and safety, abuse, or confidentiality.

36.     The Parent's second letter brought this second occurrence to the District's

attention:

**Occurrence 2:     "I'm Here" Badges**
I am also aware that some Hilliard District teachers—not counselors— are wearing so-called "I'm Here" badges that identify particular teachers as a "safe person." The badge is accompanied by a holder that says "If you are not a safe person or do not support LGBTQ+ youth or issues, please do not wear or display the 'I'm Here' badge."

That badge and the accompanying badge holder is distributed by the local teacher's union and emanates from the NEA-LGBT+ Caucus. This badge, and the holder that the badge came in, has a QR code linking to material giving instruction on sexual positions and suggested books that are not part of the District's standards. The Superintendent acknowledged in writing the material is "adult" material. The QR code

- 7 -

can be scanned by students from far away and a student testified at a recent Hilliard School Board meeting that she was given one of these badges (she held one of the badges up at the Board meeting).

The union admits the intention of the badge is to attract discussion from children about personal, intimate sexual matters—which will allow teachers (not counselors) to know who the most vulnerable children in Hilliard School District are. I have an email from the President of the Hilliard teacher's union, Linna Jordan, basically doubling down and defending her dissemination of this badge. It also came to my attention that President Jordan was personally passing out sexual literature and/or badges last week at Davidson, and the President was asking people if they were "friend or foe" before giving the materials out.

37.     The Parent's second letter brought this third occurrence to the District's

attention:

**Occurrence 3:     Displays of Sexual Content to Children, at School**
I am also aware of materials posted by a teacher, at a school, that contain educational materials about sexual materials that are not part of the district standards. I have a copy of the bulletin board. It has definitions of sexual items which, I am guessing, are not part of the District's standards.

38.     Finally, the Parent's second letter asked the following question, based on

the three issues brought to the District's attention:

**Follow Up Questions**
So hopefully, you can understand why the parents are concerned about ideological and political activism at this District that would undermine parental rights. It seems the teacher's union and President Linna Jordan in particular, are actively organizing an effort to educate students in materials that are not part of—and perhaps contrary to—the District's standards. Meanwhile, these materials label certain people including parents, teachers, and school officials as "unsafe." They are doing so in partnership with an organization with tremendous resources: the NEA and its LGBTQ+ Caucus.

Thus, the Parents respectfully request unambiguous answers to the following questions:

- 8 -

1) Was the Superintendent's statement about "outing a kid" consistent with the policies of the Hilliard School District? We would like a direct answer.

2) What is the definition of a "default expectation" as referred to in your letter? And are there consequences for teachers who ignore the "default expectation" and use different pronouns with children than when talking to the childrens' parents (excluding situations of abuse, confidential counseling, or similar situations)?

3) What are the definitions of "health and safety concerns" as it relates to persons who "are not a safe person?"

   a. Teachers are disseminating materials that say a person who does not support LGBTQ+ youth or issues is an "unsafe person." As a lawyer, you know that Americans have a right to know what conduct will result in legal consequences (i.e., the void for vagueness doctrine). Thus, is the District's policy that a person (such as a parent, teacher, etc.) who is "not a safe person" by virtue of their perceived lack of "support for LGBTQ+ issues" qualify as "health and safety concern?"

   b. In particular, will the district take a parent's opinions, thoughts, utterances, religious precepts, etc. into consideration as a "health and safety concern?" Should parents know that certain expressions could shut them out from information about their children learned at the District? Specifically, will the District take parent's expression related to so-called "gender-affirming treatment" into consideration?

4) Do the two questions presented to students last month—in writing—violate school policy (i.e., asking for a student's preferred pronouns and then  asking the student what pronouns they want teachers to use when speaking to parents)?

39. The District responded with another letter. (Ex. D).

40. The District's response refused to answer the Parent's questions asked in

the Parent's second letter, complaining: 1) the request had "quadrupled in size"; 2) that

- 9 -

the District was aware that the Parent's Legal Counselor had spoken to the Parents about potential litigation at a public meeting; and 3) that the question of whether Parent's "various hypothetical would conform or violate" Board Policy could be answered by reviewing the Board's policies online (the Parent's second letter contained no hypotheticals, but the three above-referenced real occurrences at the District). (Id.).

41.     Thus, the District explicitly refused, in writing, to state—directly to a large group of the District's parents—whether three actual occurrences at the District violated their policy or not.

42.     Around this time, District School Board Member Beth Murdoch proposed an addition to the District Services Policy in September of 2022 that would include the following language:

> all health-related information about a student must be shared with the student's parent(s) or guardian(s). It is not Hilliard City School District policy to hide or keep information from a student's parent(s) or guardian(s).

43.     In response to this proposal, District Superintendent Dave Stewart refused to put the proposed policy addition on the Policy Review Committee agenda, saying to do so would "ignite an already volatile powder-keg."

44.     The next day, Superintendent Stewart said publicly, "My fear is that the debate that will undoubtedly ensue will be focused on one set of issues and will further divide our community and once again put the spotlight on a very vulnerable population of students."

45.     Additionally, based on the following facts, the District's teacher's union is

clearly working to hide healthcare information from parents.

46.     Based on the following facts, at least some teachers in the District are following instructions given to them by the teacher's union. These instructions manifest that decisions related to diagnosis and treatment of gender dysphoria are based on ideological bias on the part of the union and teachers who follow the union's guidance.

47.     The Hilliard Education Association ("HEA") is the Defendant District's local teachers union, which is a local component of the national teachers union called the National Education Association ("NEA").

