## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Rachel Kaltenbach, et al., | : | Case No. 2:23-cv-00187 |
| Plaintiffs, | : | Judge: Michael H. Watson |
| v. | : | Magistrate Judge Kimberly A. Jolson |
| Hilliard City Schools Board of Education, et al., | : | |
| | : | |
| Defendants. | | |

---

## MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS HILLIARD CITY SCHOOLS BOARD OF EDUCATION, BETH MURDOCH, KARA CROWLEY, NADIA LONG, ZACH VORST, AND BRIAN PERRY IN THEIR OFFICIAL CAPACITIES

---

Pursuant to Federal Rule of Civil Procedure 56, Defendants Hilliard City Schools Board of Education, Beth Murdoch, Kara Crowley, Nadia Long, Zach Vorst, and Brian Perry in their official capacities (collectively the "District") move this Court for summary judgment in their favor on the remaining claims in this case. The only plaintiff remaining in this case is the parent D.S., whose remaining claims are the following: (1) Section 1983 claims for an alleged violation of due process related to the right to familial integrity (Count One) and right to freedom of conscience (Count Two); and (2) a claim for intentional or reckless infliction of emotional distress (Count Three).

Summary judgment is proper for the following reasons:

- Plaintiff's §1983 claims were filed outside the two-year statute of limitations;

- The board members sued in their official capacities should be dismissed as the Hilliard City Schools Board of Education is a party to the case;

- Plaintiff has only asserted *Monell* claims and has no evidnece of an unconstitutional policy or custom of the District;

- Plaintiff cannot satisfy the elements of intentional infliction of emotional distress as a matter of law;

- There is no evidence the District diagnosed or treated D.S.'s child for anything to do with gender or gender identity; and

- There is no constitutional obligation requiring a school district to tell parents if a child requests to be called a different name or pronoun.

For these reasons, summary judgment is proper for the District. A memorandum in support is attached hereto.

Respectfully submitted,

*/s/ Jessica K. Philemond*
Jessica K. Philemond, Trial Counsel (0076761)
jessica@scottscrivenlaw.com
Julie C. Martin (0056163)
julie@scottscrivenlaw.com
Mitchell L. Stith (0096759)
mitch@scottscrivenlaw.com
SCOTT SCRIVEN LLP
250 East Broad Street, Suite 900
Columbus, OH 43215
(614)222-8686; Fax (614) 222-8688

*/s/ Brandon Abshier*
Brandon Abshier (0083505)
Michael J. Valentine (0038806)
Austin M. Richards (0101316)
REMINGER CO., LPA
200 Civic Center Drive, Suite 800
Columbus, OH 43215
babshier@reminger.com
mvalentine@reminger.com
arichards@reminger.com
P: 614-232-2422

*Attorneys for Defendants*

**MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS AND SUMMARY OF ARGUMENT (PER LOC. R. 7.2(a)(3))**

**I.    INTRODUCTION** ............................................................................................... 1

**II.   UNDISPUTED FACTS** ...................................................................................... 3

A. Starting in her eighth-grade year, T.S. began to feel peer pressure from her close friends to identify as transgender. ...................................................................... 3

B. Ninth Grade at Hilliard Bradley High School. ................................................. 5

C. District Policies ................................................................................................ 9

**III.  LAW AND ARGUMENT** ................................................................................ 11

A. The claims against the individual board members in their official capacities should be dismissed thereby leaving only a *Monell* claim in this case ........................... 11

Plaintiff failed to name any individual parties who allegedly performed any wrongful acts and therefore her claims are limited to any district policies or customs that allegedly caused her harm. *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020).

B. D.S.'s § 1983 claims are barred by the statute of limitations..................................... 13

Plaintiff testified she knew as early as winter break of the 2020-2021 school year and "definitely" by January 15, 2021 that the school was "doing something wrong" by calling her daughter by a different name and pronoun. Plaintiff was not named as a party to this case until February 8, 2023 which is outside the two year statute of limitations. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003).

C. D.S. cannot satisfy the elements of intentional inflection of emotional distress ......... 14

Plaintiff's alleged increased stress does not, as a matter of law, satisfy the elements of a claim for intentional infliction of emotional distress. *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983). Further, Plaintiff cannot cite a policy or custom that was created to intentionally cause her emotional distress.

D. Parents have constitutional rights regarding the care, custody and control of their children, but those rights are interpreted narrowly with regard to the education of their children in public schools. ............................................................................................. 17

Parents' fundamental right to "direct the education" of their child is limited to whether to send their child to public school—it does not give parents the right to direct school operations, curriculum, or other school decisions that would impact

children once their parents have enrolled them. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005).

E. Courts have found schools interfere with a parent's rights regarding the care, custody and control of their children when there is coercion from the school, which there is no evidence of in this case .................................................................................................. 22

An unconstitutional interference with parental rights over the "traditional care, custody, and control" of their children only occurs when the state "either require[es] or prohibit[s] some activity." *Doe v. Irwin*, 615 F.2d 1162, 1168–69 (6th Cir. 1980).

F. Courts have rejected the argument that a school has a duty to tell parents when a child requests to be called by a different name and pronoun ..................................................... 24

Several courts have rejected the argument that schools have an affirmative constitutional duty to notify parents when their children request to use a preferred name or pronoun. *See John and Jane Doe Parents 1 v. Montgomery County Board of Education*, 622 F. Supp. 3d 118 (D. Md. 2022), vacated on other grounds; *Willey v. Sweetwater County School District*, No. 1:23cv69, 2023 WL 4297186 (D. Wyo. June 30, 2023).

Being transgender is not a psychiatric condition and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities and using a students preferred name or pronoun is not treatment. *Foote v. Ludlow School Committee, et al.*, No. 3:22cv30041-MGM, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022)

G. There is no evidence the District diagnosed, treated or coerced T.S. into not revealing her gender information to her parents .............................................................................. 29

IV.    **CONCLUSION** ........................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*180 Indus., LLC v. Brunner Firm Co. LPA*, 2021 U.S. App. LEXIS 20723, 2021 WL 4955268 20, 21

*Anspach ex rel. Anspach v. City of Philadelphia*, 503 F.3d 256 (3d Cir. 2007) .......................... 24

*Arnold v. Board of Education*, 880 F.2d 305 (11th Cir. 1989) .................................................... 28

*Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313 ............................................................. 19

*Banks v. City of Whitehall*, 344 F.3d 550 (6ᵗʰ Cir. 2003) .......................................................... 19

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005) ................................... passim

*Browning v. Pendleton*, 869 F.2d 989 (6ᵗʰ Cir. 1989) .............................................................. 19

*C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159 (3d Cir. 2005) ................................................... 24

*Dobbs v. Jackson Women's Health Org*, 142 S. Ct. 2228 (2022) .............................................. 23

*Doe by & through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324 (E.D. Pa. 2017) ...... 33

*Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 3:22-CV-337, 2023 WL 5018511 (S.D. Ohio Aug. 7, 2023) .................................................................................................................. 27

*Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.,*, Civil Action No. 24-00107 2024 U.S. Dist. LEXIS 29292, 2024 WL 706797 (U.S. Dist N.J,, February 21, 2024) .................................... 33

*Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980) ............................................................... 4, 27, 28

*Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005) ............................................ 27, 31

*Foote v. Ludlow School Committee, et al.*, No. 3:22cv30041-MGM, 2022 WL 18356421 (D. Mass. Dec. 14, 2022) ........................................................................................................... 33, 34

*Grimm v. Gloucester Cnty*. Sc. Bd., 972 F.3d 586 (4th Cir. 2020) ............................................. 33

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) .......................................................................... 28

