# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**Rachel Kaltenbach, *et al.*,**

       **Plaintiffs,**

       **v.**

**Hilliard City Schools Board of Education, *et al.*,**

       **Defendants.**

**Case No. 2:23-cv-187**

**Judge Michael H. Watson**

**Magistrate Judge Jolson**

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment, ECF No. 48, filed by Hilliard City Schools Board of Education ("Board") and Board members Beth Murdoch, Kara Crowley, Nadia Long, Zach Vorst, and Brian Perry, in their official capacities (collectively, "Board Members," and, together with the Board, "Defendants"). The only Plaintiff remaining in this case, D.S. ("Plaintiff"), responded, ECF No. 54, and Defendants replied, ECF No. 57.

For the reasons below, Defendants' motion is **GRANTED**.

## I. STATEMENT OF FACTS

This case arises from a school district's conduct surrounding LGBTQIA+ issues. Relevant for purposes of Defendants' motion is the conduct toward a previously enrolled student, T.S., who is Plaintiff's daughter.[1]

---

[1] The Court ordered the parties to refer to Plaintiff and her daughter by only their initials due to the sensitive nature of the allegations in this matter. ECF No. 39.

## A.     Experiences in Middle School (2018–2020)

T.S. completed seventh and eighth grade at Memorial Middle School in the

Hilliard City School District.  T.S. Dep. 8:23–9:11, ECF No. 47.  During her

middle-school years, T.S. was the victim of bullying.  *Id.* at 14:12-16.  At one

point, after a classmate physically pushed her into a wall, T.S. went to her

teacher, but the teacher replied that nothing could be done.  *Id.* at 26:16–28:1.

T.S. then tried to speak with a school counselor about the bullying, but the

counselor apparently misinterpreted the situation and told T.S. that she was

being the bully and that the classmate was actually the victim.  *Id.*  As a result,

T.S. felt unsafe and experienced anxiety and distrust toward school staff.  *Id.* at

43:19-21, 55:23–56:2.

In seventh grade, T.S. took a health/sexual education class.  T.S. Dep.

31:3-21, ECF No. 47.  Students were to learn about different types of sexual

acts, "gender expression and sexuality," and "romantic attraction."  *Id.* at 32:17–

33:12, 144:23-24.  The class included a presentation about gender

representation, from which T.S. understood that she was "allowed to be male,

female, trans, or both or neither" and that she "could be gay, straight, bisexual, or

asexual . . . your gender is not described by your parts.  It's about what your

brain thinks and what your heart wants."  *Id.*  When the presenter asked the

students about their pronouns, T.S. dodged the question, feeling uncomfortable.

*Id.* at 34:2–35:6 ("Everything felt confusing to me, other than learning about how

the male and female anatomy works, and the reproductive system.  Everything

else involving gender identity, sexuality, confusing [sic], did not understand it.").
T.S. testified that she was unfamiliar with these topics before taking the class,
such that the class was the starting point of the gender-based identity challenges
that she later endured. *Id.* at 145:7-18 (stating that the presentation "had
mentioned gender expression and sexuality . . . and then it just got worse and
worse when it came to eighth and ninth grade. It was a build-up to that
situation"); *see also* D.S. Dep. 17:19–18:10, ECF No. 46 ("[W]hen I came home,
[T.S.] was totally in—and she'll still say to this day that [the sex education class]
traumatized her for the rest of her life, basically.").