48.     The NEA jointly produced a document titled "Schools in Transition: A Guide for Supporting Transgender Students in K–12 Schools." This document offers "guidelines" to teachers as follows:

1)  One chapter of the guidelines includes: "approaches for working with unsupportive parents or parents who disagree about the appropriate response to their child's expressed gender identity." The premise of this section is stated as such: "Privacy and confidentiality are critically important for transgender students who do not have supportive families. In those situations, even inadvertent disclosures could put the student in a potentially dangerous situation at home, so it is important to have a plan in place to help avoid any mistakes or slip-ups." Of course, no definition of "supportive families" is provided, and presumably, this simply means they do not share the NEA's views. Also, there is no consideration of the damages caused by failing to inform parents about how their children are being treated for gender dysphoria.

2)  These guidelines include an eight-page worksheet instructing teachers on how to facilitate a gender "transition" in school, while training teachers on how to keep information about this "transition" from parents. The guidelines specifically give advice on how to use a student's preferred name and pronouns in class, but the legal name and normal sex-specific pronouns in communications with parents, to hide their child's symptoms

of gender dysphoria.

49. The HEA is not just a subsidiary of the NEA. The HEA is one of just a few national "Sponsors" of the NEA LGBTQ+ Caucus.

50. The NEA LGBTQ+ Caucus offers training on its views of gender identity and sexual orientation along with other resources.

51. One of the resources the HEA and the NEA LGBTQ+ Caucus offers for voluntary development is a video titled "Sex acts that don't get enough play" and features the words and phrases "blow job, fingering, vaginal intercourse, outercourse, fisting, rimming, watching porn, BD (bondage and discipline), masturbating, muffing, sexting, and anal sex."

52. The NEA LGBTQ+ Caucus promulgated the badges discussed in the Parents' letter. ("Badges") (Ex. E).

**The "District's Policy":**

53. The facts stated above establish that the District's policy is as follows:

1) The District's so-called "default expectation" is to inform parents of diagnosis and treatment of mental health conditions at the school;

2) the District will diagnose and treat children for mental health conditions at school;

3) the District will withhold and/or affirmatively deceive parents about the District's diagnosis and treatment if the District officials perceive the parents are a "health and safety" risk;

4) a "health and safety" risk will include a District official's opinion that a parent is not a "safe person," because that parent "[does] not support LBGTA+ youth or issues"; and

5) "To avoid violating Plaintiffs' rights, the District need merely refrain from coercing students to keep these issues secret from parents." (Mot. Dismiss, Doc.# 5, 13).

(The "District's Policy").

54. "Support" for "LBGTA+ youth or issues" is a matter of personal opinion. Thus, a District official's opinion of whether a parent is a "safe person" could arise from judgments related to a parent's constitutionally-protected practices, such as practicing certain religions, expressing certain political views, associating with certain people or organizations, or even simply attending certain events.

## COUNT ONE (D.S.):
### SUBSTANTIVE DUE PROCESS, RIGHT TO FAMILIAL INTEGRITY
### (42 U.S.C. § 1983)

55. Plaintiff incorporates the preceding as if fully restated herein.

**The "District's Acts":**

56. The District: 1) diagnosed and treated D.S.'s child for a clinical mental health issue; 2) withheld vital health information from D.S. about her child; and 3) affirmatively deceived D.S. about her child's vital health information. ("District's Acts").

57. As a direct result of the District's Acts, D.S.'s child's health condition spiraled out of control, culminating in a serious attempted suicide, resulting in physical injuries.

58. When D.S. inadvertently discovered her child was experiencing these health conditions at school, she was able to provide adequate care for her child.

59.     If D.S. had known the diagnosis and treatment the District imposed on her child, this knowledge would have allowed her to adequately care for her child and prevent the child's suicide attempt.

60.     D.S. has never been accused or adjudicated as one who abuses or neglects her child.

61.     D.S. had a fundamental right to any information concerning the District's diagnosis and treatment of any condition in her child. The U.S. and Ohio Constitutions grant D.S. the right to familial integrity, which encompasses D.S.'s right to independent, exclusive domain over her child's health care privacy and decisions.

62.     The District's Acts directly attack the parent-child relationship. These Acts displace the role of D.S. in her child's health decisions and destroy her ability to exercise her exclusive authority to make health care choices for her child.

63.     The District's Acts eroded the family's solidarity internally and impaired the family's ability to function because it put the D.S. in competition with the school for matters that are the exclusive domain of the parent. This placed a wedge between the parent and child, causing the child to look to school officials in making vital healthcare decisions, rather than her parents—who are legally responsible for her healthcare decisions and who have exclusive domain over this area of the child's life.

64.     Also, the District's Acts exposed D.S. to liability pursuant to D.S.'s responsibility pursuant to Ohio law to provide adequate care for her child.

65.     The District's Acts were committed consistent with the District Policy,

promulgated and implemented by the District under color of law, because the District is a public institution.

66.     The District's Acts were committed by teachers and administrators of the District, under the policies of the District, thus the conduct was done under color of law.

67.     Thus, Defendant damaged Plaintiff D.S. by depriving Plaintiff of constitutionally-protected substantive due process right to familial integrity.

68.     Plaintiff reasonably anticipates a defense based on certain interpretations of federal law Title IX. To the extent these interpretations of Title IX are consistent with the District's Policy, it also deprived D.S. of her right to familial integrity.

69.     Plaintiff D.S. requests damages in an amount to be determined in this case.

**COUNT TWO (D.S.):**
**SUBSTANTIVE DUE PROCESS, RIGHT TO FREEDOM OF CONSCIENCE**
**(42 U.S.C. § 1983)**

70.     Plaintiffs incorporate the preceding as if fully restated herein.

71.     To the extent the District's Acts and policies chose sides in a public policy matter and imposed a partisan ideological view on D.S.'s family, displacing the D.S.'s role in making decisions for her daughter concerning matters of conscience, this imposition gave rise to deprivation of the right to freedom of conscience.