*Hayward v. Cleveland Clinic Found.*, 759 F.3d 601 (6th Cir. 2014) .......................................... 20

*Herndon v. Chapel Hill–Carrboro City Bd. of Educ.,* 89 F.3d 174 (4th Cir. 1996) ...................... 27

*Howkins v. Walsh Jesuit High Sch.*, 2013 Ohio 917, 2013 WL 989376 (2013) .......................... 21

*In re Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448 (6th Cir. 1991) ........................ 19

*Jackson v. City of Cleveland*, 622 F.Supp.3d 636 (N.D. Ohio 2022) ......................................... 18

*John and Jane Doe Parents 1 v. Montgomery County Board of Education*, 622 F. Supp. 3d 118 (D. Md. 2022) ................................................................................................................. 30, 31

*Johnson v. Hardin Cnty.*, 908 F.2d 1280 (6th Cir. 1990) .......................................................... 18

*Johnson v. Wash. Cnty. Career Ctr.*, No. 2:10-cv-076, 2010 WL 2570929 (S.D. Ohio June 22, 2010) ........................................................................................................................................ 17

*Jones v. White*, No. 18109, 1997 Ohio App. LEXIS 4636, 1997 WL 669737 (Ohio Ct. App. Oct. 15, 1997) ............................................................................................................................... 21

*Kentucky v. Graham,* 473 U.S. 159 (1985) ............................................................................... 17

*Kouider on behalf of Y.C. v. Parma City Sch. Dist. Bd. of Educ.*, 480 F. Supp. 3d 772 (N.D. Ohio 2020) ................................................................................................................................. 17

*Leebaert v. Harrington,* 332 F.3d 134 (2d Cir. 2003) ............................................................... 27

*Leontiev v. Corbett School District,* 333 F. Supp. 3d 1054 (D. Or. 2018) ........................... 29, 30

v

*Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir. 1973)................................................. 19

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ................................................................... 24, 25

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). ................ 17

*Norwood v. Harrison*, 413 U.S. 455 (1972) ............................................................ 26

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684 (S.D. Ohio 2023)................................................................................................................. 26

*Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983)................................... 20, 21

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)...................................................... 24, 25

*Reardon v. Midland Community Schools*, 814 F. Supp. 2d 754 (E.D. Mich. 2011)................. 29

*Regino v. Staley*, No. CV 2:23cv32, 2023 WL 4464845 (E.D. Cal., July 11, 2023).............. 32, 33

*Reno v. Flores*, 507 U.S. 292 (1993) ...................................................................... 24, 32

*Runyon v. McCrary*, 427 U.S. 160 (1976) .............................................................. 25, 26

*Simpkins v. Boyd Cnty. Fiscal Ct.*, No. 21-5477, 2022 WL 17748619 (6th Cir. Sept. 2, 2022) .. 18

*Troxel v. Grandville*, 530 U.S. 57 (2000) ............................................................... 24

*Ward v. Oakley, 2013-Ohio-4762* (Ohio 12th Dist,) ........................................... 20, 21

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ................................................... 23

*Willey v. Sweetwater County School District*, No. 1:23cv69, 2023 WL 4297186 (D. Wyo. June 30, 2023).......................................................................................................... 31, 32, 33

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)........................................................... 24, 25, 26

*Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020) ........................................ 18

## Statutes

42 U.S.C. §1983....................................................................................................... 18

## Rules

Fed. Civ. R. 15 ......................................................................................................... 19

## I.    INTRODUCTION

In the multiple amended complaints in this case, Plaintiff has made outrageous and completely unsupported allegations against the District. Regarding the sole remaining Plaintiff D.S., testimony from Plaintiff D.S. and her minor daughter, T.S., taken on February 19, 2024, revealed that the complaint's allegations were made with <u>no factual support</u>[1]. The District submits that the egregiousness of those false allegations, combined with the fact that Plaintiff did not seek to correct or amend the complaint in this case, warrants not only summary judgment in the District's favor, but also warrants sanctions and attorney fees.

Discovery is now complete. Plaintiff can no longer rely on unsupported allegations and claims. As just one example of the egregiousness of the lack of evidentiary support in the Second Amended Complaint, Plaintiff alleges teachers convinced T.S. she was a boy and pressured T.S. to take on a different gender. (Doc. #40, ₱11). There is no evidence to support such a claim. T.S. herself admits she "put on an act" of being transgender because her close group of friends were coming out as being gay or transgender. T.S. was worried that she was going to lose her close friend group and not fit in. She therefore began to act and tell people she was transgender:

> A. As I was seeing other kids coming out, I kind of felt like -- not exactly like forced to, but it was pressure. Because everybody that I knew was going that way. And it just felt like I needed to also. Because I wanted to fit in. I'm the type of person that felt like I needed to fit in.
>
> (Dep. T.S. at p. 30)
>
> Q. So it was kind of a classic, kind of a peer pressure type thing?
> A. Yeah.
> (Dep. T.S. at p. 37)
>
> Q. You said the pressure. What was the pressure you were feeling?

---

[1] Plaintiff D.S. and her non-party minor daughter T.S. are referred to herein by their initials in order to protect their identity.

        A. From my friends, thinking that I had to keep up this act.
        (Id. at p. 42)

The Second Amended Complaint alleges the emotional trauma from the District's actions led T.S. to attempt suicide *at school*. (Doc. #40, ₱16). First, T.S. never attempted suicide at school. Per T.S, she attempted to commit suicide *at home*. Second, T.S. explained that she did this because *her best friend tried to commit suicide and T.S. felt as if she failed to stop her friend from doing it*. T.S. also began to stop identifying as being transgender and her friends continued pressuring her into keeping up the transgender identity. This culminated with T.S.'s attempted suicide. (Dep. T.S. at p. 89-94).

The Second Amended Complaint alleges the District diagnosed and treated T.S. for gender dysphoria. (Doc. #40, ₱17). There is no evidence the District or any of its employees diagnosed T.S. with gender dysphoria or treated T.S. for gender dysphoria. Further, the diagnosis and treatment of gender dysphoria is a healthcare/medical issue, which Plaintiff even admits in the Second Amended Complaint. (Doc. #40, ₱23-24). Plaintiff has not produced any expert to offer an opinion that the District diagnosed or provided treatment to T.S. for gender dysphoria. To the contrary, Defendants have identified and produced the report of a child psychiatrist who opined the District did <u>not</u> diagnose T.S. with gender dysphoria nor treat her for the same. Plaintiff D.S. has failed to set forth any admissible evidence to support her most basic allegations in this case.

Finally, there is no case law or statutory requirement that indicates a school must tell a parent when a child asks to be called by a different name or by a different pronoun.

## II.     UNDISPUTED FACTS

A.     <u>Starting in her eighth-grade year, T.S. began to feel peer pressure from her close friends to identify as transgender.</u>

Plaintiff D.S. is the mother of T.S. T.S is currently an eighteen-year-old female. (Dep. T.S. at p. 6[2]). T.S. is currently homeschooled and has been homeschooled since October 2021. (Id. at p. 6-7).

T.S. was previously enrolled at Hilliard City School District. She attended middle school at Memorial Middle School for the seventh and eighth grade and went to Hilliard Bradley High School for her ninth-grade year. (Id. at p. 9). After her ninth-grade year (2020-2021 school year), T.S. left the Hilliard School District and moved to Canton, Ohio with her family. Since then, T.S. has been homeschooled by her mother. (Id. at p. 7:10-8:4).