T.S. began questioning her gender at the beginning of her eighth-grade
year. T.S. Dep. 29:20–30:8, ECF No. 47. Around that time, T.S.'s close friends
were increasingly "coming out" as gay or transgender. *Id.* at 36:16-19, 37:3-7,
144:1-13. Afraid of losing her friends and cognizant of the peer pressure that she
was experiencing from them, T.S. began acting at school as if she were
transgender. *Id.* at 37:8–38:9 ("I think that's what led me to thinking that, oh, I
should come out, too, even if I didn't feel like this. And then played it off as an
act, because then I wouldn't lose my friendship with them. Because the more
and more I didn't say anything, the more and more they didn't want to talk to
me."). As the semester progressed, T.S. "fell into thinking [the act] was real." *Id.*
at 41:13-22. She became more confused about her gender and more worried in
response to pressure from her friends, and she fell into a cycle of depression,
lack of motivation, and disassociation. *Id.* at 39:14–42:6. The combination of her

gender uncertainty and bullying history also caused T.S. to cut herself as a form of self-harm. *Id.* at 41:13–43:24. Plaintiff noticed the marks on T.S.'s arms, but they were "not deep cuts," and T.S. "play[ed] it off" and said she was simply using pens to write on herself. *Id.* at 44:20–45:12; D.S. Dep. 19:3-20, 113:3-9, ECF No. 46. There is no evidence that the school district was ever aware of T.S.'s self-harm.

In the winter of her eighth-grade year, T.S.'s friends pressured her to attend a meeting hosted by a club called the Gay Straight Alliance ("GSA").[2] T.S. Dep. 16:2-4, 38:20–39:9, ECF No. 47. The club's purpose was to offer support and a safe space for LGBTQIA+ students to discuss problems or concerns. *Id.* 17:11–18:22. At the start of the meeting, a teacher (who served as the liaison between the club and the school) instructed students to discuss their feelings in groups. *Id.* at 20:13–21:2. T.S. talked with her friend and another student during this time. *Id.* at 22:6-14. T.S. testified that she was "caught off guard" by the LGBTQIA+ discussions, since her friend had described the meeting as "just some kids hanging out [and] talking." *Id.* at 18:13–19:1, 20:13-24.

Although T.S. does not remember doing so, Plaintiff testified that T.S. told her about the GSA meeting. *Compare* D.S. Dep. 12:3-16, ECF No. 46, *with* T.S. Dep. 28:21–29:6, ECF No. 47. Plaintiff learned from T.S. that T.S. went to

---

[2] T.S. remembers attending only one meeting, *see* T.S. Dep. 17:7-10, ECF No. 47, but Plaintiff testified that T.S. attended two meetings, one of which was formatted as a movie event rather than a meeting, *see* D.S. Dep. 13:20–14:4, ECF No. 46.

the meeting because her friends had been pressuring her to go. D.S. Dep. 12:22–13:7, ECF No. 46. Plaintiff was surprised that T.S. had attended and told T.S. that it was a conflict of interest for her to go because she was not gay. *Id*. at 15:7-19.

Because of the COVID-19 pandemic, T.S. spent the latter part of her eighth-grade year at home. T.S. Dep. 16:14–17:6, ECF No. 47. T.S. continued to talk about gender expression with her friends throughout the rest of the school year and the summer. *Id.* at 50:4–51:16. But T.S. never spoke with the GSA teacher—or with any other middle-school teachers, counselors, or administrators—about gender issues. *Id.* at 22:21–23:1, 24:21-23, 25:25–26:12.

## B. Experiences in Ninth Grade (2020–2021)

T.S. entered ninth grade at Hilliard Bradley High School in August 2020. T.S. Dep. 51:17-19, ECF No. 47. Most of her classes were online, except for an honors science class taught by Colleen Baker, which took place in-person at the high school. *Id.* at 51:22–52:16, 61:7-13, 142:21-23.

As freshmen at a new school, T.S. and her friends discussed how to "come out" to their teachers. T.S. Dep. 65:25–66:3, ECF No. 47. This prompted T.S. to approach Baker at the end of one of the first classes of the year "for a call for help" or "advice." *Id.* at 62:5-19. T.S. told Baker that she was thinking of going by a different name. *Id.* at 62:5–64:3. T.S. gave Baker a masculine name and "he/him" pronouns. *Id.* at 64:4–65:9. Baker agreed and proceeded to use the male name and pronouns in the next class. *Id.* at 65:6-9, 68:5-17.