72.     The District's Acts deprived D.S. of the right to exercise her conscience in making health decisions for her child.

73.     The District has a more narrowly tailored alternatives, such as limiting information from parents only in cases of abuse and neglect.

74. The policies and actions complained of were promulgated and implemented by the District under color of law, because the District is a public institution.

75. The conduct complained of was committed by teachers and administrators of the District, under the policies of the District, thus the conduct was done under color of law.

76. Thus, Defendant damaged Plaintiff by depriving Plaintiff of constitutionally-protected substantive due process right to freedom of conscience.

77. Plaintiff reasonably anticipates a defense based on certain interpretations of federal law Title IX. To the extent these interpretations of Title IX are consistent with the District's Policy, it also deprived D.S. of her right to freedom of conscience.

78. Plaintiff D.S. seeks damages in an amount to be determined in this case.

## COUNT THREE (D.S.):
## INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

79. Plaintiff incorporates the preceding as if fully restated herein.

80. A reasonable person would find the District's Acts extreme and outrageous.

81. The District's Acts were reckless because District officials are not qualified—and are specifically denied entitlement to—make diagnosis and treatment decisions for somebody else's child. Such acts will inevitably lead to harm.

82. The District's Acts were reckless because District officials made mental health decision for D.S.'s child based on ideological bias, rather than sound pedagogical and/or mental health counseling practices. Such acts will inevitably lead to harm.

83.     The District's Acts were reckless and caused D.S.'s child to make a serious attempt at suicide, resulting in physical injuries.

84.     The child and her parents suffered severe emotional distress as a result of the District's acts.

85.     D.S. is thus damaged in an amount to be determined in this case.

**COUNT FOUR (All Plaintiffs):**
**REQUEST FOR DECLARATORY JUDGMENT**
**CONCERNING PARENT'S RIGHT TO FREEDOM OF CONSCIENCE**
**(42 U.S.C. § 1983)**

86.     Plaintiffs incorporate the preceding as if fully restated herein.

87.     The District has a duty of neutrality as it pertains to matters of public debate.

88.     The District Policy allows the District to diagnose and treat children for mental health conditions at school. The District Policy allows officials to withhold that information from parents, and even deceive parents—if the officials believe the parent is not a "safe person," because that parent "[does] not support LBGTA+ youth or issues." The parents are entitled to that information and entitled to exclusive domain over their child's healthcare privacy and healthcare decisions. The parents are entitled to exercise their authority over this domain according to their conscience. The District's Policy supplants parents within this domain and strips them of their rights and authority to make these decisions according to their own conscience.

89.     To the extent the District's Policy involves taking sides in a public policy

matter and imposing a partisan ideological view on families by displacing the parent's role in making decisions concerning matters of conscience, this imposition gives rise to constitutional deprivation of the freedom of conscience.

90.     The District's Policy places a local government agency in competition with parents in matters of conscience, thus, driving a wedge between the parent and child relationship.

91.     Plaintiffs need a declaratory judgment. There is no way for the Plaintiffs to know what information is being withheld from them by the District. The Plaintiffs are not required to wait until their rights are violated or the damage is done (like the damages done to D.S. and Plaintiff's other witnesses) before exercising their rights to this information.

92.     The District's Policy effectively coerces the Parents into forfeiting their constitutional right to exercise their conscience in regards to the privacy of their child's healthcare information and their right to make healthcare decisions for their child.

93.     Given the damages the District caused to D.S. and others who will be witnesses in this case, the Parents seek an early opportunity to resolve their disputes so as to avoid the threat of impending litigation; to obtain both clarity in their legal relationships and the ability to make responsible decisions about their future; and to settle this controversy before it matures into full-fledged violations of law or duties.

94.     The District has a more narrowly tailored alternatives, such as limiting information from parents only in cases of abuse and neglect.

95.     The District's Policy is promulgated and implemented by the District, which is a public institution, and thus the District's Policy is set forth under color of law.

96.     Implementation of the District's Policy is committed by teachers and administrators of the District, under the policies of the District, thus the District's Policy is implemented under color of law.

97.     Thus, Plaintiffs are damaged by Defendant's policy, because it deprives them of constitutionally-protected rights to freedom of conscience and exposes them to liability under Ohio law.

98.     Plaintiffs reasonably anticipate a defense based on certain interpretations of federal law Title IX. To the extent these interpretations of Title IX are consistent with the District's Policy, it also deprives the Parents of their rights to freedom of conscience.

99.     Thus, Plaintiffs seek a declaratory judgment, declaring the District's Policy unconstitutional pursuant to the Parents' right to freedom of conscience.

**COUNT FIVE (All Plaintiffs):**
**REQUEST FOR DECLARATORY JUDGMENT CONCERNING**
**PARENT'S RIGHTS TO FAMILIAL INTEGRITY**
**(42 U.S.C. § 1983)**

100.    Plaintiff incorporates the preceding as if fully incorporated herein.

101.    The Parents own their children's healthcare privacy and have a duty to make healthcare decisions for their children. This is an essential part of the constitutionally-protected parent-child relationship.

102.    The District Policy allows the District to diagnose and treat children for

mental health conditions at school. The District Policy allows officials to withhold that information from parents, and even deceive parents—if the officials believe the parent is not a "safe person," because that parent "[does] not support LBGTA+ youth or issues."