Memorial Middle School had a club called the Gay Straight Alliance (GSA) that meets after school. (Id. at p. 16). T.S. attended a GSA meeting during her eighth-grade year on the urging and pressure from friends. (Id. at p. 18; 38:20-39:9). The GSA has a teacher liaison from the school, Ms. Burkett. When the meeting started, Ms. Burkett told the students they could discuss among themselves how they are feeling. (Id. at p. 20). Then the students got in groups and just talked. During the meeting T.S. talked to her friend and another student. (Id. at p. 22). T.S. never had any conversations with Ms. Burkett related to gender issues. (Id. at p. 24:21-23). T.S. never had any conversations with any other teachers, counselors or administrators regarding gender issues during her eighth-grade year. (Id. at p. 26:2-12).

---

[2] The deposition and below referenced exhibits of non-party minor T.S. were filed on August 30, 2024 (Doc. #47). Due to the fact it pertains to a minor, personally identifiable information from the deposition was redacted.

When D.S. picked T.S. up after school on the day of the GSA meeting, T.S. told her mother than she had attended the after-school GSA meeting. (Dep. D.S. at p. 12[3]). D.S. was surprised her daughter attended the meeting. (Id.) T.S. told her mom she attended the meeting because her friends asked her to go. (Id.). T.S. told her mom that her friends were constantly asking her to go so she finally decided to go. (Id. at p. 13). Per D.S., her daughter attended two GSA meetings (Id.). D.S. told her daughter it was a conflict of interest to attend the meetings because T.S. told her mother she was not gay. (Id. at p. 15). D.S. was also aware that T.S.'s friends seemed to be "pressuring" her to go to the GSA meetings again. (Dep. D.S. at p. 15:7-19).

D.S. was also aware during T.S.'s eighth grade year that T.S. had marks on her arms. (First Amended Complaint, Doc. #6 at ¶83-84). D.S. asked her daughter about the marks on her arms but T.S. would "play it off" and claimed she was using pencils. Per D.S. they "were not deep cuts." (Dep. D.S. at p. 19).

During her eighth grade year, more and more of T.S.'s close friends started to come out as gay or transgender. Due to fear of losing her friends, T.S. began to put on an act of being transgender. T.S. admits she started to act transgender due to the fear of losing her close friends and pressure from her friends to be transgender. Per T.S., peer pressure from her friends is why she started to "put on an act" of being transgender. (Dep. T.S. at p. 37:8-38:9).

As the eighth grade year went on, T.S. became more confused about her gender. (Id. at p. 39). T.S. continued to have conversations only with her friends about her gender and did not speak with anyone else. (Id. at p. 40:22-41:5). T.S. felt as if she put the "act" on of being transgender that she would start to believe it. (Id. at p. 41). T.S. felt increased anxiety and pressure from her

---

[3] The deposition and below referenced exhibits of D.S. were filed on August 30, 2024 (Doc. #46). Due to the fact it pertains to a minor, personally identifiable information from the deposition was redacted.

friends to continue to put on the act of being transgender. (Id. at p. 42:4:14). T.S. started cutting herself on her arms beginning in October or November of her 8th grade year. (Id. at p.42:15-43:1). T.S. recalls her mother asking her about the marks on her arm during her eighth-grade year (Id. at p. 44-45).

D.S. was also aware during middle school that T.S.'s friends were going through gender issues and identifying as transgender. (Dep. D.S. at p. 33:18-25; 35-36; 118:5-6). D.S. was aware that some of T.S.'s friends who attended the GSA meetings were maybe transgender. (Dep. D.S. at p. 118:14-16).

COVID hit in March of 2020 during the spring of T.S.'s eighth-grade year. The remainder of the year was at home. (Dep. T.S. at p. 50). T.S. continued to have conversations with her friends the remainder of her eighth-grade year regarding gender issues. (Id.). Those conversations with her friends continued into the summer between her eighth and ninth grade school years. T.S. did not have conversations with anyone else regarding gender issues. (Id. at p. 50-51). T.S.'s friends were asking T.S. in the summer between eighth and ninth grade to change her name before starting school in the 2020-2021 school year. (Dep. D.S. at p. 80:2-9).

B.    Ninth Grade at Hilliard Bradley High School.

T.S.'s ninth grade year was during the 2020-2021 school year. Due to COVID, T.S. began her freshman year of high school doing online classwork. (Dep. T.S. at p. 51). Every class she took during the fall semester was online, except for her honors science class with Mrs. Baker which was in person at school. (Id. at p. 51-52).

At the beginning of the year on August 27, 2020, T.S. sent an e-mail to her science teacher Mrs. Baker. (See Ex. A attached to the deposition of T.S., Doc. #47) (Dep. T.S. at p. 59:14-18). T.S. introduced herself to Mrs. Baker in the e-mail and told Mrs. Baker of a new name she preferred

to go by. T.S. continued in her e-mail and wrote that "[m]y parents don't know about my new name so I usually just get called that in school." (Id). T.S. testified that she mentioned her new name to Mrs. Baker because of pressure from T.S.'s friends who told T.S. that she should come out and go by a different name because it would make her "feel better." (Id. at p. 59:24-60:4). T.S. came up with the new name to "help her act" of appearing transgender. (Id. at p. 60).

T.S. believes that prior to sending this e-mail to Mrs. Baker, she approached Mrs. Baker in one of the first classes of the year and told Mrs. Baker she was thinking of using a different name. (Id. at p. 63). During this conversation, T.S. did not tell Mrs. Baker she was transgender. (Id.). Mrs. Baker responded and asked T.S. what name she wanted to be called and what pronoun she wanted to be called. (Id. at 64). T.S. allegedly told Ms. Baker the name and requested the use of the he/him pronoun. (Id.). Mrs. Baker did not say anything else to T.S. in response. (Id. at p. 65).

T.S. alleges that afterwards she felt uncomfortable with the new pronouns. But, T.S. did not say anything to Mrs. Baker about not using the pronouns that she had requested to be called. T.S. again felt peer pressure from friends to keep using the new pronouns and name. (Id. at p 65:11-24). During this time period early in the school year, T.S. and her circle of friends were having discussions about how to "come out" to their teachers. (Id. at p. 66). Mrs. Baker never told T.S. that she had to use a different name or different pronouns. (Id. at p. 67:66:24-67:5). T.S. does not recall having any other conversations with Mrs. Baker about gender issues other than Mrs. Baker called T.S. by her requested name and pronouns. (Id. at p. 67:22-25; 68:11-17; 69:12-16).

On October 26, 2020, T.S. sent another e-mail to Mrs. Baker. (Ex. B attached to the Dep. of T.S., Doc. #47). In the e-mail, T.S. wrote "before I identified as non-binary and they/them but around a week ago I realized I was transgender gender fluid and now I go by he/they so I was wondering if he/him would be easier to use instead of they/them." T.S. continued and said: "if

you're willing to use he/him more often for me that would really help, I haven't come out to my family yet and it may be kinda hard because they're all Christian, so I know they won't be supportive. So I'm currently in the "Deep in The Closet" phase right now. LOL!." (See Ex. B to Dep. of T.S.). T.S. testified that around this time her best friend was also indicating she was "gender fluid" and therefore T.S. was following her friend's lead. (Dep. T.S. at p. 71).

During winter break of the 2020-2021 school year, D.S. saw a postcard that was mailed to T.S.'s home from a secretary at the high school. T.S. would stay in the school office with the secretary while waiting to be picked up by her mom after school. The letter used T.S.'s purported male name she provided to Mrs. Baker. D.S. believes she saw the card after Christmas but before the new year, which would have been the last week of 2020. (Dep. D.S. at p. 23-25). D.S. is sure she saw the postcard by January 1, 2021:

> Q.    Do you think you definitely would have seen it by January 1st of that year, 2021?
>
> A.    Yeah, because I don't remember seeing it during that first week, I think.
>        So I'm trying to go back and -- yeah, I think I saw it before the first of the year.
>
> Q.    You definitely would have seen it, I guess, by mid-January?
>
> A.    Oh, yeah.
>
> Q.    By January 15th, 2021, you definitely would have seen it?
>
> A.    Yes.