Soon after, T.S. emailed Baker and reiterated her request, writing, "Hi! My name is [redacted] but I preferred to go by [redacted]. My parents don't know about my new name so I usually just get called that in school." ECF No. 47 at PAGEID # 621. T.S. testified that she sent the email to "basically say[ ], you know what, screw it, I'm going to add it to my act" of appearing transgender. T.S. Dep. 62:5-19, ECF No. 47. T.S. did not tell Baker that she was transgender or elaborate on her gender identity. *Id.* at 63:23-25, 66:15-19, 69:12-16.

In October 2020, T.S. sent Baker another email:

> Also I forgot to ask this on Thursday so I want to ask now so I don't forget, but before I identified as non-binary and they/them but around a week ago I realized I was transgender gender fluid and now I go by he/they so I was wondering if he/him would be easier to use instead of they/them? I figured using he/him would be easier instead of they/them just because of the fact that those pronouns aren't used as often. If you're willing to use he/him more often for me that would really help, I haven't come out to my family yet and it may be kinda hard because they're all Christian, so I know they won't be supportive. So I'm currently in the "Deep in The Closet" phase right now. LOL!

ECF No. 47 at PAGEID # 622. T.S. testified that she was mimicking her friend, who also identified as "gender fluid" and was "questioning that process" at the time. T.S. Dep. 71:3–72:8, ECF No. 47.

T.S. also asked Baker sometime during the semester about "how gender dysphoria works." T.S. Dep. 136:15–137:13, ECF No. 47. T.S. testified that Baker suggested T.S. "could have gender dysphoria" due to her "issues and [ ] insecurities about being a female." *Id.* at 116:5-13. This comment led T.S. to believe that she was suffering from gender dysphoria. *Id.* at 136:21–137:17.

Despite expressly asking Baker to use the male name and pronouns, T.S. was uncomfortable when Baker did so.[3] T.S. Dep. 64:4-16, 65:10-12, 75:20–76:12. But, still feeling peer pressure, T.S. did not immediately tell Baker to stop. *Id.* at 65:16-20. It was not until the end of the semester that T.S. told Baker that she had changed her mind and no longer wanted to go by the male name and pronouns. *Id.* at 73:3-24. According to T.S., Baker "supported the fact that [T.S.] wanted to go back to the original name" and confirmed that she would use the old name but that "it would take some time to get used to[.]" *Id.* at 74:6-23. Perhaps for this reason, though, Baker occasionally still called T.S. by the male name. *Id.* at 73:3–75:13, 134:22–136:3.

T.S. also had interactions that touched on her gender with another high-school teacher, Melissa Watts. T.S. Dep. 83:10-25, ECF No. 47. One day, T.S. came to school with a short haircut and a backwards hat. *Id.* 114:11–115:12. T.S. testified that Watts, whom she had never met, saw her appearance and asked if she was transgender, which she denied. *Id.* ("Ms. Watts basically asked me if I was a dude now, that if I was trans now, because of my haircut, when I wasn't."). Watts later learned that T.S. was thinking of using a male name and different pronouns.[4] *Id.* at 83:13–84:12. When Watts asked T.S. about the

---

[3] T.S. also testified that Baker began calling her by the new masculine name but used both "he/him" and "they/them" pronouns, which confused her. T.S. Dep. 75:20-76:16, ECF No. 47.

[4] T.S. believes that Baker told Watts that T.S. wanted to go by a different name and pronouns. T.S. Dep. 83:13-22, ECF No. 47.

name and pronouns, T.S. initially agreed to their use. *Id.* But later that day, T.S. went back to Watts and asked to be called by her original name and pronouns, and Watts "was okay with it." *Id.*

Other than these communications with Baker and Watts, T.S. did not discuss her gender identity with any other teacher, counselor, or administrator at the high school. T.S. Dep. 83:10-12, 110:15–112:17, ECF No. 47. She also did not tell her parents about her gender confusion or her interest in using a new name and pronouns. *Id.* at 60:23-25, 77:2-5, 80:14-17; *see also id.* at 131:11-12 ("I never wanted anybody to out me to my parents."). T.S. testified that although none of her teachers discouraged her from talking to her parents, Baker told T.S. that T.S. could avoid it if she felt uncomfortable, and several teachers generally reiterated that the school was a "safe space" where students could trust and go to teachers with problems. *Id.* at 112:18–113:20.