103.    The District's Policy directly attacks the parent-child relationship because the Policy displaces the role of the parent in making their child's health decisions, infringes on the Parent's right to their children's healthcare privacy, and destroys the ability of the parent to make educated choices in caring for their children.

104.    The District's Policy erodes the family's solidarity internally and impairs the family's ability to function because it causes children to look to school officials in making vital healthcare decisions, rather than their parents (who are legally responsible for their children's healthcare privacy and decisions).

105.    The District's Policy exposes the parents to liability because Ohio law imposes a duty on parents to provide adequate care for their children.

106.    Plaintiffs need a declaratory judgment. There is no way for the Plaintiffs to know what information is being withheld from them by the District. The Plaintiffs are not required to wait until the damage is done (like the damages done to D.S. and Plaintiff's other witnesses) before exercising their rights to this information.

107.    The District's Policy effectively coerces the Parents into forfeiting their constitutional right to familial integrity to the District. Under the District's Policy, the Parents will be denied their right to information they are entitled to, and may not even know it until damage occurs.

108.    Given the damages the District caused to D.S. and others who will be witnesses in this case, the Parents seek an early opportunity to resolve their disputes so as to avoid the threat of impending litigation; to obtain both clarity in their legal relationships and the ability to make responsible decisions about their future; and to settle this controversy before it matures into full-fledged violations of law or duties.

109.    Plaintiffs reasonably anticipate a defense based on certain interpretations of federal law Title IX. To the extent these interpretations of Title IX are consistent with the District's Policy, it also deprives the Parents of their right to familial integrity.

110.    Thus, Plaintiffs seek a declaratory judgment declaring that the District's Policy violates the Parents' rights to familial integrity, and is thus unconstitutional.

### COUNT SIX (All Plaintiffs):
### REQUEST FOR DECLARATORY JUDGMENT CONCERNING PARENT'S RIGHTS TO FREEDOM OF SPEECH
### (42 U.S.C. § 1983)

111.    Plaintiff incorporates the preceding as if fully restated herein.

112.    The District Policy allows the District to diagnose and treat children for mental health conditions at school. The District Policy allows officials to withhold that information from parents, and even deceive parents—if the officials believe the parent is not a "safe person," because that parent "[does] not support LBGTA+ youth or issues."

113.    As a function of the "unsafe person" label, the District Policy deprives the parent of his/her right to their child's healthcare privacy and healthcare decision-making.

114.    "Support" for "LBGTA+ youth or issues" is a matter of personal opinion.

Thus, a District official's opinion of whether a parent is a "safe person" could arise from judgments related to a parent's constitutionally-protected practices, such as practicing certain religions, expressing certain political views, associating with certain people or organizations, or even simply attending certain events

115. Thus, the District's Policy punishes the Parents, stripping them of their rights, displacing their familial role, if they express or adopt certain opinions protected by the principles of free speech in the United States and Ohio Constitutions.

116. The First Amendment to the Constitution of the United States includes a clause granting freedom of speech to all citizens. It prohibits censorship or punishment for protected expression. It is incorporated and made applicable to the states by the Fourteenth Amendment. Article I, Section 11 of the Ohio Constitution grants similar rights under Ohio law.

117. The District's Policy is not narrowly tailored to serve a significant government interest. The government has no interest in punishing parents for constitutionally-protected expression.

118. The District's Policy gives unbridled discretion to District officials by permitting them to punish messages that these government officials deems to be offensive.

119. The District's Policy and practice are overly broad because they restrict parental speech that does not and will not materially disrupt the educational process.

120. This overbreadth chills the speech of parents who wish to levy criticism of

public officials and public policy.

121. The District's Policy and practice have no compelling or legitimate reason that would justify the District's censorship of the message that the Parents seeks to express.

122. The District's Policy and practice are not the least restrictive means of achieving any compelling interest they may allege.

123. The District's Policy and practice are not reasonably related to any legitimate pedagogical concerns.

124. The Plaintiffs need a declaratory judgment. There is no way for the Plaintiffs to know what information is being withheld from them by the District due to their exercise of free speech. The Plaintiffs are not required to wait until the damage is done (like the damages done to D.S. and Plaintiff's other witnesses) before exercising their rights to exercise free speech.

125. Given the damages the District caused to D.S. and others who will be witnesses in this case, the Parents seek an early opportunity to resolve their disputes so as to avoid the threat of impending litigation; to obtain both clarity in their legal relationships and the ability to make responsible decisions about their future; and to settle this controversy before it matures into full-fledged violations of law or duties.

126. Plaintiffs reasonably anticipate a defense based on certain interpretations of federal law Title IX. To the extent these interpretations of Title IX are consistent with the District's Policy, it also deprives the Parents of their rights to freedom of speech.

127.    Thus, Plaintiffs seek a declaratory judgment declaring that the District's Policy violates the Parents' rights to free speech and is thus unconstitutional.

**COUNT SEVEN (All Plaintiffs):**
**REQUEST FOR DECLARATORY JUDGMENT CONCERNING**
**FOURTEENTH AMENDMENT: DUE PROCESS**
**(42 U.S.C. § 1983)**

128.    Plaintiffs incorporate the preceding as if fully restated herein.

129.    The Due Process Clause of the Fourteenth Amendment prohibits the government from acting pursuant to vague standards that grant enforcement officials unbridled discretion.

130.    The arbitrary determination by school officials of what is a "default expectation," and is and is not a "health and safety" exception is unconstitutionally vague and is a recipe for abuse and viewpoint discrimination.

131.    The District's "default expectation" and "health and safety exception" is designed to give the District overly-broad and potentially abusive authority to withhold vital health information about children from their parents based on the District's own labelling of people as "not a safe person" because they "do not support LBGTA+ youth or issues."