(Dep. D.S. at p. 24:6-17).

D.S. asked T.S. about the different male name used on the postcard. T.S. told D.S. that her science teacher calls her that name. (Dep. D.S. at p. 25-26). Per D.S. after seeing the postcard and talking to her daughter, this is when D.S. knew the school was calling her daughter by a different name and pronoun and something was wrong. (Id. at p. 26:12-14; 30:17-24). D.S. then continued

7

to have conversations with her daughter during the winter break about why her daughter wanted to be called a male name:

> Q.     What were the conversations about?
>
> A.     So we had the conversations of why she wanted to be called by the different name. Like I said, she would play it off at first that it was just a girl's name basically at that point. I knew about her friends and I knew about her circle of friends. And so she basically explained the same thing as she testified here, that she went ahead and wanted to go by that because she had one friend that was gender-fluid. She had another friend that clearly went by a male's name and was becoming a male. She had another one that was a male and was being a female. And she felt pressured by them that because she was a tomboy, that she should be called something other than what her female name ·was.
>
> Q.     I guess at that point in time, did you feel like the school was doing something wrong?
>
> A.     Yes.

(Dep. D.S. at p. 28:2-30; p. 30:3-5).

After learning during the winter break of 2020 that her daughter was being called by a male name and by different pronouns at school, D.S. certainly *could have* reached out to the school, teachers or the District about her apparent concerns regarding gender issues. But, she never did.

*Instead*, after learning all of this during the winter break, D.S. was only concerned about book assignments and the school discussing current events of the January 6, 2021 riots at the U.S. Capitol Building. D.S. sent an e-mail to her daughter's teachers on January 8, 2021 objecting to her daughter being given an assignment regarding the January 6, 2021 Capitol riots. (See Ex. F attached to the Dep. of D.S.; Dep. D.S. at p. 49). On February 11, 2021, D.S. sent a second e-mail to another teacher objecting to D.S. being required to read a book that was a memoir of the Holocaust. (See. Ex. F attached to the Dep. of D.S.; Dep. D.S. at p. 116). D.S. is of the opinion that the school should not have discussed the current events of the January 6, 2021 U.S. Capitol

riots or the Holocaust, and that such topics are not appropriate for anyone under eighteen years of age. (Dep. D.S. at p. 54:24-55:12).

D.S. *never* asked to speak with anyone at the District about her daughter's requested name usage or pronouns, nor raised any concerns with any teacher or administrator regarding gender issues with her daughter. (Id. at p. 33:14-16).

The District has no records of T.S. ever being diagnosed or treated for any issues pertaining to gender, gender identity, or gender dysphoria. (See Aff. of David Stewart attached hereto as Ex. A). There is no mention anywhere in T.S.'s student file regarding anything to do with gender issues. Further, T.S.'s birth name and gender were never changed in her school records. In order to change a student's name or gender in official school records at the District, a parent must sign off on the change. (Id.).

The District also identified and produced the expert report of child psychiatrist Amanda Horrigan, M.D. (See declaration and report of Dr. Horrigan attached hereto as Ex. B). Dr. Horrigan has offered opinions that the District did not diagnose or treat T.S. for gender issues. Dr. Horrigan has opined that asking someone if they are a different gender or using a different name/pronoun is not treatment or diagnosis of gender dysphoria. (See Ex. B). Plaintiff has offered no expert medical opinion to the contrary.

    C.  <u>District Policies</u>**.**

The District does not have and has never had a written policy or practice that prevents teachers or employees from telling parents about their child wanting to use a different name or pronoun. (*See* Aff. D. Stewart attached as Ex. A). Likewise, the District does not and has never had a written policy or practice requiring teachers or employees to tell a parent when a child asks to use a different name or pronoun. (Id.).

Superintendent David Stewart was appointed as superintendent of the District starting in the 2021-2022 school year. This was a year after T.S. left the District. Mr. Stewart has informed his administrators that if a student expresses concerns or problems regarding gender issues, that a teacher should refer the student to a counselor at the school. In speaking with the counselors, Mr. Stewart has indicated that the expectation is for the counselor to work with the student to discuss how to raise the issue with their parents and get the parents involved. If a student expresses health and safety concerns, there is a potential that the counselor may not push to directly involve the student's parents in these early discussions. Instead, discussion with outside agencies and authorities might occur. At no time is a parent's political views and or ideals regarding a topic a consideration regarding the health and safety of a student.

This conversation that occurs between the counselor and the student seeks student input as to how the student would feel most comfortable in raising the issue with the student's parents. There is no treatment or diagnosis of a condition. How to raise the topic with the student's parents also depends on the age of the student. The options can range from the counselor informing the parents, the parents coming into a meeting at school to discuss, or the counselor role playing with the student and practicing bringing up the topic with their parents. Mr. Stewart has also made it clear that under no circumstances should administrators or teachers lie to parents regarding any topics. (See. Aff. D. Stewart).

The District also has a clear written policy that forbids all staff from attempting to diagnose or treat a student's personal problem relating to "sexual behavior, substance abuse, mental or physical health and/or family relationships." (*See* Ex. 1 to Aff of D. Stewart). The District simply does not do any sort of medical treatment or diagnosing regarding these issues. Finally, the District

has an anti-discrimination policy forbidding any discrimination based on sex. (*See* Aff. D. Stewart).

## III.     LAW AND ARGUMENT

The Second Amended Complaint alleges that the District and its officials diagnosed and treated T.S. for gender dysphoria. (Doc. #40, PageID# 467 at ¶10, 17). There is no evidnece to support such a claim. The District has a policy specifically against diagnosing or treating students related to sexual behavior or mental health. The District has no records that anyone ever diagnosed or treated T.S. for any gender issues. Plaintiff's claims center around the argument that a teacher may have called T.S. by the name or pronoun that T.S. requested to be called. There is no evidence or medical opinion in front of this Court that calling a student by a pronoun or name that they request to be called, or asking someone if they are transgender, is the treatment or diagnosis of gender dysphoria.

D.S. alleges the District failed to tell her that her daughter was being referred to by a different name and pronoun. D.S. alleges that by failing to tell her this information, it caused D.S. severe emotional trauma and violated her constitutional rights as a parent. D.S. cannot prevail on these claims for a myriad of reasons.

    A.    <u>The claims against the individual board members in their official capacities should be dismissed thereby leaving only a *Monell* claim in this case</u>.

The Second Amended Complaint (Doc. #40) lists as defendants the Hilliard City Schools Board of Education along with Board of Education members Beth Murdoch, Kara Crowley, Nadia Long, Zach Vorst and Brian Perry. All Board Members are identified as being named in their "official capacity." (*See* Doc. #40).

Official capacity suits "represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165-166 (1985) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978). Official capacity claims are then subject to dismissal when the government entity also is named as a defendant. *Kouider on behalf of Y.C. v. Parma City Sch. Dist. Bd. of Educ.*, 480 F. Supp. 3d 772, 780 (N.D. Ohio 2020) ("When a §1983 complaint asserts a claim against a government entity and a government official in his official capacity, federal courts will dismiss the official-capacity claim."); see also *Johnson v. Wash. Cnty. Career Ctr.*, No. 2:10-cv-076, 2010 WL 2570929, at *4 (S.D. Ohio June 22, 2010). Here, the board members Murdoch, Crowley, Long, Vorst and Perry (all named in their official capacities) should be dismissed from this case, as the Board of Education is named. That would leave only a claim against the Hilliard City Schools Board of Education. Plaintiff has not named as a defendant any individual employees or teachers in their individual capacity.