Over winter break, the high school secretary mailed to T.S.'s home a postcard that used her male name. T.S. Dep. 85:21–86:14, ECF No. 47. Plaintiff saw the postcard on or before January 1, 2021. D.S. Dep. 24:6-11, ECF No. 46. Plaintiff asked T.S. about the different name, and T.S. replied that it was a name that Baker used for her. *Id.* at 26:1-25. Plaintiff testified that, in subsequent conversations, T.S. said that she wanted to go by a male name because she had friends who were gender-fluid or transgender and she felt that *they* pressured her to use a male name. *Id.* at 28:3-24. Although Plaintiff felt the school was doing something wrong by following her daughter's request to be called by a male

name and new pronouns, Plaintiff never reached out or expressed her concerns to the school district or any of T.S.'s teachers.[5]  D.S. Dep. 31:7-14, 33:11-16, 48:3-7, 57:16-24, 102:19-21, 115:9-25, ECF No. 46.

Going into the spring semester, T.S. still felt unsafe and pressured about her gender expression at school, and she continued to cut herself and "dodge" any questions about her self-harm from her parents, who had found a razor and expressed concern.  T.S. Dep. 49:15-19, ECF No. 47; D.S. Dep. 19:21–20:14, 39:5–40:12, ECF No. 46.  In February 2021, T.S. emailed Baker about an upcoming parent-teacher conference.  T.S. Dep. 78:2-12, ECF No. 47.  T.S. had tried to tell Plaintiff about her male name, but Plaintiff "kinda didn't like it and went off."  Id. at 134:5-9.  Considering this, T.S. was nervous that Baker would let slip her male name during the conference and asked if Baker could use her given name and "they/them" pronouns at the meeting "just so my mom doesn't get mad again."  Id. at 80:14–81:13; ECF No. 48-2 at PAGEID # 669.  Baker agreed but ended up using "she/her" pronouns at the conference, which "felt great" to T.S. Id. at 80:14–81:13.  In her response, Baker also wrote, "I know it might be hard with [Plaintiff] accepting your preferences, but I would continue to try and reach out to the support you have here at school."  Id. at 81:11–82:12.

---

[5] Plaintiff did, however, email her daughter's teachers objecting to certain assignments, including those concerning the Holocaust and the January 6, 2021 Capitol riots, because she believes that these topics are inappropriate for minors to learn in school. D.S. Dep. 54:2–55:12, ECF No. 46; ECF No. 46 at PAGEID # 574–81.

Toward the end of the school year, one of T.S.'s friends attempted suicide at school. T.S. Dep. 89:4–92:15, ECF No. 47. T.S. blamed herself. *Id.* at 91:22–94:17 ("It built up to me thinking that I was the problem, because for the last three years, I felt like the therapist friend, that everybody came to me with their issues, and that I wanted to help them, and if I couldn't help them, then I felt like a horrible person[.]"). Because of this incident, and because she had two other friends who were also engaging in self-harm at the time, T.S. reached a breaking point and attempted suicide herself. *Id.* at 89:4-12, 94:10-22.

T.S.'s parents learned of her suicide attempt on June 5, 2021. T.S. Dep. 94:23–95:3, ECF No. 47. During an hours-long conversation that included discussions of T.S.'s gender identity issues, they reassured T.S. that they would love her unconditionally. *Id.* at 95:4-17, 98:14-19; D.S. Dep. 45:2–46:3, ECF No. 46. They also put her on a 48-hour suicide watch before starting her in therapy.[6] T.S. Dep. 95:4-17, 98:14-19, ECF No. 47. T.S. was eventually diagnosed with post-traumatic stress disorder ("PTSD") and anxiety, "mainly" due to the bullying she experienced. D.S. Dep. 64:5–65:6, ECF No. 46.