132.    Parents of common intelligence must guess as to what the "default expectation" and "health and safety" exception encompasses. For example, parents of common intelligence must guess as to whether they will waive their constitutional rights to their children's vital health information, by being perceived as being on the wrong side

of "support [for] LGBTA+ youth or issues." This could arise from constitutionally-protected practices, such as practicing certain religions, expressing certain political views, aligning with certain organizations, or even simply attending certain events.

133.    Due to the District's Policy, the Parents are harmed because the District Policy arbitrarily deprives the Parents of rights, pursuant to vague and ambiguous government policy.

134.    Thus, Plaintiffs seek a declaratory judgment declaring that the District's Policy violates the Parents' rights to do due process and is thus unconstitutional.

**COUNT EIGHT (All Plaintiffs):**
**REQUEST FOR INJUNCTIVE RELIEF**

135.    Plaintiff incorporates the preceding as if fully restated herein.

136.    The Statement of Facts outlines certain badges which are being displayed by teachers and other District agents in the presence of the Parents' children.

137.    The badges have a QR code on them that links to obscene and pornographic content. The content provides instruction in sexual acts.

138.    The badges' holder identifies people as "not a safe person" solely and entirely as a function of their constitutionally-protected personal opinions.

139.    QR codes are scanned, by cell phones, and automatically take the scanning device to an internet website.

140.    The District Superintendent admitted publicly that the QR code takes scanning devices to websites with adult-only content.

141.    The QR code can be scanned from as far as thirty (30) feet away.

142.    Children at the District carry cell phones that scan QR codes at school, automatically taking the children to the website with pornographic materials.

143.    Although the District may have instructed District personnel to only show one side of the badge (the side with no QR code) the other side is easily accessible and displayable, as the badge hangs off of personnel's belt at eye-height for many children.

144.    One child at the District held up the Badge at a District Board meeting, saying it was hers, and it was given to her by a teacher.

145.    One can imagine why parents do not want unknown adults inviting conversations about sex with their children, just on the face of it. But the second legal problem with the badges, is that they encourage children to approach District officials, and invite those officials into the parent's exclusive realm—while the information gathered will not be shared with parents. The badges solicit and encourage private conversations between children and supervisory, non-parental adults—conversations which give the adult the ability to speak privately, authoritatively, and without parental knowledge—about matters which are the exclusive domain of parents, i.e., conversations about the child's personal sexual development.

146.    Meanwhile, some people at District are not so trustworthy, although most are well-intentioned. The badges provide a tool for predators to identify and engage in private conversations about sexual matters with vulnerable children. The District itself recently saw a teacher arrested for an inappropriate relationship with a student. Such

incidents happen frequently throughout the country.

147.    The Badges lack any justifiable educational or governmental purpose that cannot be achieved with a more narrowly tailored and more legally sound approach. There are plenty of other, legal ways the District could support children's health, without inviting children into private, confidential conversations, such as lectures, counseling, or handouts.

148.    The Badges, on their own terms (which are printed on the badge's holder) pit District agents against parents by labelling certain parents as "unsafe" if they hold certain constitutionally-protected opinions.

149.    Thus, the Badges violate the Parents' constitutional rights to familial integrity and freedom of conscience.

150.    Thus, the badges violate Ohio laws against exposing children to pornography.

151.    Thus, Plaintiffs seek an injunction on the display of the badges to children at the District.

    Plaintiff demands a trial by jury.

September 19, 2023                                      Respectfully submitted,

                                                       /s/ Joshua J. Brown
                                                       Joshua J. Brown (0089836)
                                                       Law Office of Josh Brown LLC.
                                                       3979 Main Street
                                                       Hilliard, OH 43026
                                                       P: (614) 383-8886
                                                       F: (614) 388-3947

josh@joshbrownesq.com
Attorney for Plaintiff

CERTIFICATE OF SERVICE

I certify that on September 19, 2023, a copy of the preceding SECOND AMENDED

COMPLAINT was filed through the court's ECF system and served in accordance with

Fed.R.Civ.P. 5(b) to the following:

Jessica K. Philemond (0076761)
Scott Scriven LLP
250 East Broad Street, Suite 900
Columbus, OH 43215
614-222-8686
jessica@scottscrivenlaw.com
Attorney for Defendant

/s/ Joshua J. Brown
Joshua J. Brown (0089836)

# Exhibit A

Joshua J. Brown (0089836)

Ohio Attorney at Law

5086 N. High Street

Columbus, OH 43214-1526

Office Phone: (614) 974-2022

Cell: (614) 284-4394

Fax: (614) 388-3947

josh@joshbrownesq.com

August 15, 2022

BY U.S. MAIL AND EMAIL DELIVERY

Dave Stewart, Superintendent

Hilliard City Schools

2140 Atlas Street

Columbus, OH 43228

david_stewart@hboe.org

RE:    Request for District Position on Parental Notification of
Gender Dysphoria Symptoms Manifested at School

Dear Mr. Stewart:

I am writing on behalf of over thirty (30) parents (the "Parents") who have children in Hilliard City Schools (the "District"). Some of the parents met with you on or about July 19, 2022.

In that conversation you were asked whether a teacher is at liberty to disclose to parents, that their child seeks to identify as a different name than the one they are registered with or identify as a different gender than their biological gender. You said the law is unclear and that, pursuant to Title IX, a teacher would be putting his/herself at great personal risk if teacher were to "out a kid" to their parents without the child's permission, when the teacher is not a counselor.