For the reasons above, Plaintiff is limited to only a *Monell* claim. Plaintiff therefore cannot argue that any individual actions by a District employee violated any constitutional rights and/or caused Plaintiff any harm. Instead, Plaintiff must establish that an official policy or custom was unconstitutional and/or caused her harm. "Local governing bodies can be sued under Section 1983 only where an official policy or custom causes the alleged constitutional violation." *Jackson v. City of Cleveland*, 622 F.Supp.3d 636, 641 (N.D. Ohio 2022) (citing *Johnson v. Hardin Cnty.*, 908 F.2d 1280, 1285 (6th Cir. 1990)). "There are four methods of proving an unlawful policy or custom: (1) showing an illegal official policy or legislative enactment; (2) demonstrating that an official with final decision-making authority ratified illegal actions; (3) showing a policy of inadequate training or supervision; or (4) demonstrating a custom of tolerance of or acquiescence

12

to federal rights violations." *Simpkins v. Boyd Cnty. Fiscal Ct*., No. 21-5477, 2022 WL 17748619, at *13 (6th Cir. Sept. 2, 2022) (citing *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020)).

Plaintiff cannot set forth any evidence establishing any of these methods occurred in this case.

B.     D.S.'s § 1983 claims are barred by the statute of limitations.

D.S. brought claims only individually on behalf of herself (an adult) and damages she allegedly sustained. D.S. confirmed in her deposition that her daughter is not a party to this case nor did she bring claims on behalf of her daughter. (Dep. D.S. at p. 10:10-15).

Counts 1 and 2 of the Amended Complaint are 42 U.S.C. §1983 claims for alleged violations of substantive due process rights. In Ohio, a two-year statute of limitations applies to §1983 claims. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (citing *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989).

D.S. testified after seeing the postcard that was sent to her daughter, D.S. knew the District was doing something wrong and was aware they were calling D.S. by a different name/pronoun. D.S. testified she saw the postcard during winter break of 2020 and that she definitely would have seen the postcard by January 1, 2021 and at the latest by January 15, 2021. (Dep. D.S. at p. 24:6-17). At a minimum D.S. would have needed to file her §1983 claims by January 15, 2023.

Here, the original complaint was filed on January 16, 2023. (Doc. #1). Even the original complaint was filed outside of the statute of limitations, but D.S. was not a named plaintiff in the original complaint. (Doc. #1). D.S. was added as a plaintiff when the first amended complaint was filed on February 8, 2023. (Doc. #6, PageID #100). When a new plaintiff is added to a case via amendment, that new plaintiff's claims do not relate back to the filing of the original complaint under Fed. Civ. R. 15. *Asher v. Unarco Material Handling, Inc., 596 F.3d 313, 320.* "[T]he

13

precedent of this circuit clearly holds that 'an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations.'" *In re Kent Holland Die Casting & Plating, Inc*., 928 F.2d 1448, 1449 (6th Cir. 1991) (quoting *Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6th Cir. 1973)).

Plaintiff D.S.'s § 1983 claims were filed outside of the two-year statute of limitations. D.S. is clear that she knew around winter break of 2020 and at the latest January 15, 2021 that the school was allegedly doing something wrong and had been using a different name and pronoun with her daughter. Therefore, the claims are time-barred.

      C.    <u>D.S. cannot satisfy the elements of intentional inflection of emotional distress.</u>

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove the following four elements: (1) the defendant intended to cause the plaintiff emotional distress or knew or should have known that his actions would result in emotional distress; (2) the defendant's "conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community"; (3) the defendant's actions were the proximate cause of the plaintiff's injury; and (4) the plaintiff's mental anguish is serious and of a nature that no reasonable man could be expected to endure it. *180 Indus., LLC v. Brunner Firm Co*. *LPA*, 2021 U.S. App. LEXIS 20723, *5, 2021 WL 4955268 citing *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 619 (6th Cir. 2014).

The Ohio Supreme Court has held a trial court may determine whether a complainant has stated a cause of action for tortious emotional distress by ruling whether the emotional injury alleged is serious as a matter of law." *Paugh v. Hanks*, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (1983).

In *Paugh*, the Ohio Supreme Court described "serious emotional distress" as "emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where

a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *180 Indus., LLC*, supra at \*5-6 citing *Paugh* at 6 Ohio St. 3d 72, 78. Examples "include traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.*

The person claiming serious emotional distress must present some "guarantee of genuineness" in support of his or her claim to prevent summary judgment. *Ward v. Oakley, 2013-Ohio-4762,* P38 (Ohio 12th Dist,). A plaintiff can supply this genuineness with expert medical testimony or with testimony of lay witnesses who are acquainted with the plaintiff and who "testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff." *Id.* at ¶ 39, citing *Paugh* at 80.

The U.S. Sixth Circuit rejected arguments that allegations of "intense heartache, suffering and pain," which "caused severe distraction, loss of focus and wasted time during day-to-day responsibilities, as well as with interactions his family" amounted to severe emotional distress. *180 Indus., LLC v. Brunner Firm Co. LPA*, 2021 U.S. App. LEXIS 20723, \*6. The Sixth Circuit in *180 Indus., LLC* cited other cases rejecting claims as not causing severe or debilitation emotional distress. *See Howkins v. Walsh Jesuit High Sch.*, 2013 Ohio 917, 2013 WL 989376, at \*8 (2013) (holding that allegations of "severe emotional distress, including being continually and constantly angry, upset, distraught, fearful, and anxious," did not state an IIED claim); *Jones v. White*, No. 18109, 1997 Ohio App. LEXIS 4636, 1997 WL 669737, at \*9 (Ohio Ct. App. Oct. 15, 1997), *as corrected* (Dec. 2, 1997) (holding that allegations that the plaintiff was "'distressed, upset, anxious, overwrought and was sobbing uncontrollably,' and . . . unable to concentrate, has

insomnia, is agitated, and experiences muscle tension, nauseousness, vomiting and diarrhea, without more, does not rise to the required level of seriousness.").[4]

Here, D.S. has not identified any testifying expert witness regarding the alleged emotional distress she suffered. D.S. has not produced any medical records in discovery related to emotional distress she suffered.

D.S. testified she saw a counselor for a short amount of time (the same counselor that T.S. went to) to try to understand what was going on with T.S. and also because D.S. was "under a lot of stress." (Dep. D.S. at p. 67-68). When asked what the stress was doing to her, D.S. testified that she has a lot of stress with a full-time job, keeping track of her daughter's assignments and trying to understand what her daughter was going through. (Dep. D.S. at p. 68-69). There was never a point in time where D.S. was not able to work due to the stress. (Id. at p. 71). Such evidence does not rise to the level of serious emotional distress. Simply stating one had stress is not enough as a matter of law.

There is also no evidence the District had a policy or custom whereby they intended to cause any emotional distress to D.S. The District did not have an official policy or custom

---

[4] *See* also the following which were cited by the Sixth Circuit in *180 Indus, LLL* by way of reference to *Dickerson v. Int'l UAW Union*, 98 Ohio App. 3d 171, 648 N.E.2d 40, 50 (Ohio Ct. App. 1994) (collecting cases); *Gagne v. Northwestern Natl. Ins. Co.* (C.A.6, 1989), 881 F.2d 309 (sleeplessness, withdrawal and "not the same person she was" is not of sufficient severity); *Jones v. Washington* (1990), 67 Ohio App. 3d 176, 586 N.E.2d 228 (recurring nightmares did not constitute showing of sufficient psychic injury); *McCarthy v. Cleveland Hts.* (1989), 65 Ohio App. 3d 216, 583 N.E.2d 981 (depression requiring psychological counselling following son's suicide was not sufficiently severe); *Lynn v. Allied Corp.* (1987), 41 Ohio App. 3d 392, 536 N.E.2d 25 (distraught and hysterical feelings, crying, and elevated blood pressure not sufficiently serious) ; *Crable v. Nestle USA, Inc.*, 8th Dist. Cuyahoga No. 86746, 2006-Ohio-2887 (summary judgment is appropriate when the plaintiff presents no testimony from experts or third parties as to the emotional distress suffered and where the plaintiff does not seek medical or psychological treatment for the alleged injuries).

regarding withholding gender information from a parent. There is no evidence the District established a policy or custom with the intent to harm D.S.