T.S. ended her transgender "act" and stopped communicating with her former friends.[7] T.S. Dep. 102:4-9, 103:20–104:15, 128:16-19, ECF No. 47.

---

[6] During T.S.'s ninth-grade year prior to June 2021, she and Plaintiff had been seeing a Christian counselor. D.S. Dep. 65:17–66:14, 117:9-14, ECF No. 46.

[7] T.S. testified that her friend group called CPS (i.e., children's services) on her parents that summer and reported that her parents were abusing her. T.S. Dep. 103:2-19, ECF No. 47. T.S.'s friends felt that she was not safe with her parents because she did not

T.S. and her parents also decided that she would not return to Hillard Bradley

High School, namely because she did not trust school personnel and felt unsafe

at school based on the bullying she witnessed and experienced. *Id.* at 104:12–

110:7. As of late 2024, T.S. was being homeschooled. *Id.* at 6:13-14, 8:2-4.

## C. Relevant Policies and Records at Hilliard City School District

In February 2020, Hillard City Schools adopted a "staff-student relations"

policy. ECF No. 48-1 at PAGEID # 663. That policy forbids school personnel

from "attempt[ing] to diagnose or treat a student's personal problem relating to

sexual behavior, substance abuse, mental or physical health and/or family

relationships." *Id.* at PAGEID # 664; *see also* Stewart Aff. ¶ 15, ECF No. 48-1.

Instead, school personnel "should refer the student to the appropriate individual

or agency for assistance." *Id.* The school district "does not have and has never

had a written policy or practice that prevents teachers or employees from telling

parents about their child wanting to use a different name or pronoun." Stewart

Aff. ¶ 6, ECF No. 48-1. Nor has there ever been "a written policy or practice

requiring teachers or employees to tell a parent when a child asks to use a

different name or pronoun." *Id.* ¶ 7.

The school district has no records of T.S. being diagnosed or treated for

any issues pertaining to gender, gender identity, or gender dysphoria. Stewart

Aff. ¶¶ 3–4, ECF No. 48-1; *see also* D.S. Dep. 103:6–104:4, ECF No. 46

---

want to "come out" to them. *Id.* But T.S. denied any abuse and testified that she chose
to no longer associate with these friends after their false report. *Id.*

(testifying that she is unaware of any school records diagnosing T.S. with gender dysphoria or as transgender).  T.S.'s birth name and gender were also never changed in her school records.  Stewart Aff. ¶ 5, ECF No. 48-1.

## II.  PROCEDURAL BACKGROUND

The parents of several then-enrolled students ("In-District Parents," and, with Plaintiff, the "Original Plaintiffs") sued Hilliard City School District over its approach to LGBTQIA+ issues in January 2023.  ECF No. 1.  Then, on February 8, 2023, the In-District Parents amended their Complaint to, among other things, name Defendants in place of Hillard City School District and add Plaintiff to the suit.  ECF No. 6.  The Court struck the Amended Complaint, however, for failure to comply with Federal Rule of Civil Procedure 8.  ECF No. 26.

The Original Plaintiffs then submitted a Second Amended Complaint ("SAC"), which asserts eight causes of action.[8]  SAC ¶¶ 55–151, ECF No. 40. First, the Original Plaintiffs sought declaratory judgments that Defendants' policies violated their constitutional rights to freedom of conscience, familial integrity, freedom of speech, and due process (Counts IV–VII).  *Id.* ¶¶ 86–134. They also maintained a "claim" for injunctive relief as to certain practices (Count

---

[8] The SAC was initially filed on September 19, 2023, *see* ECF No. 27, but the Court directed the parties to refile a redacted version that references certain individuals only by their initials, ECF No. 39.  The Court refers to the redacted version of the SAC, which was filed on April 1, 2024, *see* ECF No. 40, throughout this Opinion and Order.