This ambiguity gives rise to great concern, both from a standpoint of health and law. The DSM-5-TR still defines these items as symptoms of gender dysphoria. Appropriate treatment for gender dysphoria is currently a subject of sharp disagreement. ***Parents cannot support, and may inadvertently undermine treatment if they are unaware of the dysphoria and/or the treatment the school is providing.***

Erica Anderson, a clinical psychologist who is former President of the U.S. Professional Association for Transgender Health, said leaving parents in the dark is not the answer. "If there are issues between parents and children, they need to be addressed

Page 2 of 3
August 15, 2022

. . . It's like kicking a can down the road. It only postpones, in my opinion, and aggravates any conflict that may exist."

You said there were different perspectives and that this is not a clear area of law. The Parents sympathize, as the lack of clarity likely arises from the opinion of the U.S. Department of Education. In fact, that is why a Federal Judge issued an injunction against actions based on the Department's interpretation. See: *The State of Tennessee, et al. v. United States Department of Education, et al.,* Case No. 3:21-cv-00308, docket #86, Memorandum Opinion and Order granting Plaintiff's Motion for Preliminary Injunction.

The Department's opinion on Title IX is not law and will certainly undergo legal challenges. However, one area of law is crystal clear: parents have a right to direct their children's education. The U.S. Supreme Court said:

> [I]n *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, *in Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*, at 535. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 166.

*Troxel v. Granville,* 530 U.S. 57, 65 (2000). The Ohio Supreme Court adopted the same doctrine, pursuant to the Ohio Constitution. See e.g., *State v. Whisner*, 47 Ohio St. 2d 181, 215-128 (Ohio 1976).

The Parents are naturally concerned, given that this is a prominent national issue. The practice of hiding symptoms of gender dysphoria from parents led to currently ongoing lawsuits in Massachusetts, Florida, Wisconsin, Kansas, Virginia, and Maryland. Several states adopted policies that would seem to allow school officials to hide gender

Page 3 of 3
August 15, 2022

dysphoria symptoms from parents. For example, in Maryland, a lawsuit is currently pending over the Maryland State Department of Education guidelines which specifically advise school officials to hide symptoms of gender dysphoria from parents. In California, a person named Jessica Konen sued a school for allegedly manipulating and encouraging her daughter to "transition." At Charles F. Patton Middle School in Pennsylvania, emails were made public of staff members specifically stating that they will use different pronouns when talking to parents about their child. There are rumors these types of activities are currently occurring at Hilliard City Schools—and no doubt they could occur.

Thus, the Parents feel they have a right to a clear, unambiguous answer, as to whether the school will require school officials to notify parents when their child manifests symptoms of gender dysphoria (or symptoms of anything else) at school, and what specific exceptions may apply.

You may reply to my contact information in the header. We will wait thirty (30) days for an answer, which will be until September 15, 2022. At that time, if we have no answer, then we will seek to require an answer from the District in federal court.

Thank you,

Joshua J. Brown (0089836)
Ohio Attorney at Law

jjb.

CC:

Julie C. Martin, Legal Counsel
Hilliard City Schools
Scott Scriven LLP
250 E. Broad St., Suite 900
Columbus, OH 43215
Phone: (614) 222-8686
Fax: (614) 222-8688
julie@scottscrivenlaw.com

# Exhibit B



Writer's Extension:  1120
jessica@scottscrivenlaw.com

September 14, 2022

**Via Email: josh@joshbrownesq.com**
Joshua J. Brown, Esq.
5086 N. High Street
Columbus, Ohio 43214
josh@joshbrownesq.com

Re:    **Your Request to Hilliard City Schools**

Mr. Brown:

Our office serves as legal counsel to Hilliard City Schools.  Superintendent Stewart asked that I respond to your recent correspondence of August 15, 2022 wherein you indicate you represent parents with questions regarding student gender identity as it is addressed at the District.  Your letter asks the question of whether the school will "require school officials to notify parents when their child manifests symptoms of gender dysphoria (or symptoms of anything else) at school, and what specific exceptions may apply."

As an initial matter, the District's goal is to include parents in all aspects of a child's education.  Your question asks for something different, however.  Without going back and forth about who can assess "symptoms," and what that undefined term may mean to you or the parents you represent, it appears your question is really – if a student identifies at school as a gender different than their birth gender, will the school discuss this with the parents?  The answer is "probably."  Schools stand *in loco parentis*, meaning in place of parents, for students who attend school.  While parents generally have rights regarding the upbringing of their children, schools and educators have an obligation to act in the student's best interest when the student is at school.  School districts also must comply with state and federal anti-discrimination and privacy laws that protect students.  The default expectation is to include parents with regard to gender identity matters because the District's position is that is generally in the student's best interest, but that will not always be the case.  For example, there may be a health or safety concern at issue.  There also may be confidentiality issues involved because a student's conversations with a school counselor are almost always privileged under Ohio law.   With regard to school counseling and health care, when students are referred to mental or other health care professionals, the District complies with the notice and consent requirements as set forth in Ohio law.  Generally, consent for healthcare referrals or treatment must be clarified as part of a child's emergency medical authorization form.  See Board Policy JHC, Student Health Services and Requirements.

Your letter also suggested that a recent court decision issued by the United States District Court for the Eastern District of Tennessee (the "Tennessee Case") applies to transgender student rights in the education setting. We are familiar with that case, but I believe your interpretation is a bit misplaced because that case did not consider the substantive question regarding Title IX's application and did not change the controlling law under Title IX in our jurisdiction. The Tennessee Case involved a challenge, among other things, to the United States Department of Education ("DOE") guidance regarding school districts' obligations not to discriminate against, and to accommodate, transgender students. On July 15, 2022, the United States District Court for the Eastern District of Tennessee granted a preliminary injunction barring DOE from enforcing this guidance in certain states, including Ohio. As the court explained, the basis for the injunction was strictly procedural. The court held that DOE's guidance was not proper because DOE failed to comply with required administrative notice and comment procedures. Importantly, the court expressly refrained from determining whether DOE's guidance regarding transgender students was or was not "substantively lawful." In other words, the Tennessee Case did not reject DOE's substantive position that discrimination on the basis of sexual orientation or gender identity is a violation of Title IX and other federal laws.