There is also no evidence the District had a policy or practice that was so extreme or outrageous that it went beyond the bounds of decency and intolerable in a civilized society. Calling a student by a name or pronoun that the student requests to be called is not extreme or outrageous or beyond the bounds of decency. *See Foote v. Ludlow School Committee, et al.*, No. 3:22cv30041-MGM, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022)("Addressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society generally. . ."). The District has no policy that requires teachers or employees to hide this information from parents.

D.S. is unable to establish a District policy intentionally caused her severe emotional distress, that a policy or practice was extreme and outrageous or that D.S. has serious emotional distress. The claim should be dismissed as a matter of law.

    D. <u>Parents have constitutional rights regarding the care, custody and control of their children, but those rights are interpreted narrowly with regard to the education of their children in public schools</u>.

Since there is no evidence or an expert opinion of the District diagnosing or treating T.S. of gender dysphoria, all that remains is D.S.'s claim that the District had an obligation to tell D.S. when her daughter asked to be called by a different name or pronoun. D.S. argues by failing to do so, the District violated her substantive due process rights to familial integrity and freedom of conscience. Simply put, D.S.'s claims seek relief outside of what is provided by the constitutional right to direct the upbringing and care of children.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).

The Supreme Court has long recognized that the Due Process Clause protects the rights specifically enumerated in the Constitution, as well as "some rights that are not mentioned in the Constitution" but are so "deeply rooted in this Nation's history and tradition" that they are "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org*, 142 S. Ct. 2228 (2022) (quoting *Glucksberg*, 521 U.S. at 721)). These rights are often referred to as "fundamental rights." The list of fundamental rights "is short," and "the Supreme Court has expressed very little interest in expanding" the list. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 394-395 (6th Cir. 2005). In fact, the Supreme Court has expressly counseled lower courts to be "reluctant to expand the concept of substantive due process because guideposts for decision making in this unchartered area are scarce and open-ended." *Id.* at 395 citing *Glucksberg* at 720. "[T]he doctrine of judicial self-restraint requires a court to exercise the utmost care whenever asked to break new ground in this field." Id. (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993).

The Supreme Court has long recognized that parents have a "fundamental right" under the Due Process Clause of the Fourteenth Amendment to make decisions about the "care, custody, and control" of their children, including the right to direct their "education and upbringing." *Troxel v. Grandville*, 530 U.S. 57, 65 (2000); see also *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923). "The Supreme Court has never been called upon to define precise boundaries" of this parental liberty interest, but "it is clear that the right is neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005). Indeed, "it is well-established that 'minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Anspach ex rel. Anspach v. City of Philadelphia*, 503 F.3d 256, 261 (3d Cir. 2007). Parental interests must therefore

18

be "balanced with the child's right to privacy, which is also protected under the Due Process Clause." *Id.*

A claim asserting a violation of a substantive right under the Fourteenth Amendment largely hinges upon the proper characterization of the right in question. If the contested action infringes upon a fundamental constitutional right, the action is subject to strict scrutiny and must be narrowly tailored in furtherance of a compelling government interest to pass constitutional muster. Alternatively, government action that does not implicate a fundamental right need only bear a "rational" relationship to a "legitimate" government interest. *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005).

The District does not dispute the existence of parents' fundamental right to make decisions regarding the care, custody, and control of their children. However, courts have reiterated again and again this right is clearly not absolute or unlimited. Specifically, Courts have almost unanimously concluded there is no "fundamental right" for parents to dictate the nature, content, or manner of their children's education in public schools. *Blau* at 395-396.

While the right to "direct the education and upbringing" (See, *Troxel*, supra) of one's child may sound broad, federal courts— including the Supreme Court and the Sixth Circuit—have interpreted that "fundamental right" very narrowly. See *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (no parental right to educate children in private segregated schools). The Supreme Court first alluded to the parental right to "control" their children's education in 1923 in *Meyer*, 262 U.S. 390. There, the Supreme Court struck down a law that prohibited schools from teaching students any language but English before 9th grade, finding that the law interfered with "the power of parents to control the education of their own." *Id.* Two years later, in *Pierce*, 268 U.S. at 534–35, the Supreme Court expressly recognized the parental "right to direct the education" of their child.

That case involved a compulsory education law that required students to attend public schools and criminalized the decision to send children to private, religious schools. Several decades later, in *Yoder*, the Supreme Court held that Wisconsin's compulsory education law requiring school until age 16 did not prevent Amish parents from removing their children from school after 8th grade for vocational training, as required by their religious beliefs. *Yoder*, 406 U.S. at 232. Yoder emphasized "the fundamental interest of parents, as contrasted with the State, to guide the religious future and education of their children." *Id*.

Following these decisions, courts began to limit parents' rights to "direct the education" of their children to cases where a law or regulation interfered with a parents' right to direct their children's private or religious education, as opposed to directing their public education. The Supreme Court in *Runyon*, for instance, noted that Supreme Court decisions following *Pierce* have emphasized the limited scope of the right. *Runyon* explained that *Pierce* "len[ds] no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society,' but rather 'held simply that while a State may posit (educational) standards, it may not pre-empt the educational process by requiring children to attend public schools.'" *Runyon*, 427 U.S. at 177 (quoting *Yoder*, 406 U.S. at 239 (White, J. concurring)). The Supreme Court has repeatedly "stressed the 'limited scope of *Pierce*,' . . . which simply 'affirmed the right of private schools to exist and to operate.'" *Id.* (quoting *Norwood v. Harrison*, 413 U.S. 455, 462 (1972))

Consistent with Supreme Court precedent, the Sixth Circuit has likewise held that parents' fundamental right to "direct the education" of their child is limited to whether to send their child to public school—it does not give parents the right to direct school operations, curriculum, or other school decisions that would impact children once their parents have enrolled them. *Blau*, 401 F.3d

at 395–96; see also *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F.

Supp. 3d 684, 690 (S.D. Ohio 2023) (finding no parental right to "second-guess [school's] efforts

to combat harassment" by implementing school policy prohibiting students from intentionally

misgendering other students). In *Blau*, for instance, the court rejected a parent's challenge that the

school's dress code interfered with his "fundamental right to direct the education of his child,"

explaining that the "parental right" is limited in scope:

> The critical point is this: While parents may have a fundamental right
> to decide whether to send their child to a public school, they do not
> have a fundamental right generally to direct how a public school
> teaches their child. Whether it is the school curriculum, the hours of
> the school day, school discipline, the timing and content of
> examinations, the individuals hired to teach at the school, the
> extracurricular activities offered at the school or, as here, a dress
> code, these issues of public education are generally "committed to
> the control of state and local authorities."

> *Blau*, 401 F.3d at 395–96. (emphasis in original).

The Sixth Circuit is not alone. Where parents have sought to expand the scope of their

control of their children's schooling to include a right to dictate the operations of public schools,

courts have time and again rejected their efforts. Among others, courts have rejected parental

challenges to sex education programs, *see Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th

Cir. 2005); mandatory health curriculums, *see Leebaert v. Harrington,* 332 F.3d 134, 142 (2d Cir.