VIII). *Id.* ¶¶ 135–51. Finally, Plaintiff individually alleges three claims[9]—intentional infliction of emotional duress ("IIED") and violations of the rights to familial integrity and freedom of conscious (Counts I–III)—stemming from her belief that Defendants withheld T.S.'s health information and "mis"-treated her for gender dysphoria. *Id.* ¶¶ 55–85.

In April 2024, the Court dismissed without prejudice all claims except for Plaintiff's three claims involving T.S. (Counts I–III). ECF No. 43. The Court concluded that the Original Plaintiffs had not sufficiently alleged injury and so lacked standing to bring Counts IV–VIII. *Id.* at PAGEID # 533, 535. The Original Plaintiffs appealed the dismissal to the United States Court of Appeals for the Sixth Circuit, but that Court dismissed the appeal for lack of jurisdiction, finding that the collateral order doctrine did not apply. ECF No. 59 at PAGEID # 728.

While the Sixth Circuit appeal was pending, Defendants moved for summary judgment.[10] ECF No. 48. With guidance from the parties that "any next steps" in this case "will depend on the Court's ruling on the [motion] with respect to what claims, if any, remain pending," the Court proceeds to analyze Defendants' motion.

_____

[9] Plaintiff confirmed her understanding during her deposition, when she testified that her daughter is not a party to this case and that she brings claims on her own behalf, not on her daughter's behalf. D.S. Dep. 10:10-15, ECF No. 46.

[10] Plaintiff responded to Defendants' motion for summary judgment but also moved for summary judgment on her claims therein. ECF No. 54. Because the dispositive motion deadline had passed, the Court resolved to construe Plaintiff's filing as a response to Defendants' motion for summary judgment but declined to consider the portion of the brief amounting to Plaintiff's affirmative motion. ECF No. 58.

## III.    STANDARD OF REVIEW

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a): "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The Court must grant summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and "on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine dispute of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 255 (1986).  The Court disregards "all evidence favorable to the moving party that the jury would not be required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted).  Summary judgment will "not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248 (internal citations and quotation marks omitted).

The Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). The Court may rely on the parties to highlight the specific portions of the record that demonstrate a genuine issue of material fact. *Wells Fargo Bank, N.A. v. LaSalle Bank N.A.*, 643 F. Supp. 2d 1014, 1022 (S.D. Ohio 2009).

## IV. ANALYSIS

At bottom, Plaintiff challenges how the school district acted (or failed to act) with respect to her daughter. Plaintiff insists that T.S.'s teachers were "brainwashing" her to believe that she was transgender and "treating" her for gender dysphoria. ECF No. 54 at PAGEID # 681–82; T.S. Dep. 119:21–120:7, ECF No. 47. For instance, Plaintiff asserts that when T.S. requested that her teachers refer to her by a different name and different pronouns, the teachers should have prodded T.S. and determined that her requests were in fact cries for help, rather than simply agreeing to use the name and pronouns. D.S. Dep. 74:22–75:16, 91:5-14, 106:1-25, ECF No. 46. Plaintiff further alleges that the school district withheld information about T.S.'s gender expression, encouraging T.S. to use school resources rather than talk to her parents. ECF No. 54 at PAGEID # 698.

Defendants raise numerous arguments in response to these points, which the Court addresses in turn below.

**A.    Claims against Board Members**

First, Defendants contend that Plaintiff's official-capacity claims against the

Board Members should be dismissed in favor of a *Monell* claim.  ECF No. 48 at

PAGEID # 639; *see also Monell v. New York City Dept. of Soc. Servs.*, 436 U.S.

658 (1978).  Plaintiff does not respond to this argument—her opposition brief

focuses solely on the Board's conduct and does not mention any individual Board

Members.  *See generally* ECF No. 54; *see also id.* at PAGEID # 682 (stating only

that "Defendant is Hilliard City School Board").

When a party "fails to address [an argument] in response to a motion for

summary judgment," any responsive arguments are deemed waived.  *Alexander*

*v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) (citations omitted).