While the Tennessee court barred DOE from enforcing the challenged guidance in certain states, it did not change the controlling body of law in our jurisdiction that holds that Title IX and the United States Constitution prohibits discrimination on the basis of sexual orientation and gender identity. Nor did it change the numerous court opinions, including those issued by courts with jurisdiction over Ohio, that require school districts to provide accommodations to transgender students and to treat them as the gender with which they identify. *See Bd. of Edn. of the Highland Local Sch. Dist. v. United States Dept. of Edn.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Bd. of Edn. of the Highland Local Sch. Dist. v. United States Dept. of Edn.*, 2016 WL 6125403 (S.D. Ohio 2016); *Dodds v. United States Dept. of Edn.*, 845 F.3d 217 (6th Cir. 2016). The District and its administration is fully aware of the above and will continue to apply the controlling law, including as it may evolve over time, throughout its educational program.

I hope this information has helped to resolve any concerns your clients may have regarding the District's academic program. If you have further questions or would like to discuss, you may reach out to me directly.

Sincerely,

Jessica K. Philemond

Cc:     David Stewart, Superintendent

# Exhibit C

Joshua J. Brown (0089836)
Ohio Attorney at Law
5086 N. High Street
Columbus, OH 43214-1526
Office Phone: (614) 974-2022
Cell: (614) 284-4394
Fax: (614) 388-3947
josh@joshbrownesq.com

September 16, 2022

BY U.S. MAIL AND EMAIL DELIVERY
Hilliard City Schools
c/o Jessica K. Philemond, Attorney
Scott Scriven Law
250 East Broad Street, Suite 900
Columbus, OH 43215
jessica@scottscrivenlaw.com

> RE: Follow Up Request for District Position on Parental Notification of
> Gender Dysphoria Symptoms Manifested at School

Dear Mrs. Philemond:

Thank you for your letter dated September 14, 2022. I believe it took us closer to a resolution on this issue. The Parents have a few follow up questions.

On behalf of over thirty parents (hereinafter the "Parents") with children in the Hilliard School District, on August 15, 2022, I sent you a letter wherein I asked you, in short, whether the school will require school officials to notify parents when their child manifests symptoms of gender dysphoria at school. You answered that this is the "default expectation" of the school, but the school will make exceptions when there may be a "health or safety concern at issue." Also, you offered a very generalized statement that the school follows applicable law.

It is rather obvious that when a child is being abused by their parents that the school will not work with parents as normal. Also, it is obvious that a child who merely discusses sex and gender confusion issues solely within the confines of discussions with a counselor is likely to benefit from the confidentiality afforded counseling.

However, those are not the situations the Parents are concerned about. Again, the school superintendent is receiving this question because he said the law is unclear and that, pursuant to Title IX, a teacher would be putting his/herself at great personal risk if

Page 2 of 4
September 16, 2022

teacher were to "out a kid" to their parents without the child's permission, when the teacher is not a counselor.

In addition to the Superintendent's statement and a host of other items, there are a few other items that are causing serious concerns among parents that I want to point your attention toward. The Parents' concern is that there are activists within the schools in the District who are actively undermining the District's standards and the rights of parents to direct the upbringing of their children.

The Parents have a right to know if the following acts are part of the District's standards, whether it violates the District's policies, and whether these items violate the Parents' rights to control the upbringing of their children.

1.      **Survey Questions**

I possess direct evidence that teachers asked children—in a written survey (that I have a copy of) what pronouns a child prefers at school . . . *and in a different, subsequent question,* the survey asked what pronouns the student prefers the teacher use when speaking to parents. Since this was class-wide, it was not limited to situations involving health and safety, abuse, or confidentiality.

2.      **"I'm Here" Badges**

I am also aware that some Hilliard District teachers—not counselors—are wearing so-called "I'm Here" badges that identify particular teachers as a "safe person." The badge is accompanied by a holder that says "If you are not a safe person or do not support LGBTQ+ youth or issues, please do not wear or display the 'I'm Here' badge."

That badge and the accompanying badge holder is distributed by the local teacher's union and emanates from the NEA-LGBT+ Caucus. This badge, and the holder that the badge came in, has a QR code linking to material giving instruction on sexual positions and suggested books that are not part of the District's standards. The Superintendent acknowledged in writing the material is "adult" material. The QR code can be scanned by students from far away and a student testified at a recent Hilliard School Board meeting that she was given one of these badges (she held one of the badges up at the Board meeting).

The union admits the intention of the badge is to attract discussion from children about personal, intimate sexual matters—which will allow teachers (not counselors) to know who the most vulnerable children in Hilliard School District are. I have an email

Page 3 of 4
September 16, 2022

from the President of the Hilliard teacher's union, Linna Jordan, basically doubling down and defending her dissemination of this badge. It also came to my attention that President Jordan was personally passing out sexual literature and/or badges last week at Davidson, and the President was asking people if they were "friend for foe" before giving the materials out.

### 3.  Displays of Sexual Content to Children, at School

I am also aware of materials posted by a teacher, at a school, that contain educational materials about sexual materials that are not part of the district standards. I have a copy of the bulletin board. It has definitions of sexual items which, I am guessing, are not part of the District's standards.