2003); and mandatory community service programs, *see Herndon v. Chapel Hill–Carrboro City

Bd. of Educ.,* 89 F.3d 174, 176 (4th Cir. 1996).

Moreover, no public school could possibly adhere to a varied request for accommodations

by parents. See *Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 3:22-CV-337, 2023 WL

5018511, at *14 (S.D. Ohio Aug. 7, 2023) (recognizing that "[a]ccommodating the different

personal, moral or religious concerns of every parent would be 'impossible' for public schools

because different parents would often likely . . . prefer opposite and contradictory outcomes related to how schools operate bathrooms.").

      E.    <u>Courts have found schools interfere with a parent's rights regarding the care, custody and control of their children when there is coercion form the school, which there is no evidence of in this case.</u>

An unconstitutional interference with parental rights over the "traditional care, custody, and control" of their children only occurs when the state "either require[es] or prohibit[s] some activity." *Doe v. Irwin*, 615 F.2d 1162, 1168–69 (6th Cir. 1980). In *Irwin*, the Sixth Circuit rejected a challenge from a parent group that alleged that a state-run birth control clinic violated their parental rights by discussing and dispensing birth control to children as young as 14 years old without requiring notice to or consent from their parents. Id. *Irwin* explained that the children were not required to avail themselves of the services offered by the clinic, and neither were the parents prohibited from participating in decisions of their minor children on issues of sexual activity and birth control. The *Irwin* Court recognized that there is no constitutional requirement of notice to parents:

> The desire of the parents to know of such activities by their children is understandable. However the only issue before the district court and this court is whether there is a constitutional obligation on the [clinic] to notify them. The record before us does not establish that the [clinic] infringes a constitutional right of the plaintiffs by its practice of distributing contraceptive devices and medication to unemancipated minors without notice to their parents.

> Id.

By contrast, the only cases where courts have found that a school interfered with a parent's constitutional right to make decisions about the care, custody, and control of their children have been where the school has exerted coercive pressure on a student. In *Arnold v. Board of Education*, 880 F.2d 305, 312 (11th Cir. 1989), overruled on other grounds by *Leatherman v. Tarrant County*,

22

507 U.S. 163 (1993), the Eleventh Circuit concluded that "a parent's constitutional right to direct the upbringing of a minor is violated when the minor is coerced to refrain from discussing with the parent an intimate decision such as whether to obtain an abortion[.]" In *Arnold*, the school counselors "allegedly coerced the children to agree" to an abortion, and arranged for the funds and transportation to the medical facility to obtain the abortion. *Id.* at 308-309. Likewise, in *Gruenke v. Seip*, 225 F.3d 290, 306 (3d Cir. 2000), the Third Circuit concluded that the plaintiffs had sufficiently alleged a violation of their constitutionally protected parental rights when a swim coach repeatedly pressured a student to take a pregnancy test, including "telling others that it was possible [the student] was pregnant." *Id.* at 306. The student agreed to the test "as a result of threats to bar her from swimming in the state championship meet[.]" *Id.*

In *Reardon v. Midland Community Schools*, 814 F. Supp. 2d 754 (E.D. Mich. 2011), parents alleged that the school interfered with their due process right to decide matters concerning the upbringing of their daughter. In *Reardon*, the parents' relationship with their daughter had deteriorated after she began dating a boy and engaging in behaviors that were contrary to their religious beliefs, including having a sexual relationship with her boyfriend. The daughter complained about her parents to her school counselor and teacher, who began secretly working with her to develop an "exit plan" from their home and otherwise interfered with the parents' ability to oversee and interact with her. The parents alleged that the counseling, advice, financial assistance, and companionship provided by the school to their daughter interfered with their constitutional right. *Id.* at 769. *Reardon*, however, rejected that challenge because school personnel did not exert coercive pressure on the student to leave her home. The court explained:

> [Student] may have overreacted to her parents rules, rules that may well have been reasonable, but when [Student] turned to [counselor] and [teacher], neither was constitutionally obligated to meet [Student's] request for assistance with silence or a cold shoulder.

> Nothing in the Constitution prohibits school teachers or counselors from counseling students, nor does it require that the teachers and counselors obtain parental consent about the character of their counseling in the context of the facts alleged in this instance.

*Id.* at 771-772.

In *Leontiev v. Corbett School District,* 333 F. Supp. 3d 1054 (D. Or. 2018), the mother of a transgender student alleged that the school violated her right to the "care, custody, and companionship of her children" and her First Amendment right to the free exercise of religion, after her 15-year-old transgender son left her home because he felt she did not support his gender identity. *Id.* at 1059, 1062. The mother alleged that a schoolteacher, aide, individual board member, and various school volunteers took "affirmative action" to separate her from her child by devising a "plan" to prevent her child from returning home. Part of this plan included the child staying at different people's homes at night to avoid criminal liability for kidnapping or harboring a runaway. *Id.* at 1066. The court, however, found no evidence of a constitutional violation, emphasizing the lack of coercion:

> Although the Fourteenth Amendment protects parents' right to associate with and control the upbringing of their children, it does not impose on others—including school employees— an affirmative duty to turn another person's child away when that child seeks comfort, advice, or shelter.

> Id. at 1065-66.

F.    <u>Courts have rejected the argument that a school has a duty to tell parents when a child requests to be called by a different name and pronoun.</u>

Several courts have recently addressed—and rejected—Plaintiff's argument that schools have an affirmative constitutional duty to notify parents when their children request to use a preferred name or pronoun. The District Court of Maryland conducted a thorough and instructive analysis of this issue. *See John and Jane Doe Parents 1 v. Montgomery County Board of*

24

*Education*, 622 F. Supp. 3d 118 (D. Md. 2022), vacated on other grounds due to appellant's lack of standing, 78 F.4th 622 (4th Cir. 2023). In that case, the parents challenged guidelines adopted by the board of education related to transgender and gender non-conforming students. While the guidelines instructed that "the needs of students must be addressed on a case by case basis" and encouraged family involvement, they also emphasized that student privacy rights and student welfare needed to be carefully balanced. School personnel were also instructed to inquire about the level of "support" for the student's expressed gender identity at home, and in some cases, parents would not be informed of their student's expressed gender identity. *Id.* at 125-127. The school board moved to dismiss.

The district court in *Montgomery* identified the constitutional right at stake as "whether the Plaintiffs' constitutional rights as parents encompasses a fundamental right to be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child." *Id.* at 130. After surveying the relevant case law, the district court held that the plaintiffs failed to state a claim that the guidelines violated their fundamental right to "direct the education and upbringing" of their children because there was no fundamental right to affirmative notice. The court also considered the limited cases in which federal courts had found that the actions of school personnel interfered with parents' fundamental rights; noted that they all involved an element of coercion over the student not present in the guidelines; and therefore found that plaintiffs' complaint did not allege a violation of any fundamental right. *Id.* at 133-139. The court, cited to the Ninth Circuit's opinion in *Fields*:

> [The Supreme Court's precedent does not provide] support for the view that parents have a right to prevent a school from providing any kind of information—sexual or otherwise—to its students....*Meyer* and *Pierce* do not encompass [the] broad-based

> right [the parent-plaintiffs seek] *to restrict the flow of information*
> in the public schools. Although the parents are legitimately
> concerned with the subject of sexuality, there is no constitutional
> reason to distinguish that concern from any of the countless moral,
> religious, or philosophical objections that parents might have to
> other decisions of the School District—whether those objections
> regard information concerning guns, violence, the military, gay
> marriage, racial equality, slavery, the dissection of animals, or the
> teaching of scientifically-validated theories of the origins of life.
> Schools cannot be expected to accommodate the personal, moral or
> religious concerns of every parent. Such an obligation would not
> only contravene the educational mission of the public schools, but
> also would be impossible to satisfy.
>
> *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Education*, 2022
> WL 3544256, *12 (D. Md. August 18, 2022), citing *Fields,* 427 F.3d
> at 1206 (emphasis original).