Here, Plaintiff ignored Defendants' argument regarding the Board Members, so

the Court determines that Plaintiff has committed waiver.

Nonetheless, summary judgment for the Board Members is appropriate.

Plaintiff's claims against the Board Members in their official capacities amount to

claims against the Board itself and are thus duplicative, particularly since Plaintiff

is not suing the Board Members in their individual capacities and has put forth no

evidence that the Board Members had any personal involvement in the alleged

misconduct toward T.S.  *See Leach v. Shelby Cnty.*, 891 F.2d 1241, 1245–46

(6th Cir. 1989); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005).

Accordingly, summary judgment in favor of the Board Members on each of

Plaintiff's three claims is **GRANTED**.

**B.  Statute of Limitations**

Moving to Plaintiff's § 1983 claims against the Board (Counts I–II),

Defendants argue these claims are barred by the statute of limitations.  ECF No.

48 at PAGEID # 641.  The Court agrees.

"[A] prerequisite to bringing a § 1983 claim, like any other claim, is that it

must be brought within the applicable statute of limitations period."  *Hollis v.*

*Erdos*, No. 1:19-CV-436, 2020 WL 2395567, at *4 (S.D. Ohio May 12, 2020).

Because § 1983 does not contain its own statute of limitations, courts must look

to state law to determine the appropriate limitations period.  *Wallace v. Kato*, 549

U.S. 384, 388 (2007).  The appropriate statute of limitations for a § 1983 civil

rights action arising in Ohio is two years.  *Browning v. Pendleton*, 869 F.2d 989

(6th Cir. 1989) (referencing Ohio's personal injury statute); *see also, e.g.*, *Pittman*

*v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, No. 1:05-CV-00541, 2009 WL

2567776, at *4 (N.D. Ohio Aug. 17, 2009), *rev'd in part on other grounds*, 640

F.3d 716 (6th Cir. 2011) (applying two-year statute of limitations to case involving

claim that plaintiff was "deprived of his right to family integrity").

In this case, Plaintiff does not challenge the applicability of the two-year

limitation period to her federal claims—rather, she disputes the date on which the

period began to run.  ECF No. 54 at PAGEID # 700.  Although state law provides

the statute of limitations for § 1983 actions, federal law governs when that

limitations period starts.  *Wallace*, 549 U.S. at 388.  As a general rule, a cause of

action "accrues" and the statute of limitations begins to run when a plaintiff

knows, or has reason to know through the exercise of reasonable diligence, of the injury that provides the basis for the claim. *Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005).

Plaintiff's claims are founded on her belief that the school district treated her daughter for gender dysphoria and engaged in compelled gender-affirming care without telling her. ECF No. 54 at PAGEID # 681–82, 697. Plaintiff testified multiple times that she knew as of January 2021 that teachers had been referring to T.S. by a different name and pronouns. D.S. Dep. 30:15–31:6 ("Q. . . . What was at the—in your view, like what did you know during the Christmas break that the district was doing? A. That they were allowing her to go by a different name and a different pronoun."), 33:6-10 ("Q. It sounds like at least over the Christmas break, or at least by the end of January, you knew the school district was calling her [redacted] and calling her by a different pronoun, correct? A. Correct."), 38:9-13 ("Q. I got you. So you knew in January of 2021 that Ms. Baker was calling her [redacted]? A. Uh-huh. Q. And that she was using he/him with her? A. Correct."), 114:4-21 (Q. . . . She had mentioned in January 2021 that she was using—Ms. Baker was calling her [redacted] and also calling her he/him? A. Yes."), ECF No. 46. Plaintiff also testified that she saw the postcard reflecting the male name by January 15, 2021, at the latest. *Id.* at 24:3-17. As such, to fall within the two-year statute of limitations, Plaintiff needed to file her claims arising from this conduct by (at the latest) the end of January 2023.