### Follow Up Questions

So hopefully, you can understand why the parents are concerned about ideological and political activism at this District that would undermine parental rights. It seems the teacher's union and President Linna Jordan in particular, are actively organizing an effort to educate students in materials that are not part of—and perhaps contrary to—the District's standards. Meanwhile, these materials label certain people including parents, teachers, and school officials as "unsafe." They are doing so in partnership with an organization with tremendous resources: the NEA and its LGBTQ+ Caucus.

Thus, the Parents respectfully request unambiguous answers to the following questions:

1. Was the Superintendent's statement about "outing a kid" consistent with the policies of the Hilliard School District? We would like a direct answer.

2. What is the definition of a "default expectation" as referred to in your letter? And are there consequences for teachers who ignore the "default expectation" and use different pronouns with children than when talking to the childrens' parents (excluding situations of abuse, confidential counseling, or similar situations)?

3. What are the definitions of "health and safety concerns" as it relates to persons who "are not a safe person?"
   a. Teachers are disseminating materials that say a person who does not support LGBTQ+ youth or issues is an "unsafe person." As a lawyer, you know that Americans have a right to know what conduct will

Page 4 of 4
September 16, 2022

result in legal consequences (i.e., the void for vagueness doctrine). Thus, is the District's policy that a person (such as a parent, teacher, etc.) who is "not a safe person" by virtue of their perceived lack of "support for LGBTQ+ issues" qualify as "health and safety concern?"

b. In particular, will the district take a parent's opinions, thoughts, utterances, religious precepts, etc. into consideration as a "health and safety concern?" Should parents know that certain expressions could shut them out from information about their children learned at the District? Specifically, will the District take parent's expression related to so-called "gender-affirming treatment" into consideration?

4. Do the two questions presented to students last month—in writing—violate school policy (i.e., asking for a student's preferred pronouns and then asking the student what pronouns they want teachers to use when speaking to parents)?

We greatly appreciate the timeliness of your last response. Again, you may reply to my contact information in the header. We will wait thirty (30) days for an answer, which will be until October 17, 2022. At that time, if we have no answer, then we will seek to require an answer from the District in federal court.

Thank you,

Joshua J. Brown (0089836)
Ohio Attorney at Law

jjb.

CC:
Julie C. Martin, Legal Counsel
Hilliard City Schools
Scott Scriven LLP
250 E. Broad St., Suite 900
Columbus, OH 43215
Phone: (614) 222-8686
Fax: (614) 222-8688
julie@scottscrivenlaw.com

# EXHIBIT D



Writer's Extension: 1120
jessica@scottscrivenlaw.com

October 14, 2022

**Via Email: josh@joshbrownesq.com**
Joshua J. Brown, Esq.
5086 N. High Street
Columbus, Ohio 43214

Re: **Your Follow-Up Letter to Hilliard City Schools**

Mr. Brown:

We have received your follow-up letter in which you stated that the District's response "took us closer to resolution." I can't help but notice, though, that your first request had one interrogatory and this follow-up request has more than quadrupled in size. I called you at your office after receiving the letter and left a message requesting to discuss, but you did not return my call. I understand that you then held a community meeting to discuss a lawsuit against the District on these very issues and sought to raise $30,000.00 from residents for what was described as possibly two years of litigation. If that is the intent, our written exchange or discussion is pointless.

With regard to your questions concerning Board Policy and whether various hypotheticals would conform with or violate them, the Board's policies are all available online at the District webpage. Regarding your questions concerning parents' rights to direct the upbringing of their children, you cited U.S. Supreme Court case law in your first letter (see, e.g., *Troxel v. Granville*, 530 U.S. 57 (2000)). I assume you are aware of the Sixth Circuit Court of Appeals decision in *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) and a case that was recently decided outside our jurisdiction looking at similar issues (and discussing the case you cited). See, *John and Jane Parents 1, et al. v. Montgomery County Board of Education, et al.*, 2022 WL 3544256 (Aug. 18, 2022).

The District is committed to working with parents on any specific concerns they may have about their child's education, and parents are encouraged to bring any specific concerns directly to the District's attention so they may be addressed. I remain available if you would like to reach out to discuss.

Sincerely,

Jessica K. Philemond

Cc:     David Stewart, Superintendent

# EXHIBIT E





**IN PARTNERSHIP WITH**





The views expressed in this document are those of the Caucus.
The Caucus has no authority to speak for, or act on behalf of, the NEA.





We are excited that you are willing to partner with the NEA-LGBTQ+ Caucus by wearing your "I'm HERE" badge. By wearing our badge, you tell everyone that you are a safe person to discuss LGBTQ+ issues. Affirming LGBTQ+ youth couldn't be easier than by identifying yourself as a safe and supportive person.



Use the QR code on the back of the badge to access the "I'm HERE" Toolkit with links to a variety of LGBTQ+ issues, organizations, and resources.

Get your Local, State Affiliate or School District onboard today! Order additional badges from the NEA LGBTQ+ Caucus. Larger quantities can be customized with your specific group's logo/information.

To order additional badges, or find out about sponsorship, co-branding, or customization please email:

imhere@nea-lgbtqc.org



**Disclaimer:**
Links/Resources/Referrals to other organizations does not constitute an endorsement by the NEA-LGBTQ+ Caucus. All copyrights belong to their respective organization. If you are not a safe person or do not support LGBTQ+ youth or issues, please do not wear or display the "I'm Here" badge.



NEA LGBTQ⁺ Caucus
nea-lgbtqc.org

PROUDLY SUPPORTED BY

**nea** Member Benefits

**hea** Hilliard Education Association

SAFE PERSON SAFE SPACE