In *Willey v. Sweetwater County School District*, No. 1:23cv69, 2023 WL 4297186 (D. Wyo. June 30, 2023), parents alleged that the defendant-school had violated their fundamental parental rights by using the preferred name and pronouns requested by their child for nearly an entire school year, without notifying the parents or obtaining their consent. Denying the parents' request for a preliminary injunction, the district court found that the parents were unlikely "to demonstrate the Constitution imposes an affirmative obligation on the District to actively disclose information regarding a student—even in the absence of a parent's inquiry or request." Willey did find that the school's student privacy policy, which broadly forbid school personnel from disclosing a student's expressed gender identity to their parents without the student's consent, could burden parents' fundamental rights to the extent it (1) required school personnel to lie to parents in response to a direct parent inquiry and (2) did not require the school to determine that honestly responding to the parent's inquiry would pose a threat to the wellbeing of the student. Id. at *15.

In *Regino v. Staley*, No. CV 2:23cv32, 2023 WL 4464845 (E.D. Cal., July 11, 2023), the plaintiff-parent challenged a school regulation that allegedly "permit[ted] school personnel to 'socially transition' students expressing a transgender identity by referring to them by their preferred names and pronouns," and prohibited school personnel from informing the student's parents without the student's express authorization, unless required by law or to preserve the student's health. Id. at *1. The parent alleged that the school counselor "socially transitioned" her child by informing teachers of the student's preferred name and pronouns; intentionally concealed her child's request; and even discouraged her child from sharing information with her. Id. The district court rejected the parent's constitutional challenge, concluding that she was "advocating for an expansion of her parental substantive due process rights that is not supported by precedent" because no authority "opine[s] on whether the state has an affirmative duty to inform parents of their child's transgender identity nor whether the state must obtain parental consent before referring to a transgender child by the preferred name and pronouns." Id. at *3-4.

Finally in *Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.*,, Civil Action No. 24-00107 2024 U.S. Dist. LEXIS 29292, 2024 WL 706797 (U.S. Dist N.J,, February 21, 2024), a parent brought Section 1983 claims against a school district after a school counselor asked a student if she wanted to undergo a social transition from female to male in school. *Id.* at *2. The counselor also asked the student if she wanted to change her names and pronouns and be known only as a male at school to which the student agreed. *Id.* The parent was not informed. *Id.* at 3. The court denied the parent's temporary restraining order and noted "[p]laintiff asks the Court to "impose a *constitutional* obligation on state actors to contact parents of a minor" who requests to be recognized by a different gender identity, regardless of the minor's preference as to parental notification. *Id.* at *18 citing *Anspach*, 503 F.3d at 262. "The Court is not convinced that imposing

27

such an affirmative obligation is within 'the scope of the familial liberty interest protected under the Constitution.' *Id.*

Being transgender is not a psychiatric condition and "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Willey*, 2023 WL 4297186, *10 (citing *Grimm v. Gloucester Cnty*. Sc. Bd., 972 F.3d 586, 594 (4th Cir. 2020); see also *Foote v. Ludlow School Committee, et al.*, No. 3:22cv30041-MGM, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022) (citing *Grimm* and dismissing claim school usurped parent's right to make medical and mental health treatment decisions); *Doe by & through Doe v. Boyertown Area Sch. Dist*., 276 F. Supp. 3d 324, 366 (E.D. Pa. 2017), aff'd, 890 F.3d 1124 (3d Cir. 2018), and aff'd, 893 F.3d 179 (3d Cir. 2018) (finding being transgender is not a medical or psychiatric condition). Rejecting the argument that using a students' preferred name and pronoun constitutes "social transitioning" that amounts to healthcare, the court in *Foote* explained:

> Plaintiffs have not alleged Defendants' actions were undertaken as part of a treatment plan for gender dysphoria or explained how referring to a person by their preferred name and pronouns, which requires no special training or skill, has clinical significance when there is no treatment plan or diagnosis in place . . ., and, more specifically, in Massachusetts public schools where discrimination on the basis of gender identity is not permitted. This is true regardless of an individual's age . . . In the absence of supporting factual allegations, such as a relevant medically-recognized diagnosis and treatment plan, the court disregards Plaintiffs' conclusory statements describing the use of preferred names and pronouns as mental health treatment.

> 2022 WL 18356421, at *5 (emphasis added).

The authorities cited herein clearly articulate there is no constitutional requirement for the District to notify parents of these types of situations. To avoid violating Plaintiff's rights, the District need merely refrain from coercing students to keep these issues secret from parents.

28

G. <u>There is no evidence the District diagnosed, treated or coerced T.S. into not revealing her gender information to her parents.</u>

There is no evidnece that the District diagnosed or treated T.S. for any gender issues. First, the school district has a policy the forbids its employees from attempting to "diagnose or treat a student's personal problem relating to sexual behavior, substance abuse, mental or physical health and/or family relationships." *See* Aff. of D. Stewart attached hereto.

There is also no evidence that any District employees ever treated or diagnosed T.S. for any gender issues. The only evidence that exists in this case is that T.S. requested that a teacher call her by a different name and pronoun. Plaintiff has no medical opinions that calling someone by a requested name or pronoun is the diagnosis or treatment of gender dysphoria. The only medical opinion that exists in this case is that such actions do not amount to a diagnosis or treatment.

There is also no evidnece of any coercion by the District. T.S.'s own testimony is that she felt coercion and peer pressure from her close group of friends. T.S. testified that her friends were changing their genders and coming out as transgender. T.S. felt pressure from her friends to also "put on an act" of also being transgender so she would not lose her close group of friends. (Dep. T.S. at p. 37:8-38:9). There is no evidence of any District employees coercing T.S. into keeping this information from her parents. The District does not have a policy that forbids staff from telling parents about a child wanting to use a different name or pronoun. The District does not have a policy or custom that requires staff to lie to parents if asked about their child's name or pronoun. In fact, the District Superintendent has made it clear that staff and administrators are never to lie to parents.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's claims fail as a matter of law and summary judgment should be entered in favor of Defendants. Plaintiff's §1983 claims are time-barred. Plaintiff cannot set forth any evidence the District has a policy that violates any of her constitutional rights or any policy that was created intentionally or with knowledge that it would cause her emotional distress.

Respectfully submitted,

*/s/ Jessica K. Philemond*
Jessica K. Philemond, Trial Counsel (0076761)
jessica@scottscrivenlaw.com
Julie C. Martin (0056163)
julie@scottscrivenlaw.com
Mitchell L. Stith (0096759)
mitch@scottscrivenlaw.com
SCOTT SCRIVEN LLP
250 East Broad Street, Suite 900
Columbus, OH 43215
(614)222-8686; Fax (614) 222-8688

/s/ *Brandon Abshier*
Brandon Abshier (0083505)
Michael J. Valentine (0038806)
Austin M. Richards (0101316)
REMINGER CO., LPA
200 Civic Center Drive, Suite 800
Columbus, OH 43215
babshier@reminger.com
mvalentine@reminger.com
arichards@reminger.com
P: 614-232-2422

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

A true and accurate copy of the foreign was served on this 30th day of August 2024, upon

all counsel of record via the Court's electronic filing system and via e-mail

/s/ Brandon Abshier
Brandon Abshier (0083505)