Although the original Complaint in this case was filed on January 16, 2023, Plaintiff did not join the suit until the Amended Complaint was filed on February 8, 2023. ECF Nos. 1, 6. Under Federal Rule of Civil Procedure 15, when a new plaintiff is added to a case via amendment, that new plaintiff's claims do not relate back to the filing of an original complaint. *See In re Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448, 1449 (6th Cir. 1991) (quoting *Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6th Cir. 1973)) ("[T]he precedent of this circuit clearly holds that 'an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations.'"). That principle applies here, meaning that Plaintiff effectively filed her § 1983 claims on February 8, 2023, which is at least eight days after the two-year deadline.

Plaintiff's argument that she "was not fully informed until much later, when T.S. was receiving treatment, well after January 2021," ECF No. 54 at PAGEID # 700, is unpersuasive considering the above testimony. True, Plaintiff also testified that "[a] lot of what [she's] knowing now, [she] did not know back then." D.S. Dep. 121:4-11, ECF No. 46. But this vague and generalized statement does not outweigh the many times Plaintiff admitted that she was aware in January 2021 of the school's conduct surrounding the new name and pronouns. Even viewing the issue in the light most favorable to Plaintiff, her testimony establishes that, while she may not have been fully cognizant of every act or

incident involving her daughter,[11] she certainly knew about the name and pronoun usage—which ground her claims—by January 2021.

Plaintiff's § 1983 claims are time-barred, and summary judgment is **GRANTED** in favor of the Board.

## C.    Supplemental Jurisdiction

Having resolved Plaintiff's federal claims, the Court must determine whether to exercise supplemental jurisdiction over her remaining state-law claim (Count III) against the Board.

District courts are "courts of limited jurisdiction" that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Once a court has original jurisdiction over some claims in the action, it can exercise supplemental jurisdiction over additional claims that are part of the same case or controversy. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *Harper v. Auto All. Int'l, Inc.*, 392 F.3d 195, 209 (6th Cir. 2004). But supplemental jurisdiction is a matter of

---

[11] In this vein, the Court is mindful that claims filed after the applicable statute of limitations period may nevertheless not be time-barred if they involve "continuing violations." *Tolbert v. State Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999). Courts use a three-part inquiry to determine whether a continuing violation exists: (1) the defendant's wrongful conduct must continue after the precipitating event that began the pattern; (2) injury to the plaintiff must continue to accrue after that event; and (3) further injury to the plaintiff must have been avoidable if the defendants had at any time ceased their wrongful conduct. *Id.* "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Id.* (citing *National Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991)) (cleaned up). But Plaintiff does not assert a continuing violation here, *see generally* ECF Nos. 40, 54, and the Court will not make her arguments for her.

judicial discretion and "need not be exercised in every case in which it is found to exist." *United Mine Workers of Am.*, 383 U.S. at 726. When determining whether to exercise supplemental jurisdiction, courts should "consider and weigh several factors," including the "values of judicial economy, convenience, fairness, and comity." *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). District courts may also consider factors such as whether the plaintiff engaged in manipulation by dismissing federal claims, whether discovery had been completed, the degree of familiarity the court has with the issues, and if the court had invested significant time in the decision. *Gamel*, 625 F.3d at 952 (citation omitted).

On balance, the Court finds the weight of these factors is against the continued exercise of supplemental jurisdiction here. All federal claims have been resolved, such that only a state-law claim remains. There is "a strong presumption in favor of dismissing supplemental claims" once the federal claims have been dismissed. *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1250 (6th Cir. 1996) (citing cases). Plaintiff's IIED claim is **DISMISSED WITHOUT PREJUDICE** to refiling in state court.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion, ECF No. 48, is **GRANTED**. Defendants are entitled to summary judgment on Plaintiff's § 1983 claims, and

her state-law IIED claim is **DISMISSED WITHOUT PREJUDICE** to refiling in

state court.

    The Clerk shall enter judgment for Defendants on the § 1983 claims,

terminate ECF No. 48, and terminate this case.

    **IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